# Exhibit

# Z

NEWSLETTERSUBSCRIBE

- Technology
- Leadership
- Entertainment
- Ideas
- Video
- News

11.16.16

# What It's Like To Chase After Superagent Ari Emanuel And WME-IMG

The hard-charging co-CEO talks about UFC stars as Hasbro dolls, "entrepreneurial" clients, and a memorable meeting with Harvey Weinstein.



**Ari Emanuel**

f

Twitter

in

✉

**BY NICOLE LAPORTE**

LONG READ

While reporting my feature on WME-IMG for the December issue of *Fast Company*, one of my biggest tasks was to try to find the nuance in the company's leaders, co-CEO's Patrick Whitesell and Ari Emanuel. Whitesell has been summed up as politic and even-keeled, while Emanuel can be reduced to caricature as an über agent whose explosive and outspoken exploits could fill eight-seasons-and-a-movie's worth of story lines. (For reasons that should be obvious, we vowed not to reference this now-cliched analogy in the feature.) The two men complement each other: Whitesell is described as the yin to Emanuel's yang. This relationship is true even physically. Whitesell is tall and fair. Emanuel has darkly etched features and a more compact frame.

So how to get past the logline summary of these two agents-slash-media executives? The most helpful explanation I got was from another WME-IMG exec who explained that Emanuel is the constantly-in-motion ideas guy. (Quite literally—he has treadmil desks installed in all of his offices.) A tireless machine who is passionate about every detail, every possibility. Whitesell, by contrast, can spend more than an hour over the phone calmly going over strategy, point by point.

But one of my favorite insights came from David Lonner, who formed the talent management company Oasis after a career agenting folks like J.J. Abrams and Alexander Payne. Lonner worked with both Whitesell and Emanuel at Endeavor, the startup agency that Emanuel formed in 1995 with three alums of the talent agency ICM. Lonner compared Whitesell to Tom

Brady, the handsome New England Patriots quarterback. "He's Teflon when the shit rains down," Lonner says. "And he can make everything OK with his smile." As for Emanuel, Lonner told me about showing up at Endeavor and asking Emanuel about leadership at the company. What was the dynamic between the founders, what role did each of them play? Emanuel described his own role in just three words: "I'm the juice."

Two decades later, Emanuel, 55, remains the energizing force of his company, which has evolved into a global media empire that does far more than represent TV writers and directors, as Endeavor did in its earliest days. And Whitesell, who joined Endeavor in 2001, is still the star quarterback who's keeping things steady as WME-IMG grows at a dizzying clip—over the last two years it has acquired more than 20 companies. But if there is a personality and tenor to WME-IMG, which retains the rebellious, anti-establishment coda of Endeavor, it's defined by Emanuel.

Trying to capture that tenor for this story proved to be a Herculean task given Emanuel's constant globe-trotting. Meetings with him were rescheduled over and over again because he had to fly to Chile, London, New York, and China (during the reporting of this story, WME-IMG struck a joint venture with Tencent and Sequoia Capital China). As he told me when I eventually pinned him down more than four months into my reporting, "Most of Hollywood stays in Hollywood. No one's getting on a plane and going to Argentina for three meetings. Flying 14 hours for three meetings. And then getting on a plane and flying to London. Or going to China for a lunch and a dinner and coming back. I don't give a shit. I did it last weekend." Other times, he would vanish because of duties at home. One Friday night last June, I spied him at the Made LA fashion event, which WME-IMG owns and produced, but he left in time to be home by 7 p.m. for Shabbat dinner.

One thing I learned is that Emanuel is simply more comfortable being improvisational, and it was in our more impromptu encounters over the course of the six months I spent reporting this story that I got a truer sense of what it's like to work with him. Once, when I was scheduled to have lunch with WME-IMG's chief publicist, Christian Muirhead, to discuss the story, I received a call while en route to the restaurant and told, "Ari will be there." It's the kind of news that jolts, and slightly terrifies you. I hadn't spent time preparing questions or getting my head wrapped around what the story I was about to start reporting even was. And yet it ended up being a very rewarding lunch precisely because I didn't march in with a full notepad; the mood was easy and low-stakes. And let's face it, you don't really need to prepare for Emanuel. He's every reporter's dream—whip-smart and uncensored—no matter what the scenario.

For the record, he seems to delight in sudden appearances. He similarly jet-packs in on lunches with young WME-IMG agents as a way of keeping lines of communication open. (When one agent found out who his lunch partner would be one day, he decided to go home and change.) And a few times he popped in unannounced while I was interviewing other executives. "What the fuck are you guys talking about?" he said on one occasion. Then he playfully entered the room and plopped down on a couch. He stayed for about 10 minutes, then got up and left. Twenty minutes later he was back. "You guys are *still* talking?"

This Ari, as everyone calls him—the jokey, funny, profane one—is the one I mostly got to see over the course of my reporting. But I also saw "human Ari," who talks about his kids and making time for them with the little time that he has, and about his brothers Rahm and Zeke. This Ari also talks about being "less crazy" than he used to be, something he said somewhat wistfully and attributed to age; and about being an avid practitioner of meditation. Emanuel swears by the school known as
One World, and has organized meditation retreats with friends. When I asked

him why One World, which requires hours of sitting cross-legged on the floor with your eyes closed, Emanuel says that he likes it because it doesn't require chanting any mantras and that, "It says it's OK to be mad!"

Not that he's always so Zen. He has a moody side, which I saw glimpses of as well. It tends to set in abruptly and then dissipate just as quickly. Sources, even those who adore him, say you don't always know what you're going to get when Emanuel picks up the phone. It could be "Bubbe, I love you, what do you want? I'll do anything for you." Or it could be, 'What the *fuck* do you want?" His passion, his intensity, his anger—he doesn't hide any of it.

Eventually, I did get my sit-down with Emanuel. It was worth the wait. Not many people get the opportunity to chat at length with him, particularly without Whitesell by his side, so there's value in hearing direct from one of the most dynamic forces shaping the future of media and entertainment. Yes there was braggadocio (he's an agent, after all), but overall he was thoughtful and insightful, and came across as an executive who is working harder than perhaps anyone in Hollywood to crack the code of what it means, in 2016, to be an entertainment company. What with China about to devour the movie industry, streaming companies like Netflix redefining television, and major mergers such as the proposed AT&T and Time Warner marriage shaking up the studio landscape, Hollywood has never been more in flux. Emanuel and Whitesell have decided to jump in feet first and start figuring out ways to make this new, rapidly changing reality work for them and their clients. And as my story about their ambitions suggests, they're not giving up without a fight.

Here are excepts from my chat with Emanuel:

Fast Company: In 2016, how do you look at your clients? Others at WME-IMG use the term "entrepreneurial" to describe how they view talent.

Ari Emanuel: Everybody looks at it differently. There no right answer. The clients that I kind of relate to, either are very deep, like Aaron Sorkin. He's a writer—theater, television, movies. Now he wants to be a director, so we're gonna try that. But like Adam McKay or Mark Wahlberg or Charlize Theron or Pete Berg. It's, you know . . . [he makes a horizontal line with his hands to indicate their steady state]. But other people like Oprah or Tyler Perry. Michael Bay. He produces movies, he directs movies, he does indie movies, he does TV. He does commercials. Some agents say, No, I just want the TV writers. That's what they love to do. There's no right answer. For me? I need clients that I can help grow.

When you started as an agent, the business was fairly straightforward. You sell a show, it becomes a hit, you're golden thanks to syndication revenues. Move on to the next show.

That was us. 1995. Three shows. *King of the Hill, Ally McBeal, Boston Legal.*

Today, obviously, times have changed. The business has become more fractured, movie and TV deals aren't what they used to be (for the most part), thus your job is more complicated . . . .

It's the George Gilder book. *Life After Television.* The world of 10,000 networks. (*Life After Television: The Coming Transformation of Media and American Life* was first published in 1990.) So there's network shows. There's cable shows. YouTube shows. Yahoo shows. AOL shows. Netflix shows. Hulu shows. Apple shows.

Do you prioritize any?

No. Whatever's best for the client. Or, here's where I think it's best.

Do most people in Hollywood see it that way?

No.

When did you see this new landscape taking shape?

When I read that book. I said, O.K., we're gonna do this. And then you started seeing it happen.

Since the merger between WME and IMG, there has been some confusion about what you guys are doing. Why, for instance, do you buy something like Professional Bull Riders? How does it serve your talent business? And—

Here's the great thing about the platform. And I think everybody's beginning to get it. The IMG side, the WME side. Fifty percent of our business is representation. It's kind of like a little VC into what we can do, what properties we should go after to own. And 50% is owned. We have to really be Jekyll and Hyde in a good way.

So the good thing about the platform and the size of the company is, you can get a sense of what's going on in the world. Movies, TV, books, internationally, artists, musicians, chefs. So the book department is now publishing books from the hot, new chefs out of the U.K. The hottest area in chefs. So the people in LA or NY, in the reality area, can go sign them and create shows. And if we have 28 food festivals, depending on what we're gonna do with food, you can create shows, either sell them or create licensing product off of them. You're constantly being able to learn what's happening in the world through the platform and through the intel inside of the system.

The problem for competitors, and I consider many people competitors, is that we're unique. There's no place that, 50% of your business is owned, 50% of

your business is represented. You get a lot of different intel. What we have to get better at is making that intel more available, faster. Which we're continuing to work on.

Over the summer you were part of a consortium of investors that bought UFC for $4 billion. How does your talent engine play into the league? Will we be seeing more UFC stars in movies?

"We've got a list of 25 male stars and about 15 female stars. So we just started. We're in conversations with Hasbro to do dolls. We're in conversations with some of the magazines to do profiles on the women. We're just now beginning the process of building the brand and building their name recognition. We're then gonna, we got Conor McGregor—he's just not available—an offer to do *Game of Thrones*. He's not available. He's gotta fight. [Tyron] Woodley has done two movies, he met with the agency. So we're now just gonna start start building profiles. We'll put teams on 'em and start building profiles with endorsements, etc.

Even today, 20 years after you formed Endeavor, that company's street fighter mentality still seems imbued in your latest company. Do you agree?

[With Endeavor] I didn't want to be part of something. I wanted to create my own thing. Remember, I'd been an agent for like four and a half, five years at that point. I was, as my father would say, I was a *pisher*. And I said, Fuck it. These guys (at ICM) are geniuses? Really? What's the worst that could happen?

You know, in the first six months, did anyone ever tell you this story? We're at Endeavor. We get all this press for no reason. Zero reason. Harvey Weinstein calls me. He says, 'On Friday morning, you have to be in my hotel room at 8 o'clock.' We show up. [Endeavor partners] (David) Greenblatt, (Tom)

Strickler, Rick (Rosen), myself. He's got four chairs. He comes out, his shirt's on backwards, got stains on it. He goes, 'William Morris is going to buy you for $10 million. You're all going to work for William Morris.' He's telling us. I said, 'No, no, no. I'm gonna buy them. I'm not doing that!' We got up and left.

And in 2009, you did basically buy them. [Endeavor merged with William Morris, though it was effectively a takeover by Emanuel and Co.] What about CAA? They've historically been your biggest rival. Today, WME-IMG and CAA are the two biggest agencies in Hollywood and are distinguishing themselves from other agencies in similar ways.

If I had what they (the Young Turks that took over CAA when co-founders Michael Ovitz and Ron Meyer left in the 1990's) had when they had it, what I would have done with it is unbelievable. I should pay [CAA's private-equity backer] TPG to keep [CAA President] Richard Lovett in that job for the next 10 years. Though I don't think about them. I actually don't, except when people bring it up to me. We have a lot of work to do. I'm really happy about the amount of work we have to do. It's the most creative work, business-wise, that we're gonna have to do. I feel great about the challenge. Because it's gonna take a whole new mindset to get everyone where we have to go. Because now 50% of our business we own, and it's ours to lose. We can only fuck it up. We can no longer say, 'The client didn't do that. The buyer didn't do that. It's ours. We either win, we lose. It's us. The only person we're looking at is the guy in the mirror. I love that challenge for myself and Patrick. I love it."

*A version of this article appeared in the December 2016/January 2017 issue of Fast Company magazine.*

---

ABOUT THE AUTHOR

Nicole LaPorte is an LA-based writer for Fast Company who writes about where technology and entertainment intersect. She previously was a columnist for *The New York Times* and a staff

writer for *Newsweek/The Daily Beast* and *Variety*. More

---

# Fast Company Daily Newsletter

YOUR EMAIL ADDRESS                                                    SIGN UP

☑ Receive special Fast Company offers                          See All Newsletters

---

## VIDEO

**How This Google Employee Transformed His Career During A Bad Job Market**

Google UX's Jason Cornwell learned a valuable lesson about how to approach AI early on t...



How This Google Employee Transformed His Career During A Bad Job Market

---

# Exhibit

# AA

1  KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
   MICHAEL J. KUMP (SBN 100983)
2    mkump@kwikalaw.com
   GREGORY P. KORN (SBN 205306)
3    gkorn@kwikalaw.com
   808 Wilshire Boulevard, 3rd Floor
4  Santa Monica, California 90401
   Telephone: 310.566.9800
5  Facsimile: 310.566.9850

6  Attorneys for Defendants
   NEILL BLOMKAMP, SONY PICTURES
7  ENTERTAINMENT INC., TRISTAR
   PICTURES, INC., MEDIA RIGHTS
8  CAPITAL II, L.P., and QED
   INTERNATIONAL, LLC

9

10            **UNITED STATES DISTRICT COURT**

11       **NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)**

12

13  STEVE WILSON BRIGGS,            Case No. CV 13-4679-PJH

14            Plaintiff,
                                    **DEFENDANT MEDIA RIGHTS**
15       vs.                        **CAPITAL II L.P.'S RESPONSE TO**
                                    **PLAINTIFF'S FIRST SET OF**
16  NEILL BLOMKAMP; SONY            **INTERROGATORIES**
    PICTURES ENT., INC., TRISTAR
17  PICTURES, INC., MEDIA RIGHTS
    CAPITAL, and QED
18  INTERNATIONAL,

19            Defendants.

20

21

22  PROPOUNDING PARTY:      Plaintiff Steve Wilson Briggs

23  RESPONDING PARTY:       Defendant Media Rights Capital II, L.P.

24  SET NUMBER:             One (1)

25

26

27

28

---

DEFENDANT MEDIA RIGHTS CAPITAL'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

*(left margin, vertical text)* KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

Pursuant to Fed. R. Civ. P. 33, Defendant Media Rights Capital II L.P. ("Defendant") hereby responds to Plaintiff Steve Wilson Briggs's ("Plaintiff") First Set of Interrogatories, as follows:

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1.      As of the date hereof, Defendant has not yet had a sufficient opportunity to discover or otherwise obtain and review all documents and materials which may have some bearing on this case.  Consequently, these responses are based only upon such information and documents currently available, known to or understood by Defendant.  As this action proceeds, Defendant anticipates that further discovery, research and analysis may supply additional facts and additional meaning to the known facts.  Defendant reserves its right to use, as evidence in this action, any hereafter-acquired or -discovered information which would have been responsive to these interrogatories.

2.      Defendant will make reasonable efforts to respond to every interrogatory, to the extent it has not been objected to, as Defendant understands and interprets the interrogatory, provided that the interrogatory is not so vague and ambiguous that response is impossible.  If Plaintiff subsequently asserts an interpretation of the interrogatory which differs from that of Defendant, Defendant reserves its right to supplement its objections and responses as necessary.

3.      These responses are not in any way to be deemed an admission or representation that there are no further facts, documents or witnesses having knowledge relevant to the subject matter of these interrogatories.

4.      Defendant objects to these interrogatories to the extent that any interrogatory seeks information which is protected from discovery by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or doctrine.  Defendant will not disclose any such protected information in response to these interrogatories.

5.      Defendant's responses are made solely for the purposes of this action.

DEFENDANT MEDIA RIGHTS CAPITAL'S RESPONSE TO PLAINTIFF'S FIRST SET OF INTERROGATORIES

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  No incidental or implied admissions are intended by these responses.

2       6.    Defendant objects to the interrogatories in their entirety to the extent

3  that they purport to impose obligations on Defendant beyond those set forth in the

4  Federal Rules of Civil Procedure and Rules of Court.

5       7.    With respect to any interrogatory to which Defendant responds,

6  Defendant does not concede the relevance or materiality of the interrogatory or the

7  subject matter to which it relates.  These responses are made by Defendant subject

8  to, and without in any way waiving or intending to waive:

9       a.    Any objections as to competency, materiality, privilege,

10 relevancy, propriety, admissibility and/or any other objections on grounds which

11 would require exclusion of any information contained herein;

12      b.    The right to object to other discovery proceedings involving or

13 relating to the same subject matter as the interrogatories; or

14      c.    The right at any time to revise, correct, add to, or clarify any of

15 the responses set forth herein.  Furthermore, these responses are given subject to

16 correction of any omissions or errors.

17      8.    Defendant objects to these interrogatories, and to the definitions

18 contained therein, to the extent that they call for the disclosure of confidential,

19 private, proprietary and/or trade secret information.

20      9.    Defendant's responses are made subject to all general stated and

21 specific objections, and Defendant specifically reserves the right to reassert those

22 objections by motion or at the time of trial.

23

24                    **RESPONSES TO INTERROGATORIES**

25 **INTERROGATORY NO. 1**

26     How did you meet (or how were you introduced to) Neill Blomkamp?

27 **RESPONSE TO INTERROGATORY NO. 1**

28     Defendant incorporates by reference the preliminary statement and general

KINSELLA WEITZMAN ISER KUMP & ALDISERT LLP
808 WILSHIRE BOULEVARD, 3RD FLOOR
SANTA MONICA, CALIFORNIA 90401
TEL 310.566.9800 • FAX 310.566.9850

1  objections set forth above.  Defendant objects to the request on the basis that it seeks

2  information that is neither relevant nor reasonably likely to lead to the discovery of

3  admissible evidence.  Subject to and without waiving the foregoing objections,

4  Defendant responds as follows:

5       Defendant was introduced to Neill Blomkamp through his agent.

6  **INTERROGATORY NO. 2**

7       Please explain exactly what role MRC played in filming, writing, producing,

8  financing, distributing, etc., the film Elysium.

9  **RESPONSE TO INTERROGATORY NO. 2**

10      Defendant incorporates by reference the preliminary statement and general

11  objections set forth above.  Defendant objects to the request on the basis that it is

12  overbroad, unduly burdensome ,and harassing.  Defendant objects to the request on

13  the basis that it calls for a narrative.  Subject to and without waiving the foregoing

14  objections, Defendant responds as follows:

15      The entity named in this lawsuit and referred to by Plaintiff as "MRC," Media

16  Rights Capital II L.P., had no role in the writing, production, financing, or

17  distribution of *Elysium* (the "Film").

18  **INTERROGATORY NO. 3**

19      Under what business name or names (please provide all) did MRC sign any

20  and all contracts and/or agreements related to making the film Elysium?

21  **RESPONSE TO INTERROGATORY NO. 3**

22      Defendant incorporates by reference the preliminary statement and general

23  objections set forth above.  Subject to and without waiving the foregoing objections,

24  Defendant responds as follows:

25      The entity named in this lawsuit and referred to by Plaintiff as "MRC," Media

26  Rights Capital II L.P., signed no contracts relating to the production of the Film.

27      An entity named MRC II Distribution Company L.P. entered into various

28  agreements in connection with the Film, including, *inter alia*, a distribution