# Exhibit MM

Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Telephone: (510) 200 3763
Email: snc.steve@gmail.com

Pro Se Plaintiff

ORIGINAL FILED

JUN 12 2014

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA (OAKLAND)

| | |
|---|---|
| STEVE WILSON BRIGGS<br><br>Plaintiff<br><br>vs.<br><br>NEILL BOMKAMP, SONY PICTURES ENT., INC., TRISTAR PICTURES, INC., MEDIA RIGHTS CAPITAL II,L.P., and QED INTERNATIONAL<br><br>Defendants | CASE NO:   CV 13 4679 PJH<br>Judge: Honorable Phyllis J. Hamilton<br><br>**NOTICE OF MOTION AND MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date:         July 23rd, 2014<br>Time:        9:00 a.m.<br>Courtroom: 3<br>Judge:       Hon. Phyllis J. Hamilton |

**PLAINTIFF'S MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN**

   **PLEASE TAKE NOTICE** on July 23rd, 2014, or as soon thereafter as the matter may be heard, Plaintiff, Steve Wilson Briggs, moves this Court for action in the courtroom of the Honorable Phyllis J. Hamilton, Oakland Courthouse, 3rd Floor, 1301 Clay Street, Oakland, CA. **SCEDULING NOTE**: Plaintiff will be out-of-state for his son's HS graduation 6/18/14 to 6/28/14.

   **Statement of Purpose.** This motion will be based on the Memorandum Of Points And Authorities, and the Proposed Order filed herewith, moving the Court to Disqualify the Defendants' expert witness, Jeff Rovin, and his report (Expert Report Of Jeff Rovin). The Court has this remedial authority under F.R.C.P. Rule 11, and the Inherent Powers Doctrine. Plaintiff seeks this intervention due to:

1) Unconscionably false and fraudulent statements found in Rovin's report, which were NOT

- 1 -
NOTICE OF MOTION & MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN

provided in good faith. Rather, they were dishonestly provided to serve the Defendants. Rovin's shameless dishonesty includes altering the works of, misquoting and distorting other authors –even falsely referencing his own work. Plaintiff believes the first cited example of <u>Fraud On the Court</u> (page 3, under heading "Example I") should be grounds for witness disqualification alone, as the act amounts to Mr. Rovin fabricating evidence purporting to substantiate his claims against Plaintiff's.

2) Rovin's report is entirely premised on 9 false citations and fragmentations of Plaintiff copyright claims ("fragmentations" meaning: extractions of small portions of the much larger, complex collection of ideas Plaintiff presented in his Amended Complaint claims).

**NOTE 1: The copyrightability of detailed plots is established and upheld by cases such as: <u>Sheldon v. Metro-Goldwyn Pictures Corp.</u>, 81 F.2d 49 (2d Cir. 1936); <u>Nichols v. Universal Pictures</u>; 45 F.2d 119 (2d Cir.1930), cert denied 282 U.S. 902 (1931); <u>Metcalf v. Bochco</u>, 294 F.3d 1069; <u>Atari Games Corp. v. Oman</u>, 979 F. (2d) 242 (Cir DC 1992)**

**NOTE 2: <u>Ideas are not copyrightable. However, collections of ideas: plot, settings, themes, etc., are.</u> Thus, the idea of a "robot" is not copyrightable –but a gold-plated, man-shaped robot with a British accent is copyrightable (George Lucas's C3PO). By combining ideas unique expressions are born. In his Amended Complaint, Plaintiff showed collections of ideas, events, settings, themes, etc., as his copyright. Rovin dismantled Plaintiff's claims into non-copyrightable fragments**

3) Mr. Rovin provided false statements and false citations of other works throughout his report.

4) Mr. Rovin is NOT a copyright expert, and is unqualified to opine as such.

5) Mr. Rovin misstated and inflated his qualifications, and is undereducated as an "expert".

## MEMORANDUM OF POINTS AND AUTHORITIES

This motion to disqualify the Expert Report Of Jeff Rovin (and the expert" himself) is based on facts and evidence that in his report, Mr. Rovin: 1) engaged in extreme and persistent dishonesty to the Court; 2) altered, fragmented and mischaracterized Plaintiff's copyright claims; 3) provided very false, unreliable citations; 4) Mr. Rovin is not a copyright expert; 5) Mr. Rovin inflated his qualifications and is undereducated; 6) his lack of copyright qualifications led him to many ill-informed claims (particularly those concerning scènes à faire).

### FRAUDULENT, DISHONEST AND INACCURATE CONTENT OF ROVIN REPORT

What follows are but a few of Mr. Rovin's many fraudulent statements in his report.

### EXAMPLE I

On page 47, paragraph 1 of his report, Mr. Rovin shamelessly lies to the court as he "quotes" Murray Leinster's *Space Platform*. Rovin writes: "The platform was guarded like no object in history had ever been guarded... But the greatest irony of all was that **(it's proponents)** would in time become rich beyond envy."

**IN TRUTH:** this is a shockingly fraudulent statement. In quoting Leinster, Rovin inserts the parenthetic phrase "it's proponents" for a seemingly harmless omission, then continues the quotation, as if he's simply chosen a different pronoun. **But, in fact, Mr. Rovin had removed 42 words and an entire paragraph.**

**The 42 words Rovin has removed are 180 degrees the opposite of what Mr. Rovin suggests, and have nothing to do with any proponents. The actual words Rovin removed read:** "...its most probable immediate usefulness would be the help it would give in making nuclear experiments that weren't safe enough to make on Earth. That was the pure irony. Because if those experiment were successful, they could mean that everybody in the world..." This is where Rovin cuts back to his falsified point. But Leinster's final sentence should have have read: "Because if those experiment were successful, they could mean that everybody in the world in time would become rich beyond envy." **[EXHIBIT A, pp 131, 132]**

Leinster words showed hope that our future in space would make everyone rich beyond envy. But for personal gain, and the gain of the Defendants, Rovin lied and altered Leinster's work, replacing Leinster's optimism with cynicism –to make Leinster's work seem more like Plaintiff's.

### EXAMPLE II

In his report, Rovin's false statements are so widespread, at times, he doesn't even realize when he's plainly contradicting his other false statements, Compare EXAMPLE (A) and (B):

**EXAMPLE (A):** on page 45, paragraph 1 of his report, Mr. Rovin suggests getting to Uberopolis is easy for Plaintiff's hero, Arlo. Rovin writes: "Plaintiff's hero, Arlo, easily passes through customs and onto a shuttle to get to Uberopolis."

**EXAMPLE (B):** six pages later, Mr. Rovin says the exact opposite, admitting Arlo needed to SNEAK to Uberopolis and use FAKE IDs. Page 51, paragraph 2, of his report, concerning Plaintiff's *Butterfly Driver*, Rovin writes: "While the hero Arlo does need fake I.D. to sneak on to
- 3 -
NOTICE OF MOTION & MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN

Uberopolis, that is only because he is a fugitive."

## EXAMPLE III

On page 46, paragraph 4 of Rovin's report, Rovin writes: "Murray Leinster's *Space Platform* (1953) presented the core elements that the plaintiff claims as proprietary – a space station that is resented by those who are not aboard, a base that not only represents wealth but is a fortified sanctuary removed from the threat of war hanging over the Earth:" (*ignoring the fact that I, Plaintiff, never made this proprietary claim).

**IN TRUTH: Mr. Rovin's statement is simply astonishing. In Leinster's *Space Platform* there is no "space station" that Rovin speaks of. There is no "base that represents wealth," which Rovin invents. Period.**

Leinster's Space Platform is a sci-fi/adventure/mystery about a platform that is being built on a U.S. military base, on Earth. When the platform is completed it is going to be transported into space by rockets, to be the foundation of a future space station. **All of the action takes place on Earth. In the final 5 pages the platform is rocketed into space, as hero, Joe, and his friends watch from Earth. At no point in the story was the Platform ever manned. At no point was the platform ever a space station" that was "resented by those who are not aboard" (as Rovin invented), since the platform is unmanned. Nor did the U.S. military base "represent wealth…" as Rovin claimed.**

## EXAMPLE IV

Another of Rovin's inventions comes when Rovin just declares that my (Plaintiff) genetically reprogrammed villain, "Drexler", is NOT genetically reprogrammed at all –which is false, of course. Rovin either didn't understand the screenplay, or just chose to misstate it. Rovin states Plaintiff's villain only "…looks younger than he claims to be only as a secondary bi-product of this subterfuge." (p 72, para 1). Beyond his deceit, Plaintiff hopes the Court is also offended by Mr. Rovin's quote, which is plainly intended to confuse, as it contextually meaningless.

**IN TRUTH: How Rovin arrives at this errant conclusion defies logic –particularly when one considers, even if we took away the fact that Plaintiff's "Drexler" looks half his age, Drexler is still immensely strong (from the reprogramming). Additionally, the character *Jerry***

1  *Matthiessen* confirms Drexler (Midland's) DNA had been reprogramed in a DNA analysis
2  (p 90, Butterfly Driver). And as Drexler prepares to kill Arlo, he reaffirms his genetic
3  reprogramming when he plainly states, "I'm immortal." [page 99, Butterfly Driver]

### EXAMPLE V

Mr. Rovin writes (on page 38 of his report, para 2): "<u>In another example of separating rich from poor, the 2004 comic book Ministry of Space was set on a space station where blue collar people of color were segregated from white citizens.</u>"

**IN TRUTH:** *Ministry of Space* was set primarily on Earth, with a few short excursion into space, primarily in rockets, but also to a lunar station and two quick excursions to space stations --**but it was not set on a space station as Mr. Rovin dishonestly declares.**

The insert picture Rovin uses to reinforce his point (p. 38 of his report) was taken from the last page and last panel of the comic. But Mr. Rovin has meticulously cut out the word "END" from his insert photo. This, so the Court wouldn't see he had taken the photo from the **last page, last panel.** He did this because he had falsely suggested the Space Station was the comic's primary setting, and using an insert from the last page, last panel would raise doubt about that false claim. But as seen in **[Exhibit B]** a side by side comparison of the panel from the actual graphic novel (top) and Rovin's insert (bottom), Rovin has cut the word "END".

### EXAMPLE VI

Mr. Rovin cites his own work FOUR times in his report (page 19, 38, 48, 58). The most surprising of these self-citations occurs on page 58 of his report, when Mr. Rovin gives a false account of his book, *"The Transgalactic Guide to Solar System M-17"*–an extremely hard to find book, which ran only one printing, in 1981, on Perigee Books.

Page 58, para 1 of his report (concerning his book) Rovin writes: "<u>For my own science fiction, The Transgalactic Guide to Solar System M-17, I created an **exclusive** space settlement that offers royal accommodations with advanced medical facilities for those who can afford them...</u>"

**IN TRUTH:** Mr. Rovin calls his swan-shaped spaceship "exclusive", to make Plaintiff's satellite city for the rich seem less unique. But Mr. Rovin's own description, from his book, confirms Rovin has mislead the Court, as his space swan is NOT exclusive. On page 28, para

- 5 -
NOTICE OF MOTION & MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN

*Matthiessen* confirms Drexler (Midland's) DNA had been reprogramed in a DNA analysis (p 90, Butterfly Driver). And as Drexler prepares to kill Arlo, he reaffirms his genetic reprogramming when he plainly states, "I'm immortal." [page 99, Butterfly Driver]

### EXAMPLE V

Mr. Rovin writes (on page 38 of his report, para 2): "<u>In another example of separating rich from poor, the 2004 comic book Ministry of Space was set on a space station where blue collar people of color were segregated from white citizens.</u>"

**IN TRUTH:** *Ministry of Space* was set primarily on Earth, with a few short excursion into space, primarily in rockets, but also to a lunar station and two quick excursions to space stations --**but it was not set on a space station as Mr. Rovin dishonestly declares.**

The insert picture Rovin uses to reinforce his point (p. 38 of his report) was taken from the last page and last panel of the comic. But Mr. Rovin has meticulously cut out the word "END" from his insert photo. This, so the Court wouldn't see he had taken the photo from the **last page, last panel.** He did this because he had falsely suggested the Space Station was the comic's primary setting, and using an insert from the last page, last panel would raise doubt about that false claim. But as seen in **[Exhibit B]** a side by side comparison of the panel from the actual graphic novel (top) and Rovin's insert (bottom), Rovin has cut the word "END".

### EXAMPLE VI

Mr. Rovin cites his own work FOUR times in his report (page 19, 38, 48, 58). The most surprising of these self-citations occurs on page 58 of his report, when Mr. Rovin gives a false account of his book, *"The Transgalactic Guide to Solar System M-17"*–an extremely hard to find book, which ran only one printing, in 1981, on Perigee Books.

Page 58, para 1 of his report (concerning his book) Rovin writes: "<u>For my own science fiction, The Transgalactic Guide to Solar System M-17, I created an **exclusive** space settlement that offers royal accommodations with advanced medical facilities for those who can afford them...</u>"

**IN TRUTH:** Mr. Rovin calls his swan-shaped spaceship "exclusive", to make Plaintiff's satellite city for the rich seem less unique. But Mr. Rovin's own description, from his book, confirms Rovin has mislead the Court, as his space swan is NOT exclusive. On page 28, para

1  4, Rovin writes: "*Space is for everyone. And Transgalactic works hard to make it as accessible*
2  *as a trip to any city, park, resort, of your home world.*" [Exhibit C]. **In the next paragraph**
3  **(pp 28, 29, Exhibit C) Rovin shows the "Swan" is so <u>un</u>exclusive that only by committing a**
4  **crime is one's access restricted.** Rovin writes: "*MasterPass cards will not be issued to anyone*
5  *who, within the previous three years, has been convicted of a crime involving artificial aging or a*
6  *fine exceeding twenty-five Standards.*"

EXAMPLE VII

8  Under the heading "A Hero Prone To Excruciating Headaches" (p 63-68) Rovin cites five
9  works (all having no resemblance to the Plaintiff's works, as the headaches are not recurring
10 headaches originating in the hero's own head). In three of Rovin's examples the headaches are
11 caused by external forces (a "disembodied brain", "telepathic mutants", and "anti-radiation shots);
12 the other two headache examples occur only once –and are not recurring affliction headaches.

13 But the issue here occurs on Page 66, para 1, where Rovin writes: "<u>The comic book *Warp*</u>
14 <u>(1983) is about an ordinary Earthman who is about to become a space hero (on a space habitat) and</u>
15 <u>who suffers crushing headaches.</u>" Mr. Rovin also provides an insert image of page 4 of the first
16 issues of the comic series in which the character is having a terrible headache.

17 **IN TRUTH: The comic *Warp* only ran 19 issues. Over the course of all 19 issues the**
18 **main character, David Carson, has only one headache which occurs in the first issues (page 4-**
19 **7) –although Rovin claimed this character suffers "headaches" –plural.**

VIII

21 I will spare the Court the tedium of citing each of Rovin's many other false statements or
22 dishonest manipulations of language. But the following few brief "for instances" are provided to
23 confirm that many more examples abound in Rovin's report.

24 A) Rovin uses the inventive terminology *"stratospheric" utopian city* (p. 32) then
25 *"stratospheric" habitat* (p.39) concerning two works that feature cities that float in the
   atmosphere a few hundred or thousand feet about their planets. Rovin omits the term
26 "floating" and uses the term "stratospheric" hoping to induce the Court to conceive these
   cities as possibly orbiting in space (which they are not) much as Plaintiff's satellite.

27 **IN TRUTH:** the most galling aspect of Rovin's deceitful language is BOTH of Rovin's
   examples show cities floating in fluffy clouds; yet, on Earth, clouds are found in the
28 troposphere –not the stratosphere, as the stratosphere is too high.

B) Under the heading "The Satellite Serves as a Refuge For The Rich," (p 32, para 2) Mr. Rovin observes that Christopher Stasheff's novel *A Wizard in Bedlam* "features 'a successful planetary colony –for the very rich."
**IN TRUTH:** Stasheff's *Wizard in Bedlam* was not about a space colony for the rich; it's about a colony established by the disenfranchised "…people who were sick and tired of not being able to have things their own way" (p 19). Further the colony was set on a large planet –not a satellite or a space station, as Rovin's heading requires.

C) Under the heading "The Satellite Serves as a Refuge For The Rich," (p 30, para 3):: "…the space station is exclusively inhabited by the rich…" Mr. Rovin wrote, commenting on Jack Vance's short story *Abercrombie Station*.

**IN TRUTH:** Abercrombie Station is not exclusively inhabited by the rich. In the short, Abercrombie Station is one of about 10 space station vacation resorts orbiting Earth. What makes Abercrombie Station unique is that it was a space resort for people who had stayed in space too long and had become obese and were attracted to other obese people. Wealth is not a requirement, corpulence is.

D) Mr. Rovin writes about Plaintiff's screenplay: "By contrast, in Plaintiff's screenplay, citizens enjoy '100 percent employment' and 'almost no crime'". (p. 16, para 2)

**IN TRUTH**: in Plaintiff's screenplay 65-95% of the world lives in impoverished "zones" (percentage varies depending on the script version). Only in the rich "State" areas do people enjoy 100% employment. In the poor "zones", children beg in the streets; the government routinely dumps its undesirables in these "zones", and kill masses of prisoners. All of this was shown, repeatedly, in Plaintiff's script.

## ROVIN REPORT PREMISED ON FALSELY CITING, ALTERING & FRAGMENTING PLAINTIFF COPYRIGHT CLAIMS

Ideas are not copyrightable –but collections of ideas, or "expressions", are copyrightable. For each of the Plaintiff's copyright claims Plaintiff detailed the unique aggregations of attributes that made his collection of ideas and features a copyrightable expressions.

Mr. Rovin divides his report into these 9 sections (*Rovin's sections headings mocks Plaintiff claim language, but have been altered to suit the Defendants' objectives).

1) A Dystopian Earth With Income Inequalities;
2) A Satellite Orbiting Earth;
3) The Satellite Serves as a Refuge For The Rich;
4) Special Identification For Entering The Satellite;
5) Disparate Medical Resources On Earth And On The Satellite;
6) The Protagonist Who Must travel To The satellite World For Medicine;
7) A Hero Prone To Excruciating Headaches;
8) A "Keepsake" Necklace;
9) A Genetically Reprogrammed Villain.

**IN TRUTH: Rovin's "sections" address simple ideas which have nothing to do with the complex, copyrightable aggregations Plaintiff claimed as his copyright in his Amended**

1 | Complaint. Thus, all the content in these nine sections (effectively the entire report) should be
2 | disqualified as **INCOMPLETE** and **TAKEN OUT OF CONTEXT**.

### FALSE, INADMISSABLE CONTENT CITED THROUGHOUT ROVIN'S REPORT:

Several of Rovin's cited works are not just wrongly cited, they **are NOT PRIOR WORKS**. On page 42 Mr. Rovin cites the film WALL-E (2008) and the video game Mass Effect (November 2007). The first four existing drafts of the Plaintiff's screenplay were completed three years prior, in 2005, and the final draft was completed August 2007 –all well before the release of *WALL-E* or *Mass Effect* –making these citations inadmissible.

### UNQUALIFIED "EXPERT" ROVIN MISINFORMS COURT OF SCÈNES À FAIRE

Mr. Rovin provided wildly unfounded opinions concerning scènes à faire. These errant assertions were provided in bad faith (as an employee of the Defendants), or because he is not a copyright expert and is unqualified and ill-informed to opine in this arena, as he seems to have little grasp of the concept of "scènes à faire".

Scènes à faire are simple, general scenes that one would expect to see in a film of a particular genre. In a western, one would expect to see general scenes of cowboys riding on the range, maybe a bar fight, or maybe a gunfight. In a science fiction genre film (set in space) you might expect to see nifty spaceships and rockets; or in an Earth-based sci-fi genre film one might expect to see interesting flying vehicles in an ultra-modern cityscape. General. Nothing specific.

While Merriam-Webster's defines *scènes à faire* as "obligatory scenes", Wikipedia provides a more thorough, accurate and appropriate copyright definition/explanation of "scènes à faire":

> ***Scène à faire*** (French for "scene to be made" or "scene that must be done"; plural: *scènes à faire*) is a scene in a book or film <u>which is almost obligatory for a genre of its type</u>. In the U.S. it also refers to a principle in copyright law in which certain elements of a creative work are held to be not protected <u>when they are mandated by or customary to the genre</u>.
>
> For example, a spy novel is expected to contain elements such as numbered Swiss bank accounts, a femme fatale, and various spy gadgets hidden in wristwatches, belts, shoes, and other personal effects. <u>These elements are not protected by copyright, **though specific sequences and compositions of them can be**</u>.
>
> -Wikipedia:

Rovin dismantled small pieces of Plaintiff's massive claims, then wildly assured the Court the new, bite-sized aspects were scènes à faire. But In both instance Rovin was wrong and absurd.

**Example 1: page 46, line 15, Rovin claims as scènes à faire the "idea of people trying to**

sneak onto a space habitat" –which is also exclusively for the rich.

**IN TRUTH:** Rovin's example (concerning Plaintiff's work) is a very specific plot structure, and not at all scènes à faire, as no reasonable person would expect that a typical sci-fi film contain a scene in which people attempt to sneak onto a space habitat for the rich.

**Example 2: page 73 line 6, Rovin states plainly: "Any elements the works of Plaintiff and Defendants happen to share are scènes à faire..."**

**IN TRUTH:** Mr. Rovin's statement is absurd. I, Plaintiff, alleged dozens and dozens of instances of infringement in the Amended Complaint. Most of these claims are composite, complex claims involving specific plot structures, character details, etc. All of which, BY DEFINITION, are not scènes à faire. Yet, Rovin brazenly instructs the Court that all of these claims are scènes à faire.

Let's ignore Plaintiff's complex and countless copyright claims and focus just on the nine simple aspects Rovin extricated and modified, which are: 1) A Dystopian Earth With Income Inequalities; 2) A Satellite Orbiting Earth; 3) The Satellite Serves as a Refuge For The Rich; 4) Special Identification For Entering The Satellite; 5) Disparate Medical Resources On Earth And On The Satellite; 6) The Protagonist Who Must travel To The Satellite World For Medicine; 7) A Hero Prone To Excruciating Headaches; 8) A "Keepsake" Necklace; and 9) A Genetically Reprogrammed Villain. Once the definition of scènes à faire is understood, we see that NONE of Mr. Rovin's nine section headings are scènes à faire, as Rovin claimed –as no reasonable person would expect to find any of those aspects in the typical science fiction film –as they are not general "scenes", they are specific plot structures that would alter or dictate a film's entire plot.

## MR. ROVIN'S LACK OF QUALIFICATIONS

1. <u>MR. ROVIN IS NOT A COPYRIGHT EXPERT</u>.

    Mr. Rovin has interesting comics and literature credentials, but has no background in copyright IP or copyright law, making him ill-suited to opine on an infringement case.

2. <u>MR. ROVIN IS ESSENTIALLY UNEDUCATED</u>.

    A typical EXPERT witness in a copyright matter would be a copyright or intellectual property attorney. This usually means many years of college and law school. Yet, Mr. Rovin seemingly has no formal education beyond high school (p. 3, 4 of his report).

### 3. MR. ROVIN FALSIFIED AND MISSTATED HIS QUALIFICATIONS.

Among other inflated claims, Mr. Rovin claims to have "created" the short-lived comic company, *Atlas Comics*, 1974-75. This claim is also fraudulent. On page 3, para 2, line 11 and 12, Rovin states: "My magazine publications include creating and editing the Atlas Comics line – several titles of which...". But, in fact, Atlas Comics was created by Martin Goodman. Wikipedia provides some details of Altas' creation (including the following quote from Jeff Rovin himself):

> Goodman hired Warren Publishing veteran Jeff Rovin to edit the color comic-book line, and writer-artist Larry Lieber, brother of Marvel editor-in-chief Stan Lee, as editor of Atlas' black-and-white comics magazines.
> Rovin said in 1987 he became involved after answering an ad in The New York Times."I was working for Jim Warren, running his mail-order division, Captain Company, and just starting to edit Creepy [and] I'd edited comics for DC and Skywald.... Several weeks after answering the ad, I receive a call from Martin Goodman.... I was one of several people Martin interviewed, and I got the job because I'd had experience not only in comics but in mail order, the latter of which was to contribute significantly to Seaboard's cash flow. Sharing editorial duties on the comics was writer artist Larry Lieber, whom Martin had long wanted to transplant from under the shadow of Larry's brother.... Larry ended up handling about a quarter of
> Atlas' output—primarily the police, Western [and] war [comics], and color anthologies of horror stories.
> Lieber later became editor of the color comics following Rovin's departure.
> -From Wikipedia (http://en.wikipedia.org/wiki/Atlas/Seaboard_Comics)

### CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests the Court disqualify THE EXPERT REPORT OF JEFF ROVIN and disqualify Mr. Rovin as a witness in this matter due to his willful submission of false and fraudulent information, fabricating evidence purporting to substantiate his claims against Plaintiff's, altering the works of –and falsely citing the works of– numerous writers and artists, misstating his qualifications, and his lack of credentials to qualify as an expert. The court is authorized to intervene under F.R.C.P. Rule 11, the Inherent Powers Doctrine.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 12th day of June, 2014.

Respectfully Submitted By: _____
Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Plaintiff, Pro Se

# Exhibit A

after what happened up at the lake, I mustn't. Would you like to go up to the top of the Shed?"

"If you want to," he agreed without enthusiasm.

He followed when she went to a doorway—with a security guard beside it—in the sidewall. She flashed her pass and the guard let them through. They began to walk up an inclined, endless, curving ramp. It was between the inner and outer skins of the Shed. There had to be two skins because the Shed was too big to be ventilated properly, and the hot desert sunshine on one side would have made "weather" inside. There'd have been a convection-current motion of the air in the enclosed space, and minor whirlwinds, and there could even be miniature thunderclouds and lightning. Joe remembered reading that such things had happened in a shed built for Zeppelins before he was born.

They came upon an open gallery, and there was a security man looking down at the floor and the Platform. He had a very good view of all that went on.

They went around another long circuit of the slanting gallery, dimly lighted with small electric bulbs. They came to a second gallery, and saw the Platform again. There was another guard here.

They were halfway up the globular wall now, and were visibly suspended over emptiness. The view of the Platform was impressive. There were an astonishing number of rocket tubes being fastened to the outside of that huge object. Three giant cranes, working together, hoisted a tube to the last remaining level of scaffolding, and men swarmed on it and fastened it to the swelling hull. As soon as it was fast, other men hurried into it with the white pasty stuff to line it from end to end. The tubes would nearly hide the structure they were designed to propel. But they'd all be burned away when it reached its destination.

"Wonderful, isn't it?" asked Sally hopefully.

Joe looked, and said without warmth, "It's the most wonderful thing that anybody ever even tried to do."

Which was true enough, but the zest of it had unreason-

ably departed for Joe for the time being. His disappointment was new.

Halfway around again, Sally opened a door, and Joe was almost surprised out of his lethargy. Here was a watching post on the outside of the monstrous half-globe. There were two guards here, with fifty-caliber machine guns under canvas hoods. Their duties were tedious but necessary. They watched the desert. From this height it stretched out for miles, and Bootstrap could be seen as a series of white specks far away with hills behind it.

Ultimately Sally and Joe came to the very top of the Shed into the open air. From here the steep plating curved down and away in every direction. The sunshine was savagely bright and shining, but there was a breeze. And here there was a considerable expanse fenced in—almost an acre, it seemed. There were metal-walled small buildings with innumerable antennae of every possible shape for the reception of every conceivable wave length. There were three radar bowl reflectors turning restlessly to scan the horizon, and a fourth which went back and forth, revolving, to scan the sky itself. Sally told Joe that in the very middle—where there was a shed with a domelike roof which wasn't metal—there was a wave-guide radar that could spot a plane within three feet vertically, and horizontally at a distance of thirty miles, with greater distances in proportion.

There were guns down in pits so their muzzles wouldn't interfere with the radar. There were enough non-recoil antiaircraft guns to defend the Shed against anything one could imagine.

"And there are jet planes overhead too," said Sally. "Dad asked to have them reinforced, and two new wings of jet fighters landed yesterday at a field somewhere over yonder. There are plenty of guards!"

The Platform was guarded as no object in all history had ever been guarded. It was ironic that it had to be protected so, because it was actually the only hope of escape from atomic war. But that was why some people hated the Platform, and their hatred had made it seem obviously an item

of national defense. Ironically that was the reason the money had been provided for its construction. But the greatest irony of all was that its most probable immediate usefulness would be the help it would give in making nuclear experiments that weren't safe enough to make on Earth.

That was pure irony. Because if those experiments were successful, they should mean that everybody in the world would in time become rich beyond envy.

But Joe couldn't react to the fact. He was drained and empty of emotion because his job was done and he'd lost a very flimsy hope to be one of the Platform's first crew.

He didn't really feel better until late that night, when suddenly he realized that life was real and life was earnest, because a panting man was trying to strangle Joe with his bare hands. Joe was hampered in his self-defense because a large number of battling figures trampled over him and his antagonist together. They were underneath the Platform, and Joe expected to be blown to bits any second.



## 11

Joe sat on the porch of Major Holt's quarters in the area next to the Shed. It was about eight-thirty, and dark, but there was a moon. And Joe had come to realize that his personal disappointment was only his personal disappointment, and that he hadn't any right to make a nuisance of himself about it. Therefore he didn't talk about the thing nearest in his mind, but something else that was next nearest or farther away still. Yet, with the Shed filling up a full quarter of the sky, and a gibbous moon new-risen from the horizon, it was not natural for a young man like Joe to speak purely of earthly things.

"It'll come," he said yearningly, staring at the moon. "If the Platform gets up day after tomorrow, it's going to take time to ferry up the equipment it ought to have. But still, somebody ought to land on the moon before too long."

He added absorbedly: "Once the Platform is fully equipped, it won't take many rocket pay loads to refill a ship's tanks at the Platform, before it can head on out."

Mathematically, a rocket ship that could leave the Platform with full fuel tanks should have fuel to reach the moon and land on it, and take off again and return to the Platform. The mathematical fact had a peculiar nagging flavor. When a dream is subjected to statistical analysis and the report is in its favor, a dreamer's satisfaction is always diluted by a subconscious feeling that the report is only part of the dream. Everybody worries a little when a cherished dream shows a likelihood of coming true. Some people take firm steps to stop things right there, so a romantic daydream won't be spoiled by transmutation into prosaic fact. But Joe said doggedly: "Twenty ferry trips to pile up fuel, and the twenty-

Exhibit B





EXHIBIT 39

# Exhibit C

verability. However, because it does not travel through space or at mach speeds, we were able to give the fifteen-ton vessel transparent Corning-ITT-manufactured siding. The result is a truly breathtaking way to see any world. There is one pilot and one guide per Shuttle Bus, a seat computer and tray, and closer quarters, since the ship has been built compactly for easier piloting through tight spots. However, its small size makes for more personal contact with your guide.

**Other Vessels.** The scientists and tour employees who work and live on the worlds of M-17 have a wide variety of transports at their disposal. These include one-, two-, or three-person skyfliers and orbiters, atomic moles that burrow beneath the surface, multishuttles that fly as one unit in space but can be broken into two or four smaller probes once they've entered a planet's lower atmosphere, space disks for fast interplanetary travel, and a battery of land vehicles. Most of these are geared for ruggedness rather than comfort, and while you may see them going about their business, you will never have to ride in one.

On the other hand, since Transgalactic encourages everyone to participate in our tours, from the very young to the young in spirit no matter what their age, we equip all of our vehicles with Automeds, the Warner-Cadence Corporation's portable health machine. If someone should have the misfortune to fall ill during a tour, the Automed will maintain that person's bodily functions until a Rescue Vessel arrives. There are between ten and twenty such aide ships stationed at different points on every world. All of our hotels have at least one Supermed Incorporated "Minihospital" and a human physician in residence. Transgalactic feels that you will enjoy your tour more if your mind is completely at ease. Rest assured that because people are not perfect, we must be.

## ENTRY REGULATIONS AND CUSTOMS RESTRICTIONS

Space is for everyone, and Transgalactic works hard to make it as accessible as a trip to any city, park, or resort on your home world. However, with intraplanetary travel, there are sundry entry requirements. Listed herewith, they are rigidly enforced.

Most of the worlds in M-17 ask only that you present a MasterPass card for admittance, a computer card that is a combination visa and general ID. MasterPass cards are available through any Transgalactic agent or from the Bureau of Space Travel (BST). The initial fee is ten Standards, and the card is renewable annually at the rate of three Standards. A late payment automatically invalidates MasterPass, and no one is permitted into a spaceport boarding area without one. MasterPass cards





An Orbiter Bus seat, with computer console in front of the passenger; the holovision and CRT computer screen are located in the back of the preceding seat, along with a slide out, fold-down tray.

will *not* be issued to anyone who, within the previous three years, has been convicted of a crime involving artificial aging or a fine exceeding twenty-five Standards. Transgalactic services families, not felons.

Although your travel agent will alert you to particulars, be advised that some worlds in M-17 have additional entry requirements. To avoid last-minute arrangements at the terminal, be certain that all of your data records are in order.

As with BST regulations, restrictions regarding customs are among the most stringently enforced in the universe. While they vary from world to world, the general limitations are as follows. Consumable goods such as narcotics, liquor, and food may not leave the planet you are visiting, nor may they be carried to any world from your Star Cruiser. However, within a 600 vertical mile limit of wherever they are purchased, you may buy and use unlimited amounts of such items. Nonconsumables such as souvenirs, microfilm novels, and clothing may be taken beyond 600 miles of their point of purchase providing that their value does not exceed fifty Standards. In addition, you may have twenty-five Standards worth of nonconsumables shipped to your home by Universal Post—delivery takes from one to two weeks—or you may purchase them all shipped to your home. In either case, there is a tax of twenty percent on any nonconsum-

# PROOF OF SERVICE

This is to certify that on this 12th day of June, 2014,

I, _Steve Wilson Briggs_,

served, by way of U.S. mail, true copies of the documents described as "NOTICE OF MOTION AND MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN; MOMORANDUM AND POINTS AND AUTHORITIES IN SUPPORT THEREOF," and "[PROPOSED] ORDER GRANTING PLAINTIFF'S MOTION TO DISQUALIFY EXPERT REPORT OF JEFF ROVIN," and "NOTICE OF MOTION AND MOTION FOR LEAVE TO FILE A SECOND AMENDED COMPLAINT," and "[PROPOSED] ORDER GRANTING PLAINTIFF LEAVE TO FILE SECOND AMENDED COMPLAINT," and "AMENDED REBUTTAL TO DEFENDANTS' "EXPERT REPORT OF JEFF ROVIN,"' and "CORRECTION,"

on the interested parties below:

Michael J. Kump, and Gregory P. Korn

(of Kinsella, Weitzman, Iser, Kump & Aldisert)

808 Wilshire Boulevard, 3rd Floor

Santa Monica, California, 90401

310 566 9800

Executed on this 12th day of June, 2014

By, _____

Steve Wilson Briggs
681 Edna Way
San Mateo, CA 94402
Plaintiff, Pro Se

PROOF OF SERVICE   CV 13-4679 PJH