# Exhibit
# NN

OPINION

**Clinton Donors Have Picked Their 2020 Democratic Presidential Nominee**

The wealthy are lining up and rallying behind Sen. Kamala Harris

By Michael Sainato • 07/17/17 12:15pm



ON JULY 15, PAGE SIX REPORTED THAT SEN. KAMALA HARRIS, A POTENTIAL 2020 DEMOCRATIC

Since Hillary Clinton's unexpected loss to Donald Trump, her donors have strategized with Democratic leadership about how to revive the failing party. Billionaire George Soros held a closed door conference with wealthy donors in November 2016 that addressed how to "take back power" and was attended by House Minority Leader Nancy Pelosi. On the weekend of Trump's inauguration, David Brock hosted a retreat for the

most prolific Democratic donors to figure out how to "kick Donald Trump's ass." On July 15, *Page Six* reported that Sen. Kamala Harris, a potential 2020 Democratic presidential candidate, met with top Clinton donors in the Hamptons. Many figures in Clinton's inner circle attended, including Clinton's 2008 Campaign National Finance co-Chair Michael Kempner, donors Dennis Mehiel and Steven Gambrel, and Democratic National Committeeman Robert Zimmerman. Harris also attended a separate luncheon hosted by one of Clinton's top lobbyist bundlers, Liz Robbins.

Harris' meetings with Clinton's donors signal that they are rallying behind her as the 2020 Democratic presidential nominee. Harris has emerged as a leading figure in the Trump Resistance; *Politico* reported that the hearings regarding Trump's connections to Russia have enabled the Democratic Party to frame her as Trump's most aggressive critic. In response to one of the hearings she was involved in, she launched the slogan "courage not courtesy." However, despite this catchy slogan, Harris has historically lacked the courage to hold her donors accountable when they have broken the law.

The nomination of Treasury Secretary Steve Mnuchin provoked criticisms over his tenure as CEO of OneWest Bank. In 2013, California prosecutors claimed to have discovered over 1,000 foreclosure law violations, but the California Attorney General's office failed to file any action against the bank. At the time, Kamala Harris was California's attorney general. Many questioned why Harris

didn't take any action given the evidence her office uncovered.

"We went and we followed the facts and the evidence, and it's a decision my office made," Harris told *The Hill*. "We pursued it just like any other case. We go and we take a case wherever the facts lead us."

Harris' vague defense is insufficient. The Democratic Party has branded her as a leader of the Trump Resistance without addressing why Harris avoided a criminal investigation that involved donors to her campaign.

---

NATIONAL POLITICS

**Observer Delivered to Your Inbox**

Receive important daily stories covering politics and influential opinion leaders.

SIGN UP

---



Sen. Kamala Harris. Kimberly White/Getty Images for Vanity Fair

In 2011, Mnuchin's wife at the time, Heather Mnuchin, gave $8,750 to Harris' 2011 campaign. OneWest Bank donated $6,500 to Harris' 2011 election. Heather Mnuchin also donated $850 to Harris' 2014 election for California attorney general.

In 2014, the Center for American Progress graded California's campaign donor recusal laws a "C." The state's lax

laws allowed Harris to decide not to recuse herself from deciding whether or not to prosecute OneWest Bank.

Mnuchin donated to multiple Republicans' campaigns in 2016, but Harris was the only Democrat he donated to.

Harris also has ties to billionaire Democratic Party donor George Soros, who was one of the two owners of OneWest Bank at the time. Coincidentally, before Harris passed on the opportunity to file action against OneWest Bank, Soros was pouring money into California criminal policy initiatives that Harris was pushing.

In 2011, Harris' former aide Lenore Anderson was hired as campaign manager for Californians for Safety and Justice, which was financed by Soros' Open Society Foundations. In 2014, *The Los Angeles Times* reported, "The organization operates under the umbrella of a San Francisco-based nonprofit clearinghouse, which effectively shields its donor list and financial operations from public view." The report cited that since 2012 Soros had led a four-year, $16 million campaign to change California criminal policy, which Harris was deeply involved in as California attorney general. Lenore Anderson also led Vote Safe, another Soros' funded organization.

In 2014, Soros and hedge fund billionaire John Paulson sold OneWest for $3.4 billion. In 2015, Soros donated the maximum amount to Harris' Senate campaign. Also in 2015, Harris spoke at Soros' 2020 Vision Conference in San Francisco with House Minority

Leader Nancy Pelosi and at Soros' Democracy Alliance Conference.

This background information on Harris' relationship to her donors provides context as to why the Democratic establishment is rallying behind her. However, any politician that doesn't hold corporate and special interests accountable only results in more corruption.

**SEE ALSO:** Facebook's Mark Zuckerberg and the Billionaires Killing the Democratic Party

**SPONSORED STORIES**                                    Recommended by


Pay 0% Interest Until 2019 With
NextAdvisor

Could You Use A Little Help With
The Better Finance


7 Outrageous Credit Cards If You Have
NextAdvisor


How to 'Fix' Crepey Skin
Health Headlines


How To Fix Your Fatigue (Do This
Gundry MD


Pay No Interest Until May 2018
CreditCards.com


Why Doctors In The Know No Longer
Vibrant Health Network


The Sweatshirt Designed by
American Giant on Business Insider

NATIONAL POLITICS

Observer Delivered to Your Inbox

| SIGN UP |
| --- |

## MUST READS

# Exhibit OO



**CampaignMoney**.com
(https://www.campaignmoney.com/)

| Enter a Zip Code | GO | *See $$$ From Your Zip Code* |

Home
(https://www.campaignmoney.com/)

Money Search
(https://www.campaignmoney.com/advanced.asp)

Top 25
(https://www.campaign

# Ari Emanuel
# Political Campaign Contributions
# 2016 Election Cycle

| | Contribution Totals |
|---|---|
| **Download Data** | |
| Download all contribution records for this person from 1999 to present *To a Spreadsheet or Other File Type* | |
| **2016** Transaction Count/Amount | 4/$10,400 (https://www.campaignmoney.com/political/contributions/ari-emanuel.asp?cycle= |
| **2014** Transaction Count/Amount | 0/$0 |
| **2012** Transaction Count/Amount | 0/$0 |
| **2010** Transaction Count/Amount | 0/$0 |
| **2008** Transaction Count/Amount | 0/$0 |
| **2006** Transaction Count/Amount | 2/$29,427 (https://www.campaignmoney.com/political/contributions/ari-emanuel.asp?cycle= |
| **2004** Transaction Count/Amount | 3/$37,000 (https://www.campaignmoney.com/political/contributions/ari-emanuel.asp?cycle= |
| **2002** Transaction Count/Amount | 2/$6,000 (https://www.campaignmoney.com/political/contributions/ari-emanuel.asp?cycle=0 |
| **2000** Transaction Count/Amount | 0/$0 |
| **Download Data** | |
| Download all contribution records for this person from 1999 to present *To a Spreadsheet or Other File Type* | |

## Ari Emanuel Political Contributions in 2016

| Name & Location | Employer/Occupation | Dollar Amount | Date | Primary/ General | Contributed To |
|---|---|---|---|---|---|
| EMANUEL, ARI BEVERLY HILLS, CA 90211 | William Morris Endeavor Ent., Llc/Agent | $2,700 | 01/21/2015 | P | KAMALA HARRIS FOR SENATE - Democrat (https:/ |
| EMANUEL, ARI BEVERLY HILLS, CA 90211 | William Morris Endeavor Ent., Llc/Agent | $2,500 | 01/21/2015 | G | KAMALA HARRIS FOR SENATE - Democrat (https:/ |
| EMANUEL, ARI BEVERLY HILLS, CA 90211 | William Morris Endeavor Ent., Llc/Agent | $2,700 | 01/21/2015 | P | KAMALA HARRIS FOR SENATE - Democrat (https:/ |
| EMANUEL, ARI BEVERLY HILLS, CA 90211 | William Morris Endeavor Ent., Llc/Agent | $2,500 | 01/21/2015 | G | KAMALA HARRIS FOR SENATE - Democrat (https:/ |

# Exhibit

# PP

Advertisement

 COVERED CALIFORNIA

YOU ARE HERE:  LAT Home → Collections → **Jerry Brown**

Advertisement

CAUSE CELEBRE

## With Villaraigosa out, who'll get Hollywood's support?

**June 26, 2009** | TINA DAUNT

Email        Share        G+1  0              Tweet              Recommend 0

When Los Angeles Mayor Antonio Villaraigosa announced on CNN this week that he wouldn't seek the California Democratic gubernatorial nomination, San Francisco Mayor Gavin Newsom was attending a Bay Area event with First Ladies Michelle Obama and Maria Shriver.

In less than an hour, Newsom -- the Dems' only declared candidate -- was in the car and working the phones, calling major Hollywood donors and activists who'd been waiting to see what the L.A. mayor would do.

"Villaraigosa bowing out is a huge strategic opportunity for Newsom in terms of Hollywood donors," said political consultant Kristina Schake, who knows her way around the Beverly Hills-Brentwood Park-Malibu fundraising circuit. (Call it the Dems' "axis of cash.") "Without our mayor in the race, Newsom now has the chance to make his case to the considerable amount of Hollywood donors who had not committed yet because of Villaraigosa. This is Newsom's chance to get the meetings."

The telegenic San Francisco mayor first gained national and statewide attention for his early support of gay marriage, likely to be one of the coming campaign's major issues. Newsom has already had what most people in the industry would regard as top-drawer meetings. Last week, super agent and Endeavor-William Morris honcho Ari Emanuel (brother of White House Chief of Staff Rahm Emanuel) was one of the hosts at an elite Newsom fund-raising event. Other hosts included longtime activists Michele and Rob Reiner, Ben Silverman, Jamie Lynton, Craig and Lynn Jacobson, Eric Paquette, George Heller, Debbie Liebling and Andrew Bohn.

### FROM THE ARCHIVES

Hollywood liberals, oil firms unite for Jerry Brown...
*July 31, 2013*

L.A. Mayor Antonio Villaraigosa to chair Democratic...
*February 15, 2012*

Gay marriage draws support from U.S. mayors led by...
*January 20, 2012*

Gov. Brown's budget veto; 'gay girl' hoax; Villaraigosa on...
*June 20, 2011*

Newsom's candidacy also got a boost when he was introduced to agents at ICM headquarters by the agency's president, Chris Silbermann, an early supporter of Barack Obama.

Without Villaraigosa in the race, Jerry Brown, the former governor-turned-state attorney general, "becomes the most recognizable candidate in L.A. [Brown has not announced his intention to run for governor.] But while Brown is a known quantity, Newsom brings something new, which could appeal to those who stayed out of the race while Villaraigosa was weighing his options. Brown goes way back in Hollywood, but it's clear from these early events that Newsom already is being well received."

### MORE STORIES ABOUT

Jerry Brown

Chris Silbermann

Villaraigosa

In fact, while Brown is seen nowadays as a Bay Area pol, like Newsom, because of his service as Oakland's mayor, his political roots in Los Angeles -- which means Hollywood -- go deep . . . and, no, that isn't because he once dated Linda Ronstadt.) Brown first won elective office as a member of the L.A. Community College Board and ran for governor while living in a hilltop home in Laurel Canyon.

It's widely assumed that the former two-term governor would enjoy wide support in the state's African American and Latino communities, where he has long-standing ties that extend back to his support of civil rights, particularly of Cesar Chavez's United Farm Workers. Establishing the Agricultural Labor Relations Board was one of Brown's signature achievements as a first-term governor. And even though

Newsom has won many gay and lesbian backers for his cutting-edge support of marriage equality, Brown holds identical views. Many older activists will recall that he was the first statewide officeholder to publicly embrace the gay rights cause.

As Schake points out, Brown named openly gay West Hollywood lawyer Sheldon Andelson, a beloved figure in the local gay community, to the UC Board of Regents and at the time took a considerable amount of flak for it.

Kerman Maddox, L.A.'s most experienced African American political strategist, thinks "Villaraigosa would have done fantastic in Hollywood with his magnetic personality, but his absence gives both Brown and Newsom a real opportunity." Maddox says he expects both candidates to "do well with the Hollywood crowd. It will be interesting to see how their candidacies play with the different generations in Hollywood."

In fact, you already can see the beginning of such a split, much as you could between Obama and Hillary Rodham Clinton supporters in the early stages of the last general election.

While the San Francisco mayor clearly enjoys support among the current crop of uber-agents, Brown is collecting impressive donations from what might be called "Old Hollywood," including $13,000 from Eagles stalwart Don Henley and $12,000 from Edith Wasserman, widow of MCA co-founder Lew, the legendary industry power broker.

Longtime L.A. and Hollywood advisor and activist Donna Bojarsky predicts "a little Gavin boomlet" but doesn't think "it'll stick over time, as it becomes clear that he's really not terribly electable statewide."

Bojarsky is one of those who believe black and Latino Californians ultimately "will go with Jerry, and even some older gays who remember Jerry's early and pivotal support of gay rights."

Hollywood's Democrats love a choice, and they love to be courted. It looks like the governor race is shaping up as a decision between the longtime leading man with proven box office and a fresh face with niche appeal -- sounds a bit like a summer release roster.

--

tina.daunt@latimes.com

Email    Share    G+1  0        Tweet        Recommend 0

**From the Web**                                    Sponsored Links by Taboola

**Hollywood Actress Tells All: "I Hope My Story Will Help Other Women"**
ActivatedYou

**The Most Armed US States, Ranked**
CBS News

**Historic Photos Both Fascinating And Heartbreaking**
Curioushistorian.com

# Exhibit
# QQ

Advertisement

YOU ARE HERE:  LAT Home → Collections → **Copyright**

Advertisement



**LifeLock**

A STOLEN IDENTITY COULD COST YOU A LOT. HELPING PROTECT IT WON'T.

START MEMBERSHIP

**FROM THE ARCHIVES**

With 'Innocence of Muslims' ruling, 9th Circuit opens a...
*March 1, 2014*

Supreme Court takes on 'Raging Bull' copyright case
*October 1, 2013*

U.S. Supreme Court opens session, takes eight new cases
*October 1, 2013*

Robert R. Beezer dies at 83; judge on 9th Circuit Court of...
*April 3, 2012*

Bratz dolls maker wins appeal against Mattel
*July 22, 2010*

**MORE STORIES ABOUT**

Copyright

California

Not_live_web

California'

# As trial nears, 9th Circuit Court accused of favoring Hollywood

*Does the 9th Circuit Court favor Hollywood studios? The question arises as a screenwriter's daughter wages a copyright battle with MGM.*

**January 18, 2014** | By David G. Savage and Maura Dolan

WASHINGTON — The California-based 9th U.S. Circuit Court of Appeals is known for progressive rulings that champion individual rights over government and corporations, but when it comes to show business, the "Hollywood Circuit" — as it has been dubbed — stands accused of routinely siding with the home-turf entertainment industry.

Judges famously sided with film studios in the early 1980s when the studios sued Sony for infringing their copyrights by selling the Betamax video recorders. Had the Supreme Court not reversed the decision, the home video industry might never have been born.

U.S. 9th Circuit Court Chief Judge Alex Kozinski bristles at the suggestion... (Gina Ferazzi / Los Angeles...)

In another case, the majority sided with "Wheel of Fortune" TV personality Vanna White when she claimed her "right to publicity" had been violated by a commercial spoof featuring a robot with a blond wig who stood next to big block letters.

Now, the court's alleged pro-Hollywood slant is being cited again by a screenwriter's daughter who on Tuesday will ask the Supreme Court to overturn a 9th Circuit decision that blocked her copyright claim against Metro-Goldwyn-Mayer in a dispute over the 1980 movie "Raging Bull."

When it comes to copyright infringement claims from artists, entertainment companies haven't lost a single case at the 9th Circuit in 20 years, according to Los Angeles lawyer Steven T. Lowe.

"The studios and networks always win," said Lowe, who is supporting Paula Petrella, the daughter of Frank Petrella, who, along with boxer Jake LaMotta, wrote a 1963 screenplay that was said to be the basis for the Oscar-winning film.

Some of the court's own jurists acknowledge the 9th Circuit's unusually aggressive stance on the issue. "Our circuit is the most hostile to copyright owners of all the circuits," Judge William Fletcher wrote last fall, even as he joined judges in rejecting Petrella's claim.

Chief Judge Alex Kozinski has also taken the court to task at times for being overprotective of the entertainment industry. In his colorful dissent in the 1992 Vanna White decision, Kozinski wrote that the majority's "Orwellian" decision to give the game show hostess a new property right to stifle a parody that merely evoked her image was a "dangerous" precedent.

It was Kozinski who quipped in that case that, "For better or worse, we are the court of appeals for the Hollywood Circuit." His point didn't seem to be about a pro-Hollywood bias, but instead that the 9th Circuit has a special obligation to strike the right balance in copyright cases because of its jurisdiction over the entertainment capital, where many such claims arise.

But over the years, the label stuck.

Today Kozinski bristles at the suggestion that the 9th Circuit takes sides.

"We get a lot of cases, but we go every which way," Kozinski said in an interview. "I don't think we are particularly protective of studios."

But being so close to the nation's movie-making capital also means many of the judges are familiar with Hollywood and sometimes rub elbows with producers and stars. Kozinski, whose son is a film editor, made a cameo appearance in "Atlas Shrugged: Part II," appeared in three documentaries and has his own IMDb (Internet Movie Database) page.

"I cut my teeth being on 'The Dating Game' when I was 18," Kozinski said. "If you grow up out here, it is in the blood.... It is hard to live many years out here without being inured to the blandishments of Hollywood." (For the record, Kozinski, or Bachelor No. 2, got the date.)

He holds movie nights at the 9th Circuit courthouses in Pasadena, San Francisco and occasionally Seattle, where judges and lawyers pitch in for pizza and beer, watch films and hear from scriptwriters and other industry insiders about the movies. Director George Lucas used to provide the court with films before they came out on DVDs, he said, and Kozinski has dined with Clint Eastwood, "a very sweet, humble guy."

He said it is important to protect the rights of ownership to speech because it encourages more speech. If speech is not protected by copyright, he warned, there will be less incentive to produce it.

"It's a fine balance, and all my colleagues are quite sensitive to it," he said. "The best way to hurt the system is to favor one side or the other."

David Nimmer, an expert on copyright law who teaches at UCLA, said the 9th Circuit has a "spotty record" on copyright law, but that doesn't mean the studios always win. In 2010, the 9th Circuit ruled against a studio in a breach-of-contract claim by two screenwriters who said the movie "The Last Samurai" with Tom Cruise was based on their screenplay. The court also sided with music file-sharing program Grokster in 2004, saying it was not liable for users' copyright infringement.

Nimmer said it was not hard to imagine that certain industries might enjoy a hometown advantage in some circuits, but he could not say that the 9th tended to favor studios over artists.

"I would not say they are hostile to copyright infringement claims," Nimmer said.

1 | 2 | Next

**From the Web**                                   Sponsored Links by Taboola

**Before Applying For A Credit Card, Check If You Pre-Qualify**
Citi


**We Tried Bombas Socks. Here's What Happened:**
Business Insider | Bombas Socks

# Exhibit

# RR

By STEVEN T. LOWE

# DEATH
## OF COPYRIGHT

Copyright infringement may be the only remaining area of law in which courts seem increasingly willing to decide material facts on summary judgment

**COPYRIGHT INFRINGEMENT** claims against motion picture studios and television networks, for all intents and purposes, are dead. Of the 48 copyright infringement cases against studios or networks that resulted in a final judgment within the Second and Ninth Circuits (and the district courts within those circuits) in the last two decades,[1] the studios and networks prevailed in all of them—and nearly always on motions for summary judgment. (See "Perfect Storm," at 34.) In fact, in the last 20 years, only two publicly available copyright infringement cases (published or unpublished) against studios or networks proceeded to jury trial—with verdicts for the defendants.[2]

Were all these cases without merit, or did the studios and networks simply have far superior counsel in each case? These suppositions are very unlikely. The case law governing these actions simply has become so amorphous that for almost every principle of law favorable to creators, the courts have endorsed and applied an opposite principle.

As a result, the determination of each case now rests almost entirely in the unfettered discretion of trial judges, who have consistently dismissed plaintiffs' claims. Unless the current trend changes, longstanding principles once favorable to creators may be eclipsed by an evolving body of law so unfavorable to them that the studios and networks are essentially immunized from liability except in cases of identical copying and conceded access to the plaintiff's work.

Since direct evidence of copying rarely is available in a copyright infringement suit,[3] plaintiffs typically must establish that the defendant had access to the plaintiff's work and that the two works are substantially similar.[4] Proof of access requires only a "reasonable possibility" to view or copy the plaintiff's work.[5] However, courts commonly cite to the countervailing principle that "mere speculation or conjecture" is insufficient. Because the analysis of a reasonable possibility necessarily includes some conjecture and speculation, the "line between a 'bare' pos-

sibility and a 'reasonable' possibility of access is difficult to draw."[6] If the work has not been widely disseminated—which is usually the case for unpublished screenplays—"a particular chain of events" must be established between the plaintiff's work and the defendant's access to that work.[7]

Early cases outside of the Ninth Circuit found access even when the plaintiff could not actually place the work in the hands of the defendant. For example, in the First Circuit case of *Morrissey v. Procter & Gamble Company*, the plaintiff offered evidence that he had mailed his copyrighted work to the defendant's principal office. The court held that this mailing created "an inference that the letter reached its proper destination," and to require the plaintiff to show that the "particularly

---

Steven T. Lowe is a principal of Lowe Law, a boutique entertainment litigation firm in Los Angeles. He wishes to thank Daniel Lifschitz, Chris Johnson, and Michael Salvatore for their assistance in the preparation of this article.

AMANE KANEKO



responsible employees had received his communication" would have been unfair.[8] Similarly, in 1971, a New York district court held in *Bevan v. Columbia Broadcasting System, Inc.*, that corporate receipt could be "sufficient to raise a triable issue, despite plaintiff's inability to show receipt by the responsible employee,"[9] because it would be unfair to "saddle a plaintiff with disproving non-access within a corporate structure foreign to him and with witnesses not his own."[10]

Unfortunately for creators, the *Bevan* holding was rejected by some courts.[11] For example, in *Meta-Film Associates, Inc. v. MCA, Inc.*, a 1984 case, the Central District of California identified only three circumstances that would meet the type of close relationship between coworkers necessary to give rise to a reasonable opportunity of access. The person who received the plaintiff's work must 1) be "a supervisor with responsibility for the defendant's project," or 2) "part of the same work unit as the copier," or 3) have "contributed creative ideas or material to the defendant's work."[12] By limiting, as a matter of law, the instances in which a plaintiff can prove access within a corporate structure, the *Meta-Film* court effectively precluded plaintiffs from establishing access in numerous scenarios in which there is actual access but the facts do not fall into one of the court's enumerated categories.[13]

The *Meta-Film* court also recognized situations in which a third-party intermediary not of the same business enterprise as the alleged infringer may be found to have passed along the plaintiff's work.[14] The court limited such situations, however, to instances when the third-party intermediary "provided creative suggestions and ideas" concerning the allegedly infringing work, and "the dealings between the three entities (plaintiff, defendants, and [intermediary])…related to the identical subject matter."[15] Although *Meta-Film*'s effect in the Ninth Circuit has been limited to several district court cases[16]—and the Ninth Circuit has not adopted its holding[17]—*Meta-Film* has been influential in the Second Circuit, which expressly relied on the case when it overruled the *Bevan* holding.[18] Thus, *Meta-Film* remains a prominent example of why commentators note that "many courts set an unrealistically high bar as to what constitutes a close relationship" for establishing access.[19]

## Substantial Similarity

Even when access is established, the path to a favorable judgment remains perilous for plaintiffs.[20] In fact, in many cases in which summary judgment has been granted for defendants, the courts simply presume that access existed.[21] This is because "even massive evidence of access cannot by itself avoid the necessity of also proving the full measure of substantial similarity."[22] And this full measure has become virtually impossible to establish under recent case law.

To determine whether substantial similarity exists between works at the summary judgment phase, the Ninth Circuit has instructed that courts perform an "extrinsic" analysis of the works' objective elements, focusing on "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events."[23] In application, however, this analysis has been unpredictable and has resulted in wildly conflicting case law and results. In addition, in recent years, the Ninth Circuit has ignored established case law that requires the court to not only include "unprotectable elements" in its analysis[24] but also exclude dissimilarities between the two works.[25]

A long line of copyright infringement cases holds that a plaintiff and defendant's works should be compared in their entirety, including both protectable and unprotectable elements,[26] to determine whether a qualitatively (or quantitatively) significant portion of

## Perfect Storm

In the last 20 years, in the Second and Ninth Circuits and the lower courts within those circuits, 48 copyright infringement cases against studios or networks were litigated to final judgment. In all 48 cases, the victors were the studio and network defendants. Most of the cases were determined by a grant of summary judgment.

✖ *Arden v. Columbia Pictures Industries*, 908 F. Supp. 1248 (S.D. N.Y. 1995) (summary judgment for defendant) (*Groundhog Day*).
✖ *Benay v. Warner Bros. Entertainment, Inc.*, 607 F. 3d 620 (9th Cir. 2010) (summary judgment for defendant affirmed) (*The Last Samurai*).
✖ *Benjamin v. Walt Disney Company*, 2007 U.S. Dist. LEXIS 91710 (C.D. Cal. 2007) (summary judgment for defendant) (*Sweet Home Alabama*).
✖ *Bethea v. Burnett*, 2005 WL 1720631 (C.D. Cal. 2005) (summary judgment for defendant) (*The Apprentice*).
✖ *Blakeman v. Walt Disney Company*, 613 F. Supp. 2d 288 (E.D. N.Y. 2009) (summary judgment for defendant) (*Swing Vote*).
✖ *Burns v. Imagine Films Entertainment, Inc.*, 2001 U.S. Dist. LEXIS 24653 (W.D. N.Y. 2001) (summary judgment for defendant) (*Backdraft*).
✖ *Brown v. Perdue*, 177 Fed. Appx. 121 (2d Cir. 2006) (summary judgment for defendant affirmed) (*The Da Vinci Code*).
✖ *Bunick v. UPN*, 2008 U.S. Dist. LEXIS 35536 (S.D. N.Y. 2008) (summary judgment for defendant) (*South Beach*).
✖ *Cabell v. Sony Pictures Entertainment, Inc.*, 2010 U.S. Dist. LEXIS 54667 (S.D. N.Y. 2010) (summary judgment for defendant) (*You Don't Mess with the Zohan*).
✖ *Cox v. Abrams*, 1997 U.S. Dist. LEXIS 6687 (S.D. N.Y. 1997) (summary judgment for defendant) (*Regarding Henry*).
✖ *Flaherty v. Filardi*, 2009 U.S. Dist. LEXIS 22641 (S.D. N.Y. 2009) (summary judgment for defendant) (*Bringing Down the House*).
✖ *Flynn v. Surnow*, 2003 U.S. Dist. LEXIS 26973 (C.D. Cal. 2003) (summary judgment for defendant) (*24*).
✖ *Funky Films v. Time Warner Entertainment*, 462 F. 3d 1072 (9th Cir. 2006) (summary judgment for defendant) (*Six Feet Under*).
✖ *Gable v. NBC*, 2010 WL 2990077 (C.D. Cal. 2010) (summary judgment for defendant) (*My Name Is Earl*).
✖ *Gilbert v. New Line Productions*, 2010 U.S. Dist. LEXIS 27134 (C.D. Cal. 2010) (summary judgment for defendant) (*Monster in Law*).
✖ *Gregory v. Murphy*, 1991 U.S. App. LEXIS 4893 (9th Cir. 1991) (summary judgment for defendant affirmed) (*Coming to America*).
✖ *Grosso v. Miramax Film Corporation*, 2001 U.S. Dist. LEXIS 26199 (C.D. Cal. 2001) (summary judgment for defendant) (*Rounders*).
✖ *Historical Truth Productions v. Sony Pictures Entertainment*, 1995 U.S. Dist. LEXIS 17477 (S.D. N.Y. 1995) (summary judgment for defendant) (*Universal Soldier*).
✖ *Hudson v. Universal Pictures Corporation*, 2004 U.S. Dist. LEXIS 11508 (E.D. N.Y. 2004) (summary judgment for defendant) (*Life*).
✖ *Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d (C.D. Cal. 2001) (summary judgment for defendant) (*The Peacemaker*).
✖ *Kodadek v. MTV Networks*, 1996 U.S. Dist. LEXIS 20776 (C.D. Cal. 1996) (summary judgment for defendant) (*Beavis & Butthead*).

a plaintiff's work was appropriated.[27] This comports with basic principles of copyright law and is known as the "selection and arrangement" test.[28]

In the seminal 1991 case *Feist Publications Inc. v. Rural Telephone Services Company*, the U.S. Supreme Court held that when dealing with works largely (or even entirely) composed of unprotectable elements, "choices as to selection and arrangement, so long as they are made independently by the compiler and entail a minimal degree of creativity, are sufficiently original."[29] Transposed to the literary arts, the test provides that although copyright law does not generally protect basic plot premises in literary works or commonly used expressions that flow naturally from those premises ("scenes a faire"), the original selection and arrangement of these elements can constitute a protectable work in and of itself.[30] Therefore, the wholesale exclusion of all "unprotectable" elements improperly limits the scope of copyright protection. The Ninth Circuit has recognized this principle on numerous occasions but has spent the better part of the past decade aggressively denying its use to plaintiffs in copyright infringement cases against studios and networks.

*Metcalf v. Bochco*, decided in 2002, is one of only two copyright infringement cases against a studio or network in the last 20 years that proceeded to trial. (The other is *Shaw v. Lindheim*.[31]) In *Metcalf*, the plaintiff offered evidence that the defendant had misappropriated many elements of the plaintiff's screenplay to create a television series for NBC. The court recognized that "the similarities proffered by [the plaintiff] are not protectable when considered individually; they are either too generic or constitute 'scenes a faire.'"[32] However, "the presence of so many generic similarities and the common patterns in which they arise help satisfy the extrinsic test."[33] The court memorably compared the elements of literary works to those of musical compositions:

The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element. Each note in a scale, for example, is not protectable, but a pattern of notes in a tune may earn copyright protection.[34]

The court did not strip the works of their unprotectable elements before diving into an extrinsic analysis of substantial similarity, consistent with the general purpose of the selection and arrangement test (that is, to protect in combination that which cannot

be protected separately).[35] In the years since its publication, however, the analysis of *Metcalf* has proven to be the exception and not the rule.

The 2003 case of *Rice v. Fox Broadcasting Company* may have played the heaviest hand against the use of the selection and arrangement test. The *Rice* court stated that "similarities derived from the use of common ideas cannot be protected."[36] This assertion ignored the holdings and rationales of the cases that the court cited, including *Metcalf*, but the *Rice* court attempted to distinguish *Metcalf* by stating that it was "based on a form of inverse ratio rule analysis" (i.e., the rule whereby more access requires less substantial similarity and vice versa) and seemed to imply that the selection and arrangement test is only applicable when access is conceded.[37] This implication, which limits *Metcalf* to its facts, overlooks that nowhere in *Metcalf* (or any case prior to it) is the inverse ratio rule required for the application of the selection and arrangement test.[38] Nevertheless, Rice's misinterpretation of *Metcalf* has been repeatedly followed by the Ninth Circuit in subsequent opinions.

Indeed, in the 2006 case of *Funky Films, Inc. v. Time Warner Entertainment Company, L.P.*, the Ninth Circuit once again ignored the

✖ *Kouf v. Walt Disney Pictures and Television*, 16 F. 3d 1042 (9th Cir. 1994) (summary judgment for defendant affirmed) (*Honey, I Shrunk the Kids*).
✖ *Kretschmer v. Warner Bros.*, 1994 U.S. Dist. LEXIS 7805 (S.D. N.Y. 1994) (summary judgment for defendant) (*Defending Your Life*).
✖ *Lane v. Universal City Studios*, 1994 U.S. App. LEXIS 23769 (9th Cir. 1994) (summary judgment for defendants affirmed) (*Kojak: Fatal Flaw*).
✖ *Laskay v. New Line Cinema*, 1998 U.S. App. LEXIS 23461 (C.D. Cal. 1998) (summary judgment for defendant) (*Don Juan DeMarco*).
✖ *Lassiter v. Twentieth Century Fox Film Corporation*, 238 Fed. Appx. 194 (9th Cir. 2007) (summary judgment for defendant affirmed) (*Drumline*).
✖ *Mallery v. NBC Universal, Inc.*, 331 Fed. Appx. 821 (2d Cir. 2009) (summary judgment for defendant affirmed) (*Heroes*).
✖ *Merrill v. Paramount Pictures Corporation*, 2005 U.S. Dist. LEXIS 45401 (C.D. Cal. 2005) (summary judgment for defendant) (*Crossroads*).
✖ *Mestre v. Vivendi Universal U.S. Holding Co.*, 273 Fed. Appx. 631 (9th Cir. 2008) (summary judgment for defendant affirmed) (*Billy Elliot*).
✖ *Metcalf v. Bochco*, 294 F. 3d 1069 (9th Cir. 2002) (jury verdict in favor of defendant studio), aff'd, Metcalf v. Bochco, 200 Fed. Appx. 635 (9th Cir. 2006) (*City of Angels*).
✖ *Milano v. NBC Universal, Inc.*, 584 F. Supp. 2d 1288 (C.D. Cal. 2008) (summary judgment for defendant) (*The Biggest Loser*).
✖ *Mowry v. Viacom International, Inc.*, 2005 U.S. Dist. LEXIS 15189 (S.D. N.Y. 2005) (summary judgment for defendant) (*The Truman Show*).
✖ *Novak v. National Broadcasting Company*, 752 F. Supp. 164 (S.D. N.Y. 1990) (summary judgment for defendant) (*Saturday Night Live*).
✖ *Ostrowski v. Creative Artists Agency*, 1994 U.S. App. LEXIS 23732 (9th Cir. Cal. 1994) (summary judgment for defendant affirmed) (*To Forget Palermo*).

✖ *Pelt v. CBS, Inc.*, 1993 U.S. Dist. LEXIS 20464 (C.D. Cal. 1993) (summary judgment for defendant) (*Listen Up! Young Voices for Change*).
✖ *Rice v. Fox Broadcasting Company*, 330 F. 3d 1170 (9th Cir. 2003) (summary judgment for defendant affirmed) (*The Mystery Magician*).
✖ *Robinson v. Viacom International*, 1995 U.S. Dist. LEXIS 9781 (S.D. N.Y. 1995) (summary judgment for defendant) (*Hi Honey*).
✖ *Rodriguez v. Heidi Klum Company, LLC*, 2008 U.S. Dist. LEXIS 80805 (S.D. N.Y. 2008) (summary judgment for defendant) (*Project Runway*).
✖ *Rosenfeld v. Twentieth Century Fox Film*, 2009 U.S. Dist. LEXIS 9305 (C.D. Cal. 2009) (summary judgment for defendant) (*Robots*).
✖ *Shaw v. Lindheim*, 809 F. Supp. 1393 (C.D. Cal. 1992) (upon remand, judgment as a matter of law in favor of defendant studio) (*The Equalizer*).
✖ *Stewart v. Wachowski*, 574 F. Supp. 2d 1074 (C.D. Cal. 2005) (summary judgment for defendant) (*The Matrix*).
✖ *The Sheldon Abend Revocable Trust v. Steven Spielberg*, 2010 WL 3701343 (S.D. N.Y. 2010) (summary judgment for defendants) (*Disturbia*).
✖ *Thomas v. Walt Disney Company*, 337 Fed. Appx. 694 (9th Cir. 2009) (defendant's motion to dismiss affirmed) (*Finding Nemo*).
✖ *Walker v. Viacom International, Inc.*, 2010 U.S. App. LEXIS 1475 (9th Cir. 2010) (summary judgment for defendant) (*SpongeBob SquarePants*).
✖ *Weygand v. CBS*, 1997 U.S. Dist. LEXIS 10613 (C.D. Cal. 1997) (summary judgment for defendant) (*Chaplin*).
✖ *Williams v. Crichton*, 84 F. 3d 581 (2d Cir. 1996) (summary judgment for defendant) (*Jurassic Park*).
✖ *Willis v. HBO*, 2001 U.S. Dist. LEXIS 17887 (S.D. N.Y. 2001) (summary judgment for defendant) (*Arli$$*).
✖ *Zella v. E.W. Scripps Company*, 529 F. Supp. 2d 1124 (C.D. Cal. 2007) (defendant's motion to dismiss granted) (*Rachael Ray*). —S.T.L.

selection and arrangement test, holding that:
[Courts] must take care to inquire only whether the *protectable elements*, *standing alone*, are substantially similar. In so doing, [courts] filter out and disregard the non-protectable elements in making [their] substantial similarity determination.[39]

Moreover, in one flourish of its pen, the *Funky Films* court created a whole new defense for alleged infringers where none previously existed and which has been heav-

arrangement test, comfortably stripping all unprotected elements from the works and ultimately using the new *Funky Films* dissimilarity analysis as a basis to rule against the plaintiffs on their copyright claim.[49]

In the end, the *Benay* plaintiffs only were able to continue to pursue their state law claim of breach of implied contract.[50] Though this claim can be satisfied when copying does not rise to a level of substantial similarity, it requires a higher level of access to establish an implied contract, as well as privity between

favored on the substantial similarity issue in copyright cases,"[54] the overwhelming majority of copyright cases are dismissed on exactly that issue. Admissible expert testimony normally can defeat summary judgment against the party it supports.[55] When two expert witnesses reasonably contradict one another, the contradiction should create a material issue of fact that a jury is required to resolve.[56] However, courts inexplicably have carved out literary analysis as an exception to this rule. Courts have become more willing to

# Not only has the ad hoc use of substantial dissimilarity and the refusal to acknowledge selection and arrangement stripped creators of the doctrines that once protected them, but it also effectively endorses creative theft whenever the elements of an implied contract are not satisfied.

ily relied upon in subsequent court opinions. The court stated that a "reading of the two works reveal[ed] greater, more significant differences" than similarities.[40] In essence, the court constructed a brand new test of "substantial dissimilarity" in the context of copyright infringement, one that completely contravenes the well-established principle that dissimilarity is irrelevant as long as the plaintiff makes a showing of the defendant work's similarity to a substantial element of the plaintiff's work.[41]

It appears that the old Learned Hand chestnut that "no plagiarist can excuse the wrong by showing how much of his work he did not pirate" may no longer be true.[42] The result of this shift in copyright law is that third parties now have the freedom to steal from screenplays with impunity, provided they cover their tracks by creating sufficient dissimilarities in what is, in reality, a "derivative work."[43] The recent case of *Benay v. Warner Bros.* illustrates this point.[44]

In *Benay*, decided in June 2010, the plaintiffs' agent pitched and provided a copy of their screenplay *The Last Samurai* to the president of production at Warner Bros.[45] The studio declined to proceed further with the screenplay but later produced and released a film with the exact same title and premise as the plaintiffs' work.[46] Despite compelling evidence that actual copying of the plaintiff's screenplay occurred,[47] the court deemed it "insufficient to overcome the overall lack of similarities between protected elements of the works."[48] The Ninth Circuit's extrinsic analysis once again ignored the selection and

the parties.[51] Furthermore, even if established, the remedies available in a breach of implied contract claim are not as broad as those for copyright claims.[52] Overall, the state claim is a poor substitute for the once robust protections offered to creators under copyright law. The claim also has been limited extensively by the application of the preemptive effect of federal copyright law—the very law creators hoped it would supplement.[53]

**Phasing Out Experts and Juries**

The outcome in *Benay* is emblematic of just how far copyright decisions have strayed from maintaining a balance between the interests of creators and the interests of producers. Not only has the ad hoc use of substantial dissimilarity and the refusal to acknowledge selection and arrangement stripped creators of the doctrines that once protected them, but it also effectively endorses creative theft whenever the elements of an implied contract are not satisfied. If more juries were exposed to the facts of these cases, creators might hope to reverse the imbalance. However, the determination of appropriation has time and again been allocated to the presiding judge of each case instead. Indeed, copyright infringement may be the only remaining area of the law in which judges seem increasingly willing to decide material facts on summary judgment, effectively removing both experts and juries from the process entirely.

While courts repeatedly cite the proposition that "summary judgment is not highly

dismiss expert witnesses to screenplay copyright infringement claims and analyze the works themselves.[57]

In 2001, the Central District of California stated in *Fleener v. Trinity Broadcasting Network* (a case that was not against a major studio), "There is abundant case-law establishing that expert testimony is particularly appropriate in summary judgment motions under the copyright 'extrinsic test.'"[58] However, judges have become comfortable with disregarding this type of testimony when they believe they can do their own comparison, regardless of how it comports with well-established legal standards.[59]

Many troubling questions arise from this trend. Why do judges believe they can perform the extrinsic analysis of literary works better than plaintiffs' experts?[60] An extrinsic analysis is no easy feat. A judge who dismisses an expert witness, believing the subject matter within his or her grasp, effectively acts as a self-appointed expert. This is a disservice to the creators of literary works. It implies that writing a screenplay is a less complex and involved undertaking than writing a song or a software program. Moreover, the judge essentially deprives plaintiffs of their constitutional right to a jury trial. Nevertheless, this is the current state of copyright law for literary works, with no signs of rebalancing anytime soon.

In copyright infringement cases, judges are supposed to play the role of gatekeeper to the jury. Their task in analyzing substantial similarity is supposed to be extrinsic—that is, objective.[61] If a plaintiff can show objective