1  Steve Wilson Briggs

2  681 Edna Way,

3  San Mateo, CA 94402

4  510 200 3763

5  snc.steve@gmail.com

6  PLAINTIFF In Propria Persona

7

8  **UNITED STATES DISTRICT COURT**

9  **NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| STEVE WILSON BRIGGS | Civ No: CV 17 6552 |
| Plaintiff, | **FIRST AMENDED COMPLAINT** |
| vs | **FOR:** |
| UNIVERSAL CITY STUDIOS LLC; NBCUNIVERSAL MEDIA, LLC; SONY PICTURES ENT INC.; KEVIN SPACEY; ARI (ARIEL) EMANUEL; MATT DAMON; BEN AFFLECK; NEILL BLOMKAMP; MORDECAI (MODI) WICZYK; ASIF SATCHU; BILL BLOCK; DANA BRUNETTI; MRC II DISTRIBUTION COMPANY LP (AKA MRC, Media Rights Capital, and all other MRC entities and subsidiaries)  Defendants. | 1.  CIVIL CONSPIRACY<br>2.  SPOLIATION OF EVIDENCE<br>3.  BREACH OF CONTRACT<br>4.  FRAUD / INTENTIONAL MISREPRESENTATIONS<br>5.  DECEIT<br>6.  CONCEALMENT<br>7.  NEGLIGENCE<br>8.  GROSS NEGLIGENCE<br>9.  VIOLATION OF CALIFORNIA LABOR CODE § 1700.39<br>10. VIOLATION OF UNFAIR BUSINESS PRACTICES ACT [CAL BUS & PROF CODE § 17200, ET SEQ.]<br>11. WITNESS TAMPERING<br>12. INFRINGING EXPORTATION (17 USC § 602, under 17 USC § 501)<br>13. COPYRIGHT INFRINGEMENT (17 U.S.C § 501)<br><br>**DEMAND FOR JURY TRIAL** |

10
11
12
13
14
15
16
17
18
19
20
21
21
22
23
24
25
26
27
28

## NATURE OF ACTION:

**1.**     Pursuant to 28 U.S. Code § 1331 (as this matter involves violations of US federal law) and 28 U.S. Code § 1367(a) (as this matter is substantially related to the prior action, Briggs v Blomkamp, currently in appeals), Plaintiff brings this action against the Defendants (**Defs**) for their violations of federal and state law.  In pursuit of personal enrichment and/or to gain unlawful competitive advantage, the Defendants engaged in such violations as:

1. Spoliation: 6 days after Plaintiff filed Notice of Appeal (in Briggs v Blomkamp, C134679), the Defs closed their social network *TriggerStreet.com* (**TS**) to destroy evidence and records, as this was their *access* point in Briggs v Blomkamp; Plaintiff would subpoena these records if the 9th Circuit remands the matter for trial.

2. Defs Spacey and Brunetti (likely acting at Def Emanuel's behest) created the social network, TS, to secretly and unlawfully access, appropriate and alter the original works of undiscovered writers. The Defs financially profited from these activities, or received film acting roles, or film production or distribution benefits.

3. **Breach:** TS's *Terms Of Use* stated the site was **solely for use in the USA,** yet secretly the site operated around the world. Further, secretly and without consent from US members, Spacey and Brunetti went to London (2002) and Spain (2009) to recruit new members, touting TS's **"400,000 members around the world."**

4. By making Plaintiff's work available in foreign markets, without Plaintiff's consent, the Defs committed Infringing Exportation, infringing on the Plaintiff's copyright.

5. Without informing TS members, the Defendants installed an anti-security feature on TS, which erased all access records if a member deleted their work.

6. In *Briggs v Blomkamp*, the Defs hired 'fixer" **Jeff Rovin** (a high school-educated fantasy writer) as their sole "expert" witness. Rovin provided a falsified report to the court. Two years after Briggs v Blomkamp went to appeals, on Oct. 24, 2016, Rovin went on national TV, Fox News' *The Sean Hannity Show*, to admit he was a professional "fixer" (someone who makes problems go away by producing false stories and documents) for President Bill Clinton's administration. Clearly, the Defs hired Rovin to "fix" his expert report, and violate the judicial process. In June 2014,

1   the Plaintiff moved to exclude Rovin's report due to its gross fraud: Motion denied.

2   7. Evidence will show Def Ari Emanuel, a talent agent, is also Hollywood's most

3   powerful film producer—against California labor & business codes § 1700.39,

4   which makes it unlawful for a talent agent to act as both agent and as an employer.

5   8. Defs boasted TS had "industry standard" security, when, in fact, they removed all

6   security features to allow themselves constant anonymous access to writer's works.

7   9. Defs made wild false promises to entice new writers to TS, such as: "Our team has

8   been extensively researching and designing TriggerStreet.com **to ensure that it**

9   **encapsulates every aspect of the user's desires and needs**".

10  10. The Defs used Def Emanuel's influence with Universal Pictures to entice, persuade

11  or bribe the enlistment of other conspirators and as leverage against business rivals.

12  11. The Defs unlawful relationships (e.g. Defs Emanuel's and Block's co-ownership of

13  Screenbid.com with Sony Picture's CEO M. Lynton; Emanuel's co-ownership of

14  MRC with Defs Satchu and Wiczyk) created a culture where the Defs neglected to

15  do due diligence. Thus, **before they ever read a script**, Sony Pictures and MRC

16  bought the rights to the film *Elysium* (which was misappropriated from the Plaintiff).

17  **JURISDICTION:**

18  2. **Jurisdiction:** This court has subject matter jurisdiction per 28 USC § 1331, as this

19  action involves violation of federal law; per 28 U.S. Code § 1367(a), as this matter is

20  substantially related to Plaintiff's prior federal action, Briggs v Blomkamp; and perhaps

21  partially under 28 USC § 1332(a)(2), as one or more Defendant is/are foreign citizens.

21  3. **Venue:** venue is proper pursuant to 28 § 1391(b)(2) as events giving rise to this

22  complaint occurred in this district, and 28 § 1391(d), by virtue of the Defendants' business

23  transaction with this dist., and under 326 US 310 the Defs meet the minimum contact rule.

24  4. **Intradistrict Assignment:** San Francisco is the proper intradistrict assignment as a

25  substantial part of the events and omissions, leading to this lawsuit, occurred in this district.

26  **THE PARTIES:**

27  5. **Plaintiff,** Steve Wilson Briggs, is a filmmaker, screenwriter, author, musician and a

28  makerspace tinkerer/teacher at Cesar Chavez & Green Oaks Academy.

COMPLAINT
3

6. **Defendant** Universal Pictures is an American film studio; NBCUniversal subsidiary.

7. **Defendant** Sony Pictures is a subsidiary of the Japanese multinational Sony Corp.

8. **Def** NBCUniversal is a multinational media conglomerate & Comcast subsidiary.

9. **Defendant** Kevin Spacey is an American actor, and one of the men purportedly responsible for creating the now defunct social network TriggerStreet (TS).

10. **Defendant** Ariel (Ari) Emanuel is a talent agent and co-CEO of WME-IMG.

11. **Defendant** Matt Damon is an American actor and screenwriter.

12. **Defendant** Ben Affleck is an American actor and screenwriter.

13. **Defendant** Neill Blomkamp is a South African-born film director. He is, on information and belief, a Canadian or South African citizen.

14. **Defendant** Mordecai Wiczyk is the co-CEO of Media Rights Capital (MRC);

15. **Def** Asif Satchu is the co-CEO of MRC, and is believed to be a citizen of Canada.

16. **Def** Bill Block is CEO of Miramax (a subsidiary of Qatari's beIN Media & Al Jazeera).

17. **Defendant** Dana Brunetti is credited with the conception of TriggerStreet.

18. **Defendant** MRC is a diversified global media company, with many subsidiaries and/or aliases, including: Media Rights Capital, MRC II LP; MRC II Distribution Company LP; ; MRC II Holdings, L.P.; AsgarI Inc.; Oaktree Entertainment, Inc., and more.

NOTE:

19. Some of the issues in this Complaint concern false statements made during discovery and a falsified witness report submitted in Briggs v Blomkamp, C134679 PJH. Some of the issues concern certain the Defendants destroying property/evidence related to Briggs v Blomkamp, as that matter moved into appeals—actions which were unknown to the Plaintiff until February 2016. Some of the issues involve the Defendants creating a business culture that encouraged deceit and neglect, creating the conditions under which the Plaintiff's property was violated. Some of the issues involve the Defendants writing and entering into falsified contracts and/or breaching these contracts, which bound the Defendants and Plaintiff until the contract terminated when TriggerStreet.com (or labs.triggerstreet.com) went out of business, November 6th, 2016.

COMPLAINT

4

| | |
|---|---|
| 1 | **STATEMENT OF FACTS & ALLEGATIONS:** |
| 2 | **Brief Case Overview** |
| 3 | 20.  The Defendants conspired to create and operate (for 12 years) a social network for |
| 4 | screenwriters and filmmakers, known as **TriggerStreet** (referred to as **TS** in this |
| 5 | Complaint). TriggerStreet (**TS**) was located at www.triggerstreet.com from 11/2002 to |
| 6 | 07/2011, and at www.labs.triggerstreet.com from 07/2011 to 11/2014. The Defendants used |
| 7 | TS to fraudulently access and acquire original film ideas. By using TS's 400,000+ members |
| 8 | to review, judge, and rank the best work, the Defendants were able to peruse the very best |
| 9 | scripts at their leisure, alter them slightly, then produce and market them, as their own. |
| 10 | 21.   To entice the best undiscovered writers into joining TS and submitting their |
| 11 | screenplays, the Defs published and rendered a contract comprised of false claims, |
| 12 | deception and concealments. TS's "Terms of Use", "About Us" and "Security" pages |
| 13 | claimed to employ "industry standard" security, and boasted that TS "encapsulates every |
| 14 | aspect of the user's desires and needs", when, in fact, TS's security features were effectively |
| 15 | non-existent. (Said TS websites pages "Terms of Use", "About Us" and "Privacy" are |
| 16 | attached, respectively, as **Exhibit A**, **Exhibit B**, **Exhibit C**, and are incorporated by |
| 17 | reference as if fully set out herein.)  The Defs conspired to remove all security features on |
| 18 | the website. Any member could download any script, without the writer knowing the |
| 19 | downloader's ID. Only if an accessor chose to write a script review would the writer be |
| 20 | informed of the accessor's ID —but only the accessor's pseudonym (fake name) ID, while |
| 21 | others users who downloaded the script without leaving a review, left no trace at all. |
| 21 | 22.   More astounding, in 2007, the Defs added a new **anti**-security feature, **without** |
| 22 | **informing members,** whereby if a member—concerned about security—deleted his script |
| 23 | from TS, the deletion would trigger the erasure of all access records. This was done to |
| 24 | conceal the Defs accessing the Plaintiff's work (only posted in 2007). In May 2016, in an |
| 25 | Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95) a |
| 26 | former TS member recalled that this **"memory dump"** feature was added in 2007. (Said |
| 27 | forum is attached as "**Exhibit D**" and incorporated by reference as if fully set out herein; |
| 28 | see last entry, page 4.) In 2014, as Briggs v Blomkamp proceeded through discovery, the |

1    Plaintiff contacted TS to ask for their records of all the members who accessed his work.

2    (Said email is attached as "**Exhibit E**" and  incorporated by reference as if fully set out

3    herein). TS replied that when his work was removed, all access records were erased.  (Said

4    email is attached as "**Exhibit F**" and is incorporated by reference as if fully set out herein.)

5       23.  TS falsely assured members that the site was intended solely for use in the USA.

6    But Spacey and Brunetti secretly marketed TS all around the world.

7       24.  Through secret and private business co-ownerships with key CEOs, in businesses

8    like Screenbid and MRC, Def Emanuel cultivated unethical relationships with Universal

9    Pictures, Sony Pictures, MRC, QED, etc. Thus, these companies would finance and

10   distribute almost any project Emanuel asked, ignoring due diligence and best practices.

11      25.  The Defendants' final illegal action occurred on Nov 6th, 2014, 6 days after

12   Plaintiff filed his Notice Of Appeal (Briggs v Blomkamp), when the Defs surreptitiously

13   closed TS, to destroy incriminating evidence —understanding the district court based its

14   MFSJ ruling on vacated law, rather than prevailing law (cited by Plaintiff). Thus, the case

15   was apt to be remanded for trial, where the Plaintiff would subpoena all site access records.

16                                     NOTE:

17   26.  This Complaint reveals Def Ari Emanuel lead a conspiracy to misappropriate ideas

18   using TS and ProjectGreenlight.com (**Project Greenlight**), to market these ideas to his

19   business partners at Sony Pictures, MRC, Universal Pictures, NBCUniversal, etc.  Relevant

20   to this, Def Emanuel or WME has represented Defs Ben Affleck and Matt Damon for most

21   of their careers. Curiously, like Spacey, Affleck and Damon ran a screenwriter/filmmaker

21   website, *Project Greenlight,* from 2000-05 and 2015-16**.** Curiously, both sites used peculiar

22   language like *peer-to-peer,* and used *peer reviews* to weed out bad scripts. And curiously,

23   Spacey, Damon and Affleck were the only celebrities with screenwriter websites from

24   2000-2014.   In 2005, writer Joel Lamontagne sued Project Greenlight and **Harvey**

25   **Weinstein's** *Miramax,* alleging the TV series *Project Runway* (2005-present) was stolen

26   from a treatment he submitted to Project Greenlight. The allegedly stolen work became the

27   property of Universal Pictures' parent, **NBCUniversal**. Def Emanuel's shadowy projects

28   eventually becoming the property of Universal is a recurring pattern in this Complaint.

| | |
|---|---|
| 1 | **BACKGROUND FACTS:** |
| 2 | **(Understanding This Case Requires Knowledge Of Key Background Facts & Actors;** |
| 3 | **A Review Of Facts Directly Pertaining To The Defs Violations Begins On Page 18)** |
| 4 | <u>THE SIX (6) PRIMARY DEFENDANT ACTORS</u>: |
| 5 | **ARI EMANUEL** (DEFENDANT) |

6   27.   Defendant Ari Emanuel is the co-CEO of William Morris Endeavor (WME, aka
7   WME-IMG). Prior Emanuel was CEO of Endeavor Talent Agency (1995-2009), where his
8   aggressive, unethical business practices inspired the character *Ari Gold*, in the HBO TV
9   series *Entourage*. In 2002, Def Emanuel's *Endeavor* was sued for sexual harassment by
10  Sandra Epstein. Epstein also accused Def Emanuel of making racist remarks. In 2014 WME
11  was found guilty at arbitration of racial discrimination. Logically, WME-IMG attracts
12  clients who share Def Emanuel's values; thus, WME-IMG disproportionately represents
13  aging white clients and *difficult* clients that other agencies avoid (Charlie Sheen, Russell
14  Crowe), and clients who are politically conservative, or politically unaware or inactive.

15  28.   November 20th, 2016, Def Emanuel traveled to New Jersey to congratulate
16  President-elect Trump. Emanuel is also President Trump's former talent agent. Predictably,
17  *The Apprentice* (starring Trump) was broadcast on **NBCUniversal**. Recently, *The Hill* (and
18  others) reported that it was Def Emanuel who helped seal the Miss Universe tape archives,
19  so no further tapes of candidate Trump sexually harassing beauty contestants would be
20  released. (Said "The Hill" article is attached as **"Exhibit G"** and is incorporated by
21  reference as if fully set out herein.)

21     **ASIF SATCHU (Defendant)**

22  29.   Defendant Asif Satchu was born in Kenya but moved to **Canada** when he was 6
23  years old. Satchu, like Def Blomkamp, is believed to be a Canadian citizen. (Canadian
24  connections are a recurring feature in this matter.) Def Satchu is a co-founder of MRC, with
25  Wiczyk. Def Satchu is the brother of **Reza Satchu**, an enormously successful Canadian
26  businessman. Def Satchu and Reza, both graduated from Canada's **McGill** University. Def
27  Satchu is something of a business and business-technology genius. **In 1999 Satchu**
28  **co-founded SupplierMarket.com** with Jon Burgstone (Reza Satchu was also a heavily

1   invested partner). SupplierMarket.com facilitated the **international sales and distribution**
2   of software, bolts, nuts, fasteners, rubber and glass products, corrugated packaging, and
3   probably anything else. **Only 18 months later, Aug. 2000, Satchu and his partners sold**
4   **SupplierMarket for $950,000,000.**  Def Satchu graduated from Harvard (MBA) in 1999.

5        **MORDECAI (MODI) WICZYK (Defendant)**

6   30.   Defendant Modi Wiczyk is an American born businessman, co-CEO and co-founder
7   of MRC (with Defendant Satchu). Wiczyk is the **visionary** of this conspiracy.

8   31.   Around 1995, fresh out of college, Defendant Wiczyk began working at Summit
9   Entertainment, LLC. That was the first year Summit began producing and financing films
10  (prior, Summit had exclusively sold US films abroad); surely the vision of Def Wiczyk.

11  32.   Only four years later, in 1999, when Wiczyk was only 27, Summit Entertainment
12  made Wiczyk their Senior Vice President of Production and Acquisitions. That same year,
13  1999, Wiczyk sent out his now famous **memo**, **which would make him one of the most**
14  **influential and sought after men in Hollywood**. Within a year, in 2000, likely on the order
15  of Def Ari Emanuel, Def Wiczyk was **hired by Universal Pictures** as Vice President of
16  Productions, where Wiczyk served for 2 years, until January 2002, when Def Ari Emanuel
17  made Wiczyk a partner at Emanuel's Endeavor Talent Agency.  Def Wiczyk graduated from
18  Harvard (MBA) in 1999.

19        **KEVIN SPACEY** (Defendant).

20  33.   Defendant Kevin Spacey is an Academy Award winning actor. His career was
21  floundering and at its nadir in 2000 when the conspiracy(s) detailed herein began, and when,
21  purportedly, he and Def Brunetti conceived of TS. Def Spacey, who dropped out of Juilliard
22  School in his sophomore year, has no known web-design skills. Seemingly, Spacey's only
23  value to the TS social network was as a high-profile, semi-likeable celebrity whose promise
24  of "industry access and exposure" would lure the best undiscovered writers to the website,
25  to unwittingly surrendering their wares to the Defendants.

26        **DANE BRUNETTI** (Defendant)

27  34.   Defendant Brunetti has no known college education. He joined the US coast guard in
28  1992, at 18 or 19. Brunetti met Spacey around 1998, while Brunetti was selling cell phones

1    in New York. Brunetti soon became Spacey's partner and personal assistant. It is purported

2    around the internet (including on Wikipedia) that Brunetti was responsible for designing

3    TriggerStreet.com. That is possible. However, there is no evidence that Brunetti possessed

4    any of the skills required to design a social network. The Plaintiff suspects Def Asif Satchu

5    (who founded the internet-based marketplace SupplierMarket.com) may be the website's

6    true designer and talent coordinator.

7        **MRC**

8        35.   MRC is a television and film studio, founded by its co-CEOs Defs Asif Satchu and

9    Modi Wiczyk. MRC was started in 2003 with money provided by Def Ari Emanuel

10   (although MRC often reports it was started in 2006 or 2007). Def Emanuel is a silent

11   partner in MRC. Unlike most ethical companies MRC operates under many names. Likely,

12   only Defs Emanuel, Satchu and Wiczyk know what these companies do. But such LLC

13   companies are a hallmark of money laundering networks (see Dept of Treasury's FinCEN

14   report). The Plaintiff is aware of 11 MRC companies: **MRC, Media Rights Capital; MRC**

15   **II LP; MRC II Distribution Company LP (foreign based); MRC II Holdings, LP;**

16   **Oaktree Entertainment, Inc. (a foreign stock business); MRC I Hedge Co, LLC; MRC**

17   **II Capital Company, LP; MRC Sub Gp, LLC; MRC I Project Company, LLC; Asgari**

18   **Inc.** Plaintiff believes that most of these *companies* are "shell" companies (fronts for illegal

19   activity), existing to launder money and other transactions. Working in conjunction with

20   Def Bill Block (**Miramax** CEO) and *Al Jazeera or beIN Media Group* (Miramax's parent),

21   and perhaps with Satchu's Kenyan-based family, these shells may also be responsible for:

21       a.   producing and selling ideas taken from TS to foreign markets (not for US release);

22       b.   financing foreign films that utilize ideas taken from TS (not for US release).

23

24       **Def Ari Emanuel's Relationship With Defendant Spacey:**

25       36.   Defendant Ari Emanuel likely first met Defendant Kevin Spacey between 1987 and

26   1989, when both men were at Creative Artist Agency (CAA). In 1987 Def Ari Emanuel was

27   a new CAA talent agent, working in **TV** casting. In 1987 Def Kevin Spacey, represented by

28   CAA, was working in Los Angeles and appeared in 9 episodes of the **TV** series "Wiseguy".

**Def Emanuel's Notorious Connection to Def Wiczyk & Satchu:**

37.   Defendant Ari Emanuel is a quiet partner in MRC. Thus, by casting WME-IMG actors in MRC films, Def Emanuel profits both as an agent and as a studio owner. This arrangement is a conflict of interest, in violation of CA Labor Code 1700.39.

38.   In 2007, The New York Times published an article called *"Tilting The Balance of Power Toward Talent Agency Clients"* (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients"  is attached as  "**Exhibit H**" and is incorporated by reference as if fully set out herein.) The article states:

> ….representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist." According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

39.   Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds.
>
> "For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights, but might do so if it was satisfied that the company's ownership and influences were clear. "What becomes critical is who is the management?" he asked. "What level of transparency are we going to have?"
>
> Robert Jones, California's acting labor commissioner, whose office regulates talent agents, said the state's labor code has a provision banning conflicts of interest by agencies. The law, from a time when models were sometimes sent for hair and makeup work by operators with a close connection to their agencies, says that **no agent may refer a client for services to any entity in which the agency has a direct or indirect financial interest.**

| | |
|---|---|
| 1 | <u>**BACKGROUND FACTS**</u> (CONTINUED) |
| 2 | <u>THE 4 MAJOR EVENTS THAT SET UP THE CONSPIRACY(S)</u> |
| 3 | **40.**  The seeds of the Defendants unlawful actions were planted about two decades ago, |
| 4 | by **4 events:** two of these events occurring in 1995, two occurring in 1999. |
| 5 | 1.  **In 1995**  Def Ari Emanuel started Endeavor Talent Agency. |
| 6 | 2.  **In 1995** Edgar Bronfman Jr. (CEO of Seagram's) bought Universal Pictures. |
| 7 | 3.  **In 1999**,   Jerrol   LeBaron   copyrighted   a   revolutionary   screenwriter-to- |
| 8 | Hollywood-film-industry-professional   website   **Writers' Script Network.com**, |
| 9 | which went online in March 2000, changing its name to "**InkTip**" (inktip.com) in |
| 10 | 2003. |
| 11 | 4.  **In 1999** Defendant Modi Wiczyk wrote  a revolutionary <u>**memo**</u>, titled "Another New |
| 12 | Ball   Game",   which   sent   Hollywood's   powerhouses   scrambling.   Wiczyk's   memo |
| 13 | would be discussed in  magazines and lounges for years to come. |
| 14 | |
| 15 | **41.**  These 4 events, **each** require a brief explanation to understand how they set the stage |
| 16 | for the Defendants' conspiracy(s). |
| 17 | **(1) <u>Def Ari Emanuel Comes To Power As CEO Of Endeavor Talent Agency, 1995</u>** |
| 18 | **42.**  In 1995 Def Ari Emanuel started Endeavor Talent Agency. Soon, his aggressive, |
| 19 | unethical practices would make Endeavor the fastest growing talent agency in Hollywood. |
| 20 | **(2) <u>Edgar Bronfman Jr. Comes To Power At Universal Pictures, 1995</u>** |
| 21 | **43.**  In 1995, Canadian based "Seagram's" (the giant beverage company) bought |
| 21 | controlling interest (80%) of Universal Pictures, and Edgar Bronfman Jr. (Seagram's heir; |
| 22 | **Canadian**, graduate of **McGill** College) became owner and CEO of Universal Pictures. |
| 23 | Bronfman remained CEO of Universal Pictures even after Vivendi bought Universal in |
| 24 | 2000.  He stepped down as chief of Universal in 2001, BUT remained Vice-Chairman of the |
| 25 | Board (likely to insure that Def Emanuel's relationship to Universal remained in place) until |
| 26 | December 2003; by then Def Emanuel's role with Universal Pictures was well established. |
| 27 | **44.**  To pay for Universal Pictures, Bronfman Jr. sold Seagram's stake in Dupont (for |
| 28 | $9-billion). Most analysts and Seagram's investors considered this a terrible business move. |

1   To make matters worse, Bronfman knew little about the film business. **NOTE:** Bronfman

2   was convicted of insider trading, in France, in 2011, receiving a 15 months suspended

3   sentence, and a €5,000,000 fine.

4     45.  In 1995, Bromfman and Def Ari Emanuel represented big changes in Hollywood,

5   but the biggest change in Hollywood in 1995 was the advent of the **DVD**. DVDs

6   represented huge new opportunities for producers and film companies —opportunities that

7   would make movies FAR more profitable than ever before; but more profitable for

8   producers, NOT talent agents—adding fuel to Emanuel's drive to become a producer and a

9   studio owner.

10       **(3)  The Advent Of Writers' Script Network.com (InkTip.com), 1999**

11     46.   In 1999, Jerrol LeBaron copyrighted his brilliant website **Writers' Script**

12   **Network.com**,  (writersscriptnetwork.com), going online March 2000; changing its name

13   to **InkTip** and its location to inktip.com in 2003. Unlike all other screenwriter websites at

14   that time (which either just posted screenwriter agents' addresses, or just allowed

15   screenwriters to post loglines or synopses, with no ability to bring the writers to the agents

16   and filmmakers), LeBarons website promised something new. Based in Los Angeles

17   County, LeBaron went out and told Hollywood agents and filmmakers about his website,

18   and invited them to join and peruse the works of thousands of undiscovered screenwriters.

19   The site had great safeguards, designed to protect both the writers and industry

20   professionals. Writers' Script Network.com required all users to use their real names.

21   Writers could not read other writers' work, as that would only reduced the writers' safety.

21   However, after registering, the **industry professionals** could freely read any logline (a

22   short description, 60 words or less) on the website. If a professional wanted to read more,

23   they could click on a link to read a synopsis—and immediately the screenwriter would

24   receive notification of who had accessed his work, when, and from where. If the

25   professional wanted to read the entire script, he/she would then need to contact the writer

26   and request a script. Writers' Script Network.com kept all records of access. **LeBarons's**

27   **site was the new online industry standard** (where there had been no standard, rules,

28   safety, or security for screenwriters ); flawless in conception, safety and transparency.

COMPLAINT

**(4) <u>The Memo, 1999</u>**

47.   In 1999, only 27 years old, Def Mordecai (Modi) Wiczyk, the new Senior Vice President of Production and Acquisitions at Summit Entertainment, LLC, sent out a **memo** titled "Another New Ball Game". That memo sent Hollywood's unethical establishment scrambling after massive new profits. Wiczyk's memo would be discussed in magazines and lounges for years. Within a year, in 2000 (likely at Def Ari Emanuel's bidding) **Universal Pictures** would steal Wiczyk away from Summit, making him VP of Productions. Two years later, Def Ari Emanuel made Wiczyk his **partner** at Endeavor Talent Agency.

48.   In 2007, *Slate* remembered "the memo" in an article called "How An Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate" article is attached as "**Exhibit I**" and is incorporated by reference as if fully set out herein.). Writer Kim Masters wrote:

> ...The memo predicted the decline of the studios, with filmmaking talent as the beneficiary. He also predicted that <u>a management company with a lot of big stars</u> would start to produce and own films. "The most immediate and pressing challenge would be to get the studios to carry the product," he said. The likelihood of a studio boycott was remote, he said, because "whichever studio was suffering at the time would probably break ranks in the name of short-term self-preservation." Hmm.
>
> Michael Ovitz eventually tried to launch such a management company and failed. But Wiczyk's memo said the agencies could also carry out the change. **"A similar structure could be created which complies with the conflict-of-interest laws,"** Wiczyk wrote. "If [a] fund was created as a stand-alone entity and the agency had an arms-length service contract, they could avoid conflict-of-interest violations… <u>Admittedly this is a delicate issue and a tough deal to pull off, but</u> it's <u>certain someone would</u> **try it**." Why? The potential for enhancing agency commission was "too rich to ignore." **In fact, he said, an agency could <u>double</u> its annual revenues.**

49.   Wiczyk's psychopathy is on full display in those final lines of the article, as he enthusiastically implies it is reasonable to behave without ethics —if the profits are "too rich to ignore." But Wiczyk's prediction that "...it's certain someone would <u>try it</u>" would soon prove correct.

50.   But who would want to wander with Wyczyk into such ethically questionable water?

**THE ENDEAVOR/UNIVERSAL/MRC DEFENDANTS:**

ARI EMANUEL AND  HIS SECRET RELATIONSHIP WITH UNIVERSAL

PICTURES; EMANUEL UNITES WITH ASIF SATCHU AND MODI WICZYK

51.   In 1999, Def Ari Emanuel knew producers made the REAL money in Hollywood. But, as a talent agent, he couldn't get in the action—not legally (or not with his name on the product), due to California's conflict of interest laws.

52.   But Def Emanuel saw an opportunity.

53.   Defendant Ari Emanuel had a **distribution problem**. His talent agency (Endeavor) represented many directors, writers and actors, who sometimes decided to make independent and experimental films, only to discover, later, that their films couldn't get national or global distribution because the distributors thought the films weren't marketable. Thus, many of these films died early deaths.

54.   Bronfman Jr., on the other hand, had a **talent problem**. Bronfman Jr. knew the importance of getting marquee names on films. Big American studios crank out about 17 films a year. In this haste, sometimes the studios commit to bad screenplays that no big actors will commit to, thereby dooming the films. But just one or two big names attached to these *inferior* films could increase their returns by tens of millions of dollars.

55.   Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it. Bronfman Jr. came to power in 1995 with Universal in 4th place among the big six studios (20 Century Fox, Disney, Paramount, Warner Bros., Sony Pictures, Universal Pictures). But only one year later, in 1996, Universal was in last place. And last again in 1997. And in 1998, even worse: last place, and Universal had one of its worst years ever, with only a 5.9% market share. Stockholders were restless. (See **Exhibit J**.)

56.   In this tough time, Def Ari Emanuel approached Bronfman with a proposal.

57.   Def Emanuel offered to put special effort into Universal Picture films, and ask his actors, writers and directors to give preference to Universal Pictures films. Emanuel also likely offered to take a reduced agent's fee. **In exchange** Def Ari Emanuel likely received a percentage of the films, and/or a generous share of Seagram's (Universal's parent) stock, but no film credit), and an agreement that Universal Pictures would distribute, and/or provide

1   production money for, any reasonably viable film Def Emanuel brought to Universal
2   Pictures.

3       58.   The agreement was made late 1998.

4       59.   The next year, 1999, Universal pictures would have its best year since Bronfman
5   arrived, climbing to 3rd place, with a 12.7% market share. That was 1999 —the same year
6   Def Modi Wiczyk wrote his memo.

7       60.   Def Ari Emanuel read the memo.

8       61.   Bronfman Jr. surely read the memo. In fact, two years after Wiczyk wrote the memo,
9   in 2001, Bronfman's **Universal Pictures** made Def Wiczyk their vice President of
10   Productions. (An article about Universal hiring Wiczyk is attached as "**Exhibit K**" and is
11   incorporated by reference as if fully set out herein.)

12       62.   And a year after that, in 2002, Def Emanuel would hire Def Wiczyk away from
13   Bronfman Jr., to make Wiczyk a **partner** at Endeavor Talent Agency.

14   ●   63.   But Wiczyk had been Vice President of **productions** at Summit Entertainment,
15   AND Vice President of **productions** at  Universal Pictures. Wiczyk was a  **producer**. Why
16   would Defendant Ari Emanuel need a producer at a talent agency? Because Def Emanuel
17   was secretly going into the production business with MRC and Universal Pictures.

18       64.   When Def Ari Emanuel stole Wiczyk away from Universal Pictures there were no
19   hard feelings between Def Emanuel, Bronfman and Universal Pictures, and nothing changed
20   in their arrangement. Def Ari Emanuel continued to provide the same talent and producorial
21   services for both MRC and Universal Pictures. And although Bronfman left Universal a
21   year later (2003), Def Emanuel continues to do favors for Bronfman and his Universal
22   "family" to this very day (e.g. Def Emanuel and WME-IMG represent Bronfman Jr's
23   daughter, Hannah).

24                   **Wiczyk's Memo Inspires A Conspiracy**

25       65.   The driving force behind Defs Emanuel's, Wiczyk's and Satchu's involvement in
26   this conspiracy was to create the film production system outlined in Wiczyk's **memo**, to
27   increase—maybe even **double—**profits. The conspiracy required only 3 or 4 players, with
28   the right talents. Def Emanuel had connections to all the studios, and access to huge stars;

1   Asif Satchu was a creative business force who specialized in distribution and networking;
2   Modi Wiczyk was a proven business, financing, and film production prodigy. They had
3   almost everything they needed—except good screenplays. But as a new "questionable"
4   company, established writers were not inclined to work with this unscrupulous band.

5       66.   A film production starts with acquiring a screenplay, a "property". The Defendants
6   knew that. They also knew good screenplays are hard to find, cost good money and are a
7   risky investment. A bad director could ruin a great script, and even the best writers
8   sometimes wrote bad scripts. In 2000 Def Wiczyk helped sell his brother's (Roee Wiczyk)
9   screenplay to his former employer (Summit Ent.). But the script was weak, thus never
10  developed, and Roee Wiczyk never sold another script. "Variety" reported on this script sale
11  in 2000. (Said article is attached as "**Exhibit L**" and is incorporated by reference as if fully
12  set out herein.) As a business man, Wiczyk could sell anything —he sold his brother's script
13  idea without even having a script name. But now, operating as film producers and a *studio*,
14  without an **actual** *good* script, or some good ideas, they couldn't get any project started.

15      67.   The Defendants needed scripts, but they wanted to reduce their risks.

16      68.   Defs Emanuel, Satchu and Wiczyk knew ideas are not copyrightable; only unique
17  arrangements of ideas are copyrightable. If the Defendants had a method to access good
18  writers' work, they could extract the best of those ideas, then pay their own writers to turn
19  them into "new" screenplays, then produce and market those derivatives as their own.

20      69.   The L.A. based Defendants were aware of Writers Script Network.com. As "industry
21  insiders" they had likely even received a call or email from Jerrol LeBaron. They wanted
21  something like Writers Script Network.com—but **without** the good security features.

22

23                    **THE TRIGGERSTREET DEFENDANTS**
24            SPACEY'S CAREER SPUTTERS; SPACEY MEETS BRUNETTI;
25          THE CONCEPTION OF THE TRIGGERSTREET SOCIAL NETWORK

26      70.   In 1994 Def Spacey learned Warner Bros intended to make a movie about the life of
27  Bobby Darin (eventually called "Beyond The Sea"). This was Spacey's secret dream role.
28  He offered to play the leading role, but the producers refused, believing Spacey was too old.

71. In 1995, Def Spacey's career soared with *Usual Suspects* and *Seven*. But in 1996 and 1997 Def Spacey was back to NOT getting solid leading-man roles.

72. This likely inspired Def Spacey to form his production company, "Trigger Street Productions", to make quality films with himself cast as the lead. But for the next 7 years his production company floundered. The problem was getting a good screenplay.

73. It is reported that around 1998 Def Spacey met Def Dana Brunetti, who soon became Spacey's personal assistant.

74. Although in 1999 Def Spacey won an **Academy Award** for Best Actor (American Beauty), 1999 would mark the beginning of a very difficult period of Def Spacey's career (1999-2003). His production company would go 3 years without making a film (Jan 2000 to Jan 2003). And worse, for some reason Hollywood would not invest much money in any movie with **Kevin Spacey** in a leading role, **his films budgets were far below the Hollywood average** (the average Hollywood budget in 2000 was about $60 million): 1. American Beauty, 1999, **$15 million**; 2. The Big Kahuna, 1999, **$7 million**; 3. Ordinary Decent Criminal, 2000, **$12 million**; 4. Pay It Forward, 2000, **$40 million**.

75. Def Spacey's difficulty consistently getting good roles, then, was likely due to his terrible reputation around Hollywood as something of a hustler. In 1999, actor Val Kilmer explained in a "Mr Showbiz" interview that in the 1970s Kevin Spacey, who was then a young college student, tricked Kilmer's father out of $18,000 for college tuition —but Spacey, according to Kilmer, kept the money, dropped out of school, and never repaid Kilmer's father. (Said "Mr. Showbiz" article is attached as "**Exhibit M**" and is incorporated by reference as if fully set out herein.) Stories like Kilmer's, and a tabloid photo journal of Def Spacey participating in a public indiscretion, contributed to Def Spacey's trouble.

76. But amid all of these struggles, somehow in 2000, Spacey was able to secure the film rights to his dream project -**Bobby** **Darin's** **life** **story**. But since Def Spacey had no production funding, he would have to wait almost 4 more years to make his movie.

77. It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon *Writers Script Network.com*, which inspired them to create TS... Then, this

1  unlikely pair—a college dropout actor whose career was on life support, and a cellphone
2  salesman—teamed up to create a massive social network for screenwriters and filmmakers.
3  And soon Ari Emanuel learned about the site and asked Spacey to make some
4  modifications: relaxing security, and making access private and untraceable. That could be
5  how TS was created. It makes little difference to the conspiracy that followed.

6     78.   However, the Plaintiff believes TS was formed in a conspiracy conceived by Def
7  Ari Emanuel, to enrich himself and his conspirators. Elysium, alone, earned $286,000,000
8  worldwide theatrically, and should have earn another $570,000,000 in home entertainment
9  and TV, (typically, movies earn twice their theatrical total in home ent., TV, and auxiliary
10  sales), for a total of **$856,000,000** —almost a billion dollars. **This is why setting up TS and**
11  **Project Greenlight were so important to Def Ari Emanuel. One good script can easily**
12  **earn a billion dollars, and one big TV show can earn far more than that.**

13

14                              **THE DEFENDANTS' CONSPIRACY BEGINS:**

15

16     79.   In 2000, shortly after Def Emanuel discovered Writers Script Network.com, Def
17  Emanuel planned his own screenwriter/filmmaker website, with minimal or no security
18  features. He would use his clients, Def Matt Damon and Ben Affleck, as the website's
19  spokesmen and its alleged *conceivers*. In August 2000 Project Greenlight was born. (An
20  Internet Archives screenshot of projectgreenlight.com—showing its origin time—is
21  attached as "**Exhibit N**" and is incorporated by reference as if fully set out herein.)

21     80.   Then misfortune struck Universal Pictures in 2000, and  Def Ari Emanuel seized the
22  occasion to launch a **second** website, allegedly conceived by Defs Spacey and Brunetti.

23     81.   In 2000, Universal Pictures was in a bind. They were just a few months away from
24  beginning to film "K-PAX" but they didn't have a leading actor (after Will Smith and others
25  dropped out). Smith, and other actors and directors (with integrity) were perhaps dropping
26  out due to rumours that Argentinian film director and screenwriter, Eliseo Subiela, learned
27  about writer Gene Brewer's 1995 book "K-PAX" and planned to sue Brewer and Universal
28  Pictures for copyright infringement of Subiela's 1986 film "Man Facing Southeast".

82.   But Universal Pictures, not worried about a small director from Argentina suing, decided to push forward, film, release, make a fortune, and fight Subiela in court later.

83.   By mid 2000, with little time to find a leading man, Universal Pictures was desperate enough to consider casting Def Kevin Spacey in the leading role.

84.   Def Ari Emanuel could have just asked Spacey to take the leading role. Spacey would have leaped at the chance. But Spacey wasn't an Endeavor client, so Def Emanuel wouldn't receive his casting fee.  Def Ari Emanuel was a businessman. As such, even though he needed a favor from Spacey, he wasn't going to just give Spacey a leading role, he wanted something in return. Def Ari Emanuel knew Def Spacey's career was in trouble.

85.   Def Ari Emanuel approached Def Spacey to ask him about starting or endorsing, a screenwriter/filmmaker social network; a social network with little or no security features. The conversation likely started with Def Ari Emanuel asking how Spacey's career was going.  Def Spacey likely explained his recent career setbacks, and his hope to one day film Bobby Darin's life story. He may have explained that he had recently secured the rights to his Bobby Darin film (Beyond the Sea), but had no funding to shoot his dream film.

**Quid Pro Quo**

86.   Upon hearing about Spacey's career troubles, Def Emanuel made Def Spacey and Brunetti an offer: (1) he asked Defs Spacey and Brunetti to design a social network so that ALL user could access ALL screenplays, anonymously, with few security safeguards (it is possible/probable that Def Asif Satchu facilitated the website design); (2) Def Emanuel also may have asked Spacey and Brunetti to include a counter-security feature whereby if a screenplay was removed from the website all access history would also be erased (**although the Defs seem to have added this second features in 2007, shortly before accessing the Plaintiff's work**). The Plaintiff believes that in exchange for agreeing to operate such a social network, Def Ari Emanuel promised Defs Spacey and Brunetti a few things in return:

1. Spacey would star in K-PAX, a film with a solid $68 million budget;

2. Def Ari Emanuel would finance Spacey's production company to make Def Spacey's dream film, Beyond the Sea;

3. Def Emanuel would help Spacey's production company arrange financing and

1   distribution (as needed) for the life of the social network;

2   **4.** Def Emanuel would introduce Spacey and Brunetti to the financial and distribution

3   partners necessary for their production company to succeed;

4   **5.** Emanuel would try to find Spacey a meaningful, perhaps "career defining," role.

5   87.   The agreement was made.

6   88.   Thus, September 2000, only <u>one</u> <u>month</u> <u>after</u> <u>the</u> <u>birth</u> <u>of</u> <u>Project</u> <u>Greenlight</u>,

7   **TriggerStreet.com (<u>TS</u>) was born.** (Internet Archives screenshot of projectgreenlight.com,

8   showing the origin time of Project Greenlight is attached as "**Exhibit O**" and incorporated

9   by reference as if fully set out herein.) The probability that both of the world's only

10  screenwriter/filmmaker social websites (both of which also happened to be prominently

11  celebrity-endorsed) coincidentally starting only a month apart is infinitesimal.

12  89.   But TS would remain a closed and inactive site for 2 years, not having its official

13  "launch" party until 2002. This helped avert suspicion, kept TriggerSteet from competing

14  with Project Greenlight, and allowed TS to learn from Project Greenlight's mistakes.

15  90.   In November 2000, as agreed, Spacey began filming KPAX. When the film was

16  released it would be the first smoking gun in this conspiracy:

17  ●   91.   KPAX was released Oct 2001. It would be the first time **Universal Pictures**

18  **EVER** cast Kevin Spacey in a leading role (in fact, Universal had only ever cast Spacey in

19  **one [1]** film, a **supporting** role, ten years prior, in 1990, in "Henry & June"). (*Spacey was

20  most commonly cast in **Warner Bros** films and independent films.) <u>Casting</u> <u>Spacey</u> <u>to</u> <u>star</u>

21  <u>in</u> <u>K-PAX,</u> <u>a</u> <u>$68</u> <u>million</u> <u>film,</u> <u>at</u> <u>such</u> <u>a</u> <u>low</u> <u>point</u> <u>in</u> <u>Spacey's</u> <u>career,</u> <u>was</u> <u>almost</u>

21  <u>inconceivable</u>. **Def Spacey wouldn't star in a film with a budget over $40 million for 5**

22  **more years** (Superman Returns). Spacey would only appear in one other Universal Pictures

23  film, 2 years later, *The Life of David Gale*—originally a Warner Bros (Spacey's stable)

24  property that Universal Pictures optioned. Spacey just came with the deal.

25  ●   92.   A month after K-PAX was released, in November 2001, director/writer **Eliseo**

26  **Subiela (via Jason Laskay) sued Universal Pictures**, Gene Brewer, et al, for plagiarizing

27  his film *Man Facing Southeast*. The suit was eventually withdrawn when Subiela and

28  Laskay could no longer afford to litigate against a giant corporation like Universal Pictures.

| | |
|---|---|
| 1 | **TS LAUNCHES, NOVEMBER 2002** |
| 2 | 93.   After giving Project Greenlight two years to gain traction, November 2002, the |
| 3 | Defendants prepared to launch TS. To attract the best undiscovered writers, the Defendants |
| 4 | planned to generate "buzz" by throwing 3 huge TS "launch parties": one in New York, one |
| 5 | in Los Angeles, and one in **London**. (A photo of Kevin Spacey at the TS London Launch |
| 6 | party is attached as "**Exhibit P**" and is incorporated by reference as if fully set out herein.) |
| 7 | While in Britain, Def Spacey did many interviews about TS. The Guardian featured a piece |
| 8 | called "Cyber Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's |
| 9 | well-rehearsed lines. (Said Guardian article in which Def Spacey went to London to discuss |
| 10 | TS is attached as "**Exhibit Q**" and incorporated by reference as if fully set out herein.) |
| 11 | Writer Sean Clarke wrote: |
| 12 | Spacey tells an anecdote about the original idea for the site, |
| 13 | which is essentially Brunetti's brainchild. He says they "came up with a sketchy plan, which at the time..." and chuckles |
| 14 | wryly, on which cue Brunetti take up the story "... which at the time, we thought was great." They both shake their heads |
| 15 | ruefully. Later, I watch as the pair address a press conference, |
| 16 | they repeat the story, with exactly the same pauses, the same chuckle, the same interruptions. It's beat-perfect, like a |
| 17 | Mamet script. |
| 18 | |
| 19 | 94.   And to generate even more buzz, before the website was launched, Budweiser |
| 20 | announced their corporate sponsorship of the TS social network. |
| 21 | 95.   Along with the sponsors, parties and interviews, to help repair Def Spacey's |
| 21 | damaged reputation, the TS website posted a heartwarming story that Spacey started his |
| 22 | new social network "to help undiscovered writers and filmmakers get industry access and |
| 23 | exposure." |
| 24 | 96.   **TriggerStreet.com was "launched", and went online, November 2002** |
| 25 | ●   97.   Def Spacey held a New York TriggerStreet **launch party** on Nov 11th, 2002. |
| 26 | ●   98.   Def Spacey held a Los Angeles TS **launch party** on Nov 18th, 2002. |
| 27 | ●   99.   Def Spacey held a London TS **launch party** on Nov 26th, 2002. |
| 28 | |

| | |
|---|---|
| 1 | **After TriggerStreet Officially Launched, Nov 11th, 2002,** |
| 2 | **The Following Events (Connecting The Defendants) Occurred:** |
| 3 | 100.  Within just a few months of TS's official launch (Nov 2002), Def Spacey would |
| 4 | receive **3** huge payments from Defs Ari Emanuel and Universal Pictures (although Spacey |
| 5 | would receive many other "benefits" during the 12 year lifespan of TS): **1)** Universal |
| 6 | Pictures would distribute "The Life of David Gale"; **2)** Spacey's production company |
| 7 | would receive distribution money for "United States of Leland"; **3)** after 3 long years, |
| 8 | Spacey's production company would receive **$25,000,000** to produce "Beyond the Sea". |
| 9 | ● 101.  In **February** 2003, 3 months after TS launched, **Universal Pictures** |
| 10 | distributed Spacey's film "**The Life of David Gale**" (again, originally a property of |
| 11 | Spacey's home studio, Warner Bros). This would be the last time Universal Pictures would |
| 12 | be involved in a Spacey film (to the date of the filing of this Complaint). Thus, the only two |
| 13 | Universal Pictures films featuring Spacey as a lead are *K-PAX*, and *The Life of David Gale*. |
| 14 | ● 102. That same month, **February of 2003**, Spacey's production company would |
| 15 | magically get money to release and distribute its first movie in 3 years: "United States of |
| 16 | Leland". The film would only be released in 14 theaters, losing millions, and bringing in |
| 17 | only $344,000. Likely, Universal Pictures wouldn't put their name on the film, because |
| 18 | after two bad years, Universal was back in 5th place (second to last place), and they didn't |
| 19 | want *United States of Leland* to move them into last place. |
| 20 | ● 103.  That same month, again, **February 2003**, it was announced that production |
| 21 | of Spacey's Dream film, "Beyond the Sea," was being fast-tracked—directed by and |
| 21 | starring Spacey and produced by Spacey's production company, with a $25,000,000 budget. |
| 22 | 104.  Suddenly, in the nadir of Spacey's career, inexplicably Hollywood was showing |
| 23 | him tremendous support—when 4 of Spacey's previous 5 films were major money losers. |
| 24 | Footnotes: |
| 25 | 105.  Shortly after TS launched, in **2003**, Ari Emanuel gave Asif Satchu and Mordecai |
| 26 | Wiczyk financing to start MRC. |
| 27 | 106. **December 17th, 2004,** *Beyond the Sea* was released. It would be Spacey's **greatest** |
| 28 | **failure**; costing $25 million, but only earning $8.4 million; losing over $16,000,000. |

**<u>Additional Facts Regarding TS And The Defendants</u>**

1

2   ● 107.   Spacey's production company made no films for 3 years, January 2000 to

3   January 2003: Ordinary Decent Criminal (Jan 2000, direct to DVD in USA), and United

4   States of Leland (Jan 2003, released in only 14 theaters).

5   ● 108.   Since TS launched, Def Spacey's production company has made 22 films.

6   ● 109.   May 2005, 2.5 years after TS launched, Project Greenlight was effectively

7   dead (no new contests for filmmakers or screenwriters); killed by the success of TS.

8   Although, oddly, the Project Greenlight website remained open, but inactive —no new

9   contests, no new submissions accepted; just an open, inactive website (until 2015).

10   ● 110.   In 2006 Spacey held a TriggerStreet "RE-launch" party in Los Angeles.

11   ● 111.   2007, Plaintiff's screenplay, Butterfly Driver, was posted and accessed on TS.

12   ● 112.   2007-2009 TS secretly joined Bud.TV (Budweiser TV), without informing

13   members or revising its Term of Use page. In a 2007 Anheuser-Busch announced it was

14   launching Bud.TV with TriggerStreet.com providing programming. (Said Bud.TV news

15   release is attached as "**Exhibit R**" and incorporated by reference as if fully set out herein.)

16   Curiously, Bud.TV's Wikipedia page shows Defs Matt Damon and Ben Affleck (Project

17   Greenlight), and Kevin Spacey (TS) all provided Bud.TV programming. (Said Wikipedia

18   article is attached as "**Exhibit S**" and incorporated by reference as if fully set out herein.)

19   ● 113.   Feb 2009, the BBC reported Def Spacey hosted the Mofilm Film Festival, in

20   Spain, where he boasted of TS's **"400,000 members around the world."** (Said BBC article

21   is attached as "**Exhibit T**" and is incorporated by reference as if fully set out herein.)

21   Willfully marketing TS outside of the USA violated the Plaintiff's copyrights.

22   ● 114.   On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency (ETA)

23   merged with the William Morris Agency (WMA), creating William Morris Endeavor.

24   **17 days later**, May 14th 2009, **after about 20 years** <u>**with**</u> <u>**the**</u> <u>**William**</u> <u>**Morris**</u> <u>**Agency**</u>,

25   Def Spacey signed with CAA (Creative Artist Agency). Def Spacey did so to keep TS

26   members (and any observing regulatory authorities) from becoming suspicious of his link to

27   Def Ari Emanuel through TS. (A New York Times article about the April 2009 merger of

28   WMA and Endeavor is attached as **"Exhibit U"** and is incorporated by reference as if fully

set out herein.)  (A May 2009 Variety article about Def Spacey leaving WME is attached as "**Exhibit V**" and is incorporated by reference as if fully set out herein.)

- 115.   May 2010, "Deadline Hollywood" reported Defendant **Universal Pictures** and Defendant Media Rights Capital (MRC) announced a 20 picture, 5-year production and distribution deal. (Said "Deadline Hollywood" article is attached as "**Exhibit W**" and is incorporated by reference as if fully set out herein.)  Thus, MRC's (a company co-owned by Defendant Ari Emanuel) first mega-deal would be with **Universal Pictures**.

- 116.   March 15th, 2011, **Netflix** and Def **MRC** (owned by Defs Emanuel, Wiczyk and Satchu) announced their mega $100 million dollar 2-season deal to produce the new series *House of Cards*, starring Def Kevin Spacey. Quietly, a few months later, July 2011, **with the role of a lifetime secured**, Spacey moved TS to http//www.labs.triggerstreet.com, and begin to use the web address triggerstreet.com as his production company's site.

- 117.   August 2013, the film ***Elysium*** (infringing on the Plaintiff's work) was released. The Plaintiff then sued for copyright infringement, October 2013.

- 118.   November 6th, 2014, 6 days after the Plaintiff filed his Notice Of Motion of appeal, Defs Spacey and Brunetti closed and destroyed the TS social network.

- 119.   In 2015, almost immediately after TS closed, Project Greenlight (which had been **dead for 10 years**, came back to life, with a new HBO TV show, airing fall of 2015.

- 120.   July 2016, HBO announced the Project Greenlight TV show was cancelled.

- 121.   In 2016, with the cancellation of the TV show *Project Greenlight*, and with the closing of TS—with no way to gain access to original screenplays to misappropriate— ProjectGreenlight**.com** went active, again. **After 10 years of online inactivity**, Def Matt Damon, Ben Affleck and ProjectGreenlight.com began seeking new screenplays again.

- 122.   In 2015, Def Dana Brunetti produced his **first** solo effort (without Kevin Spacey or their *Trigger Street Production* company), ***50 Shades of Grey***. *50 Shades of Grey* was, of course, underline distributed by **Universal Pictures,** apparently the only major distributor that will touch a Brunetti film (without Def Spacey or their *Trigger Street Productions* company attached). (A Wikipedia article showing the producers and distributors of 50 Shades of Grey is attached as "**Exhibit X**" and is incorporated by reference as if fully set out herein.)

1    **SONY PICTURES EMAIL LEAK EXPOSE DEF ARI EMANUEL'S SECRET**

2    **UNIVERSAL PICTURES TIES,  HIS UNLAWFUL RELATIONSHIPS WITH SONY**

3    **PICTURES' CEO (M. LYNTON), & HIS BULLYING, THUGGISH METHODS**

4    123.    Further confirming all allegation herein, in 2015 Wikileaks released thousands of

5    Sony Pictures emails, which had been previously released in 2014, when North Korea

6    hacked and published thousands of Sony's emails. Within days hundreds of respected news

7    agencies carried the story —The NYTimes, LATimes, Hollywood Reporter, all reported the

8    juicy details—and the juiciest story was the story of how Sony Pictures lost -or passed on-

9    "Steve Jobs", the movie.

10    124.    All of the reports are similar: the emails provide an inside view of bunch of

11    super-rich Hollywood producers, writers, and directors negotiating the production budget of

12    the film "Steve Jobs", until the deal went bad and Sony gave up on the film. And right in the

13    eye of the storm is Def Ari Emanuel. (An articles from "Mashable.com" about said "Steve

14    Jobs" film emails is attached as "**Exhibit Y**"and is incorporated by reference as if fully set

15    out herein.)

16    125.    A few of the celebrities captured on Sony Pictures email/text leak, at times,

17    behaved poorly, but no one behaved worse than, Def Emanuel. Brazen and thuggish, we see

18    Def Ari Emanuel berate Sony Pictures' Chairman Amy Pascal, with impunity. And when

19    the other Sony execs learned of this, they only called Def Emanuel a *bully*—behind his

20    back. No one dared to confront Def Emanuel. But more surprisingly, through a tiny sliver of

21    Def Ari Emanuel's emails (just those going into, or out of, Sony Pictures) we learn:

21    1. Def Ari Emanuel is a major film producer —in conflict with his role as a talent

22        agent, and in violating California labor law which forbids employers (a producer)

23        from charging employees (his actors) fees to be hired—perhaps an even more

24        significant conflict of interest than Def Emanuel's partnership in MRC II LP.

25    2. Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures CEO and

26        Chairman) are secretly business partners: co-owners in the company *Screenbid*.

27    3. Ari Emanuel is also a film financier, or executive producer (a person who provides

28        or finds money to make films).

COMPLAINT

25

4.   Def Ari Emanuel also arranges peripheral services for Sony Pictures (and others), like making deals with Hasbro Toy Co. for Sony Pictures  (for Spider-Man 2 & Minions  action figures?).

5.   <u>Whenever necessary, **Universal Pictures** will distribute ANY film for Ari Emanuel</u>.

"STEVE JOBS" EMAILS CONFIRM DEF ARI EMANUEL

IS SECRETLY A MAJOR FILM PRODUCER, AND THE TRUE

PRODUCER OF "STEVE JOBS" —NOT SCOTT RUDIN

126.   Through the Sony "Steve Jobs" email trail we see the "Steve Jobs" negotiation go on for about 8 months, then it begins to fall apart on October 16th, 2014, after Sony Pictures' President of Business Affairs, Andrew Gumpert, sends Sony Pictures Chairperson Amy Pascal, film producer Scott Rudin, Def Ari Emanuel, and WME co-CEO Patrick Whitesell a financing offer, which the filmmakers felt was too low.  October 18th, 2014, two days after Gumpert's low offer, Scott Rudin, angrily responds:

2014-10-18 16:09:38  Re: wwbo bumps/jobs From: Scott Rudin
<sr@scottrudinproductions.com> To: pascal, amy
gumpert, andrew  aemanuel@wmeentertainment.com
pwhitesell@wmeentertainment.com

**SCOTT RUDIN:**

"You have NO risk in the movie but WE should have risk? You lay off every cent except what you choose to keep and WE should then also fund you --- that's how this should work?

I cannot believe you're serious. What idiot would make this deal? The presumption that five Oscar winners would be desperate enough to give up all value for their services and then also risk the baseline bargain-basement fees on top of it is beyond comprehension.

Every single movie like this that we have made for you has worked. And you think this is fair?"

127.   At Rudin's words, Def Ari Emanuel, who purports to the world that he is just a talent agent, would then take over the email exchange —seemingly eager to bully a woman.

On Oct 18, 2014, at 9:15 AM,  From: Ariel Emanuel
<AEmanuel@wmeentertainment.com> To: pascal, amy

COMPLAINT

26

1                 sr@scottrudinproductions.com   gumpert, andrew

2                       pwhitesell@wmeentertainment.com

**ARI EMANUEL:**

3        "This offer is fucking bull shit. Give us the movie back. You you guys

4        in the business. No other studio would even ask for this. Pass"

5     128.   Def Ari Emanuel immediately establishes and retains dominance and control of the

6  matter for the remainder of the negotiation, and Scott Rudin would remain quiet and

7  subordinate to Def Emanuel. But the key detail in this email is that Def Emanuel has the

8  authority to say "Pass", meaning: we choose NOT to do business with you, we will find

9  another partner. No mere talent agent can usurp that power from the producer.  Scott Rudin

10  put Ari Emanuel on that email chain because Ari Emanuel is the true producer.

11     129.   The exchange goes on. Amy Pascal writes:

12           On Oct 18, 2014, at 10:18 AM  From: Amy_Pascal@spe.sony.com

13                   To: aemanuel@wmeentertainment.com

          sr@scottrudinproductions.com gumpert, Andrew

14                pwhitesell@wmeentertainment.com

**AMY PASCAL:**

15        "Can we please deal with this Monday

16        Maybe we all get in a room and close it up"

17     130.   But Def Ari Emanuel will not be silenced by Ms Pascal's request to wait until

18  Monday. He replies five minutes later::

19             On Oct 18, 2014, at 10:23 AM,  From: Ariel Emanuel

20               <AEmanuel@wmeentertainment.com>  To: pascal,

21          amy  sr@scottrudinproductions.com   gumpert,

           andrew pwhitesell@wmeentertainment.com

21  **ARI EMANUEL:**

      "Whatever

22        **You guys ask us to find financing. Scott, Patrick and myself get**

23        **Modi** and we still get no respect. Amy, this is not what you want to

      hear - but this NEVER happens and any other studio. In fact they

24        then would go out of their way to make a proper deal.

25        Even Harvey.

      Monday is fine."

26

27     131.   With that statement **Def Ari Emanuel admitted he found film financiers for**

28  **"Steve Jobs", which is a strictly a producer's, or an executive producer's job.** Def Ari

Emanuel also generously (and falsely) shares credit with Rudin and Whitsell for getting Modi Wiczyk to help with financing, to make Rudin and Whitsell appear more significant to the process. Again, Defs Modi Wiczyk and Ari Emanuel had been a business partners since 2002 (at Endeavor, as well as in MRC) Getting Def Modi Wiczyk involved was entirely Def Ari Emanuel's doing. Amy Pascal responds to Def Emanuel's provocation:

> On Oct 18, 2014, at 10:51 AM,  From: Amy_Pascal@spe.sony.com
> To: aemanuel@wmeentertainment.com
> sr@scottrudinproductions.com gumpert,Andrew
> pwhitesell@wmeentertainment.com
> **AMY PASCAL:**
> "arithat is totally unnecessary we are in a negotiationwe have all
> been doing this a long timewe want to make moneyyou want to
> make money for yourselves andyour clientsthis has nothing to do
> with respect and to be fair and its a credit to the movie that scott
> put together there are more financing partners  than we know
> what todo with here....thats not the issue...we are the only major
> studio  that  even  tries  to  make  thesekind of movesdont  make  it
> harder than it isthe tone is really uncalled for  and unfairand
> doesnt help get things doneamy"

132.    Through all of this, Scott Rudin never commented or told Def Ari Emanuel to disengaged. That is not his place. Ari runs the show. Def Ari Emanuel replies:

> 2014-10-18 10:58:41  Re: wwbo bumps/jobs From: Ariel Emanuel
> <AEmanuel@wmeentertainment.com>  To: pascal, amy
> sr@scottrudinproductions.com   gumpert,
> andrew pwhitesell@wmeentertainment.com
> **ARI EMANUEL:**
> "Ok not true. Other studios make these movies"

133.    Def Ari Emanuel was alluding to Universal Pictures, who would produce any film Def Emanuel suggested. Texting stopped for 7 or 8 hours, until Def Ari Emanuel resumed.

> 2014-10-18 16:20:47 From: aemanuel@wmeentertainment.com
> To: gumpert, andrew sr@scottrudinproductions.com,
> pwhitesell@wmeentertainment.com,  pascal, amy
> **ARI EMANUEL:**
> "In the real world when some one either risks something or gives something
> up they get something in return. You guys seem to think we should be
> honored just to be in business with you based on your offer. Why?"

134.   After this, the negotiation disintegrated over the next 4 weeks. The last email from Def Emanuel to Amy Pascal was sent November 11, 2014, when Emanuel abruptly asked:

> 2014-11-14 22:57:02  From: aemanuel@wmeentertainment.com
> To: pascal, amy
>
> **ARI EMANUEL:**
> "Is business affairs calling me so I can take this to Fox Searchlight officially?"

135.   <u>With that statement Def Emanuel showed that, in addition to producing, **he even arranges distribution**</u>. Def Emanuel is asking Amy Pascal if Sony Pictures' President of Business Affairs, Andrew Gumpert, is going to call to let him know if Sony wants "Steve Jobs". Def Emanuel is bluffing that Fox Searchlight has agreed to take the film. He  never had a deal with Fox Searchlight. He was just playing hardball; trying to get a better offer out of Sony, AND keep them in the dark about his distribution relationship with **Universal Pictures.**

136.   As this deal dragged on over 8 months, 3 weeks before the previous exchange, Sony Pictures' Andrew Dumpert, spotted Def Emanuel's chicanery and bad motives. In an email to Sony execs Lynton, Pascal, and Doug Belgrad; Andrew Gumpert wrote:

> 2014-10-18 16:59:16  From: Andrew Gumpert
> To: lynton, michael; pascal, amy; belgrad, doug
>
> **Andrew Gumpert:**
> "The fact is there is only so much in the kitty. Unless the movie massively breaks out they can never make real money, nor can we and our investors.They have a 50pt pool with the best definition and 5m of box office bonuses. **Do they want to make MORE than the equity? I think they do.** There is a huge philosophical gap (given the rude and insolent responses from Ari and **Scott**)..."

137.   Andrew Gumpert knew something was wrong, because Def Ari Emanuel and Scott Rudin weren't adhering to established guidelines.

138.   Although there have surely been occasions when Sony Pictures did cave-in to Def Emanuel's arm-twisting, this would not be one of those occasion. But oddly, Michael Lynton, CEO of Sony Pictures, responds to Gumpert only with silence—because Def Ari Emanuel is his close friend and secret business partner in Screenbid.

1          **"Steve Jobs" Film's Not-So Surprising *Twist* Ending:**

2     139.   Fox Searchlight never touched "Steve Jobs".

3     140.   Def Ari Emanuel had just been playing the ace up his sleeve; trying to push the

4     price of the film above market value, to increase his profit margin. He didn't need Sony

5     Pictures to give him standard market value for "Steve Jobs", he could get standard value

6     from Universal Pictures. When the maneuver failed, and Sony Pictures backed out, Def Ari

7     Emanuel took the film to the Studio that has distributed all of his films, since around 1999.

8     141.   On September 5th, 2015, 10 months after Sony Pictures declined on "Steve Jobs",

9     after so much posturing and tumult, "Steve Jobs" was distributed by **Universal Pictures.**

10

11        SONY PICTURES EMAILS SHOW DEFS EMANUEL & BILL BLOCK & SONY

12          PICTURES' CEO  (M. LYNTON) MAINTAIN UNETHICAL RELATIONSHIPS,

13            AS THEY CO-OWN "SCREENBID" TOGETHER (CONFLICT OF INTERESTS)

14    142.   The "Steve Jobs" emails reveal Defs Emanuel and Bill Block are in a co-ownership

15    business with Sony Pictures' then-CEO Michael Lynton. As we see Def Ari Emanuel write

16    Michael Lynton to ask Lynton to check on their co-owned business, *Screenbid.*

17              On Dec 3, 2013, at 3:11 PM, From: aemanuel@wmeentertainment.com
                                    To: lynton, michael;
18        **ARI EMANUEL:**
19              Michael -
              What are we doing on Screenbid? We had success on our early tests,
20            nothing since. You guys own a piece of this company, we've had
21            nothing since our early success. We have to keep the engines going.

21    143.   In the text above, Def Emanuel's and CEO Michael Lynton's joint ownership of

22    Screenbid is confirmed by the repeated use of pronoun"we". Def Ari Emanuel asks "What

23    are **we** doing..." Then he states "**We** had success on our early tests…" Then he reminds

24    Lynton that he (and some unknown party, or parties) also own shares of this company. Then,

25    implying Lynton has a responsibility, Def Emanuel says, "**You guys own a piece of this**

26    **company…**" Then Def Emanuel exhorts CEO Michael Lynton to take action, saying: "**We**

27    have to keep the engines going."

28    144.   These are not the messages of quiet stockholders. These men are owners.

145.   Sony Picture's CEO, Michael Lynton is quite a bit wiser than Def Emanuel, and does not reply to Emanuel through his Sony Email account, understanding they are engaged in an unlawful enterprise. But 11 months later, 10/31/2014, Def Bill Block, the CEO of Screenbid, not-so-wisely emails Def Emanuel and Lynton (to Lynton's Sony email address) to give his business partners a business report, pasted below his reply text. (Bill Block was the CEO of QED International, a Defendant in Briggs v Blomkamp.) Def Bill Block's reply email reads:

> 2014-10-31 00:35:37 FW: SCREENBID AUCTION UPDATE
> From: bblock@qedintl.com  To: aemanuel@wmeentertainment.com
> michael_lynton@spe.sony.com
>
> **BILL BLOCK:**
>    Going well gentlemen.
>    Bill
>    From: Jeffrey A. Dash [mailto:jdash@screenbid.com]
>    Sent: Monday, October 27, 2014 10:13 AM
>    To: Bill Block
>    Subject: SCREENBID AUCTION UPDATE
>    AUCTION UPDATE:
>
>    TRUE BLOOD: (HBO) We are winding down aftermarket sales and fulfillment and are on schedule to present audited reports to HBO accounting within 14 days.
>
>    SONS OF ANARCHY: (FOX) We visited the set on Friday 10/24/14 and met with the department heads for props, wardrobe, transportation and set decoration. They are scheduled to wrap next week and we will take delivery by 11/5/14, immediately inventory and shoot. Writing began about 2 weeks ago The auction is scheduled to go live on 12/01/14 and bidding will end on 12/10/14. Fulfillment time will be tight. In order to get everything shipped prior to XMAS  we will have extra staff in place to facilitate…"

146.   In this unethical relationship, Sony Pictures' CEO Lynton, personally profited as Screenbid's owner, in such ways as directing Sony Pictures to give Screenbid millions in set furnishings to auction on Screenbid, where he and Def Emanuel profited as owners. Lynton's secret relationship with Def Emanuel is why Sony Pictures did not do due diligence to vet Def Blomkamp's Elysium script.

| | |
|---|---|
| 1 | <u>SONY EMAILS SHOW DEF EMANUEL PERFORMS</u> |
| 2 | <u>PRODUCORIAL SERVICES:  CALLING SONY'S CEO & CHAIRMAN</u> |
| 3 | <u>TO ARRANGE A DEAL WITH HASBRO</u> |
| 4 | 147.   On March 28, 2014, Def Ari Emanuel emailed/texted Sony's Pictures' CEO and |
| 5 | Chairman to close an animation co-financing deal with Hasbro. Def Emanuel's email read: |
| 6 | 2014-03-28   re: HASBRO Animation deal |
| 7 | From: aemanuel@wmeentertainment.com<br>To:<u>amy_pascal@spe.sony.com</u>;  michael_lynton@spe.sony.com |
| 8 | **ARI EMANUEL:** |
| 9 | "HASBRO Animation deal<br>Amy & Michael - |
| 10 | We have sent Ronni our proposal for the animation co-financing |
| 11 | deal. Please take a look when you get a chance and lets lock this<br>down. |
| 12 | Ari |
| 13 | 148.   Talent Agents don't arrange animation co-financing deals with Hasbro—producers |
| 14 | and studios do. Curiously, after Billionaire Def Ari Emanuel recently purchased the UFC he |
| 15 | arranged a UFC Hasbro deal. (An article where Def Emanuel discusses UFC and Hasbro is |
| 16 | attached as "**Exhibit Z**" and is incorporated by reference as if fully set out herein.) |
| 17 | |
| 18 | **SONY EMAILS SHOW DEFENDANTS COMMITTED PERJURY REGARDING** |
| 19 | **THEIR EFFORTS TO HIDE INFRINGEMENT IN BRIGGS V BLOMKAMP** |
| 20 | 149.   The Defendants' fraud, conspiracy and routine deceit included committing perjury |
| 21 | by lying on documents signed under oath. |
| 21 | 150.   During the discovery phase of Briggs v Blomkamp, et al (C13 4679 PJH) the |
| 22 | Plaintiff informed the district court that he suspected that writer/producer Simon Kinberg |
| 23 | was hired to rewrite Def Blomkamp's poorly written screenplay. In response to Plaintiff's |
| 24 | interrogatories to MRC II LP, the Defendants  made false statement, under oath, regarding a |
| 25 | substantial matter in that case, which may impact the Plaintiff's ability to prevail in that |
| 26 | lawsuit (currently in appeals). (Said Def MRC II LP's Interrogatory Responses from Briggs |
| 27 | v Blomkamp are attached as "**Exhibit AA**"  and is incorporated by reference as if fully set |
| 28 | out herein.) |

151.    That deceit occurred when the Defs responded to interrogatory #17; believing Simon Kinberg helped disguise Def Blomkamp's infringement, the Plaintiff asked:

**Plaintiff's Interrogatory:**
INTERROGATORY #17:
"Simon Kinberg is a writer and "script doctor" (a writer who fixes scripts that have serious problems). Simon Kinberg is listed as a producer of Elysium. Exactly what duties did Simon Kinberg play in the production and script doctoring of the screenplay and film "Elysium"?"

**Defendants' Answer:**
"Defendant incorporates by reference the preliminary statement and general objections... Subject to and without waiving the foregoing objections, Defendant responds as follows:
          Simon Kinberg <u>produced</u> <u>the</u> <u>Film</u>. As producer, Mr. Kinberg also **assisted  with a <u>polish</u> of the Film's screenplay** during the later stages of writing."

**<u>But The Leaked Sony Emails Reveal The Truth About Said Perjury:</u>**

152.   The Defendants admitted that Simon Kinberg helped improve the weak screenplay, BUT suggested that his help was just a "polish", which suggests merely dotting I's and crossing T's, and maybe a dialogue suggestion here and there. But, in fact, Simon Kinberg had to do exhaustive work to try to salvage Elysium's terrible screenplay.

153.   The gross underestimation and misrepresentation of all the work Simon Kinberg had to do to repair Def Blomkamp's Elysium script is revealed in the 2015 Wikileaks're-posting of the Sony Pictures' hacked emails, in five (5) key email exchanges between Defs **Modi Wiczyk**, **Simon Kinberg**, and Sony Pictures Chairperson **Amy Pascal**. In the first email, Def Wiczyk explains Kinberg's role:

          2014-10-27 13:36:12  <u>Fwd: CHAPPIE NOTES</u>
          From: mwiczyk@mrcstudios.com To: pascal, amy
**MODI WICZYK:,**
          "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying. great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb</u> <u>has</u> <u>been</u> <u>ignoring</u> <u>him</u> <u>the</u> <u>past</u> <u>few</u> <u>weeks</u> <u>after</u> <u>listening</u> <u>to</u> <u>him</u> <u>up</u> <u>until</u> <u>then</u>. dont know why, dont care. its our turn now.i told doug that we should

COMPLAINT
33

leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

154.   Def Wiczyk, Simon Kinberg, and Amy Pascal continued to discuss the endless and unimaginable problems Kinberg was having helping director Def Blomkamp's save his film, *Chappie*; the executives discuss reshoots,  dialogue rewrites, other huge changes, and how to protect Def Blomkamp's insecure ego. Yet, amid these massive problems, Kinberg comments that Def Blomkamp was handling Kinberg's executive ordered changes much better than he handled them on Elysium, where Kinberg explains Blomkamp **"shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once."** In this email to Amy Pascal, Simon Kinberg wrote:

2014-08-07 07:02:55  Re: Chappie  from:
sdkinberg@aol.com   to: pascal, amy
**SIMON KINBERG:**
"cool! neill has been really open throughout this process, and wants to get the audience all the way there. i think we're all feeling the same things now, so we can put it together and deliver to him, and he'll take it as an assignment not a judgement, and stay creative. **i saw him shut down on elysium, partly because he felt he didn't have the answers. he's never shut down on this movie, not once. so i don't think he will now…**"

155.   In fact, the text/emails reveal Def Wiczyk and Amy Pascal were forced to hide from Def Blomkamp the fact that Simon Kinberg had to take over the film to finish it. This is revealed when Def Wiczyk wrote to Sony's Chairperson, Amy Pascal:

2014-10-27 13:42:22  Re: To discuss
From: mwiczyk@mrcstudios.com; To: pascal, amy
**MODI WICZYK:**
"not to oversimplify but i know simon has been biting his tongue for a month and all the sloppy stuff has been making him **crazy.** when i speak to him he seems to have a very clear view of what he wants to do. it lines up w what ur saying. i hink if we make them do it we will have a much much much better film that works. we just cant literally tell neill **si is taking over....**so its "our" notes"

156.   Additional evidence of the extreme measures that Defendants Simon Kinberg, Sony Pictures, MRC and Modi Wiczyk resorted to salvage Chappie. Can be seen in such

1  emails/texts as when Def Modi Wiczyk explains director Def Neill Blomkamp's inability to
2  even write or direct "basics". In an email text to Amy Pascal, Wiczyk wrote:

3  2014-10-27 13:52:57  <u>Re: To discuss</u><br>From: <u>mwiczyk@mrcstudios.com</u>, To: pascal, amy
4  **MODI WICZYK:**
5      "yes thats what i meanthe right version of this could be iconic and do 300
   and have a huge sequel<u>what bugs me is how obvious and unpolished the</u>
6  <u>problems areall the hard stuff is great but all the basics are killing us</u>"

7

8    157.    A week later, Def Modi Wiczyk emailed Amy Pascal to discuss BlomKamp's
9  insecurities, and how they were impacting production.

10  2014-11-03 04:31:07  <u>Re:</u>  From:<br><u>mwiczyk@mrcstudios.com</u> To: pascal, amy
11  **MODI WICZYK:**
12      "dunno re simon. <u>maybe insecure, maybe thinks simon is on "studio"</u>
    <u>side, which is juvenile.</u> hes <u>always mad at somebody.</u> vacillates btwn
13  targets. i ignore it until it stops forward progress.
14  re edgar i actually initiallygot nervous the music was too old to be
   cool,but all my assistants say lots of these songs are in the collective
15  consciousness, played in bars and clubs. shows what i know....i dug the
16  reel he did. and i loved the app w script and music."

17    158.  There are many more such emails that further reveal how inept and difficult Def
18  Blomkamp is. But from these select emails, we see that to revise Blomkamp's *Chappie*,
19  Kinberg took extraordinary measures, and that Blomkamp's inept, "insecure" and "juvenile"
20  conduct made Kinberg "crazy", forcing the executives to takeover the edit. Yet, Kinberg
21  implied these problems were mild compared to what he endured with Blomkamp revising
21  *Elysium*, where the problems were so extreme that Blomkamp **"shut down"** and **"didn't**
22  **have the answers".** Thus, clearly the script work Kinberg did on Elysium was **exhaustive**,
23  and not a mere "polish" as Def MRC II LP stated under oath. <u>This was a clear act of perjury</u>.

24

25        **SONY EMAILS CONFIRM DEFS RULE 37 VIOLATION IN BRIGGS V**
26      **BLOMKAMP, SHOWING DEFS OMITTED TESTIMONY & EVIDENCE**
27    159.  On page 28 of the Plaintiff's First Amended Complaint in Briggs v Blomkamp, et
28  al, the Plaintiff made a bold prediction: that sometime after May of 2013 (when Blomkamp

COMPLAINT

1  learned the details of Plaintiff's impending copyright lawsuit) Defendant Neill Blomkamp

2  went back into the editing room and tried to edit-out key headache scenes, which were

3  identical to the Plaintiff's work. The Plaintiff explained that Blomkamp did this <u>to try to</u>

4  <u>cover-up his theft of the Plaintiff's intellectual property</u>.

5  160.   Supporting this prediction, during the discovery phase of Briggs v Blomkamp, the

6  Plaintiff found a report on TheProvince.com (titled: "Elysium's ready as director Blomkamp

7  looks forward to next project" from February 2013) in which Def Blomkamp stated the film

8  was finished back in February 2013. (Said article from "The Province" is attached as

9  "**Exhibit BB**" and is incorporated by reference as if fully set out herein.) Then, proving the

10  Plaintiff's prediction, in sworn responses to Plaintiff's interrogatories, during discovery in

11  Briggs v Blomkamp, Def Blomkamp admitted film editing was finished "Sometime in or

12  about June 2013." (Said Defendant Blomkamp's Interrogatory Responses from Briggs v

13  Blomkamp are attached as "**Exhibit CC**" and are incorporated by reference, as if fully set

14  out herein.)

15  161.   The Plaintiff then filed a motion to compel documents, asking for all texts and

16  emails between Def Blomkamp and both *Elysium* film editors: Julian Clarke and Lee Smith

17  (Smith was the final editor—the editor who would have made these headache changes). The

18  Plaintiff made this motion to prove that Def Blomkamp resumed film editing after February

19  2013, to try to remove or alter the "headache" scenes. However, **the Defendants would not**

20  **provide a response from Lee Smith**, only from Clarke (Clarke stated that editing ended

21  well before June 2013—contradicting Blomkamp, who said editing ended June 2013). But

21  Lee Smith returned to the editing room to fix the headache scenes in May and June 2013.

22  162.   As well as doing the final edit of Elysium, the 2014 Sony email leak show that Lee

23  Smith also did the final edits for Blomkamp's next film, *Chappie* (although Smith isn't

24  credited on IMDB or Wikipedia).

25  163.   Lee Smith's final edit of Chappie is revealed in the Sony email leaks as Def Modi

26  Wiczyk writes to Amy Pascal:

27             2014-08-12 00:13:30  <u>saw it.</u>  From:
                    <u>mwiczyk@mrcstudios.com</u>  To:
28

COMPLAINT
36

amy_pascal@spe.sony.com

**MODI WICZYK:**

"we are going to get there and have a big success with this one. **lee smith** will be huge, **nb** is in GREAT frame of mind."

164.    Def Wiczyk knew Smith would be "huge" because of how Smith helped salvage Elysium. A few months later Def Wiczyk told Amy Pascal about all the work Lee Smith had left to do on the film, and the continued problems between Blomkamp and Kinberg.

2014-11-03 02:03:10 <u>Re:</u>  From: mwiczyk@mrcstudios.com
To; pascal, amy

**MODI WICZYK:**

"Hi!
in terms of neill, totally ur call but...
i feel like <u>this coming week is neill has to really really let lee in to polish,</u> refine, etc. alot of little indulgences are gonna have to go.
so--- i was trying to be positive but also let him know theres real real work yet to do. and in a short period of time.... i talked to lee for a while today who says neills been very open so thats good...but hes been a dick to simon for whatever reason. so a long way of saying i want to keep the pressure on him. because i agree it can be special.
make sense?"

165.    The Plaintiff filed his Motion to Compel (seeking a statement from Lee Smith) three (3) weeks before the deadline for dispositive motions (liability), July 9th, 2013. But the district court set the motion hearing for more than a week AFTER the deadline for dispositive motions (Aug 7th, 2013).   Thus, the Plaintiff had to file his Motion For Summary Judgment (**MFSJ**), without being able to inform the court of the Defendants' **violation of Rule 37** (failure to cooperate to compel a discovery response); a violation that, in this case, resulted in the omission of evidence of a cover-up (that cover-up being: Neill Blomkamp returned to the editing room with Lee Smith, in June 2013, to ask Smith to try to erase edit and remove the headaches from Elysium). Thus, during the teleconference hearing with Magistrate Judge Laurel Beeler, the Plaintiff explained that the matter was unresolved but was effectively "moot" because both parties' MFSJs had been filed, and the Plaintiff had less than a week to file his Reply Brief (Magistrate Beeler thus ruled the issue moot). (Note: the Defs also refused ALL of the Plaintiff's discovery requests for texts or emails regarding ANY Elysium matters; expanding the Defendants' **Rule 37 violations**).

COMPLAINT
37

**MRC & SONY PICTURES NEGLECTED TO DO BASIC**

**DUE DILIGENCE, BUYING THE RIGHTS TO ELYSIUM**

**WITHOUT EVEN READING A SCREENPLAY**

166.   In 2008, Def Neill Blomkamp filmed *District 9* without a screenplay.  District 9's star, Sharlto Copley, has given many interviews discussing the fact that he improvised every line of the film—such as the interview he gave *USA Today* in 2011. (Said USA Today article with Sharlto Copley is attached as "**Exhibit DD**" and is incorporated by reference as if fully set out herein.) Due to Def Emanuel's inappropriate relationship with Sony Pictures' CEO Michael Lynton and Def Bill Block (of QED Int.), Emanuel was able to get QED and Sony Pictures' subsidiary *TriStar* to produce and distribute District 9, without a screenplay —using only Def Blomkamp's notes, which they referred to as a "script". Countless writers and fans, in online forums, have tried to find a copy of a District 9 script. All have failed.

167.   Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures bought the film and distribution rights to Elysium from Def Blomkamp, without ever reading a screenplay. Sony Pictures bought the rights to Elysium in a hasty meeting in 2008. In this well documented meeting MRC and Def Blomkamp displayed 50-60 concept art paintings of scenes from Blomkamp's proposed film. The art was so persuasive that Sony Pictures agreed to buy the rights, immediately, never bothering to read the script. HollywoodReporter.com reported the details of the stunningly hasty meeting between Blomkamp, MRC and Sony Pictures —on the very day it occurred, January 19, 2011. MRC scheduled meetings with several other distributors that same day, but Sony Pictures was so rushed and eager to buy the film that MRC canceled all other distribution meetings scheduled that day. The Hollywood Reporter article carefully reports the "art designs" that secured this deal, but never mentions a "screenplay" or a "script".  (Said Hollywood Reporter article about Blomkamp, MRC closing the deal with Sony Pictures is attached as "**Exhibit EE**" and is incorporated by reference as if fully set out herein.)  This same meeting and concept art were also recounted in the book "Elysium: The Art of the Film" —a book primarily made up of interviews with Def Blomkamp, himself. On August 6th, 2013, Deep Focus Review (deepfocusreview.com) reviewed the book "Elysium: The Art of

1  the Film", reflecting on this meeting. (Said Deep Focus Review article is attached as
2  "**Exhibit FF**" and and is incorporated by reference as if fully set out herein.)   Upon
3  interviewing Blomkamp, the Deep Focus Review article revealed that Defs Blomkamp and
4  MRC staged 50-60 concept art paintings "and set them against the screenplay", explaining:

5
6
7
> "On the strength of these images—not to mention the strength of his first
> film, *District 9*—he garnered himself a $100 million budget and signed
> stars Matt Damon and Jodie Foster."

8      168.   The Defendants used the amazing artwork to strategically distract attention from
9  the flawed screenplay. Sony Pictures took the bait. Within an hour or so, a deal for about
10  $115 million was made, and no executive from Sony Pictures ever read a script. MRC didn't
11  do due diligence because Defendant Ari Emanuel was a co-owner of MRC and Def
12  Blomkamp's personal agent; thus, they stood to make millions from the deal. Sony Pictures
13  failed to do due diligence because CEO Michael Lynton had an improper, secret business
14  partnership with Def Emanuel (Screenbid.com), and wanted to maintain good relations with
15  Defs Emanuel and MRC—and make millions without regard for whose work they pirated.

16      169.   Def Blomkamp's script was so poorly executed and riddled with evidence of
17  misappropriation of the Plaintiff's work, that Defs Blomkamp, MRC and Sony Pictures took
18  extreme measures to protect the script during film production. The website Games Radar
19  (gamesradar.com) interviewed one of Elysium's stars, film icon **Jodie Foster**, who revealed
20  the producer's paranoia as she explained she wasn't allowed to possess a script.   (Said
21  Games Radar interview with Jodie Foster is attached as "**Exhibit GG**" and is incorporated
21  by reference as if fully set out herein.)  Foster said:

22
23
24
> **"They won't even give me a screenplay. I've read it, but they won't
> give me one to physically keep in my home 'cause they're so worried
> about everybody."**

25      170.   How Sony Pictures and MRC committed $115 million to a movie without reading a
26  screenplay, but invested millions to keep the screenplay secret defies reason. This was done
27  to keep the Plaintiff from learning details of the film's plot before it was released, to prevent
28  the Plaintiff from getting an injunction to stop  production.

171.   Had Sony Pictures behaved ethically, AND done their due diligence, they would have read Blomkamp's screenplay, then they would have seen Def Blomkamp's unfocused ideas, vast story weakness, and his poor literary skills. These shortcomings, juxtaposing concepts that were beyond such limited literary skills, should have raised red flags that Blomkamp's story may have been misappropriate, thus killing the deal. Hence, the Plaintiff would have filed no claims, including all claims herein.

172.   When Sony Pictures finally read Blomkamp's screenplay, seeing his poor writing skills and disjointed ideas, they hired writer/producer Simon Kinberg, who Def Wiczyk described as a "fixer" (a term Wiczyk borrowed from Jeff Rovin, expert witness in Briggs v Blomkamp). In a 2014 email to Sony Pictures Chairperson, Amy Pascal.  Wiczyk wrote:

> 2014-10-27 13:36:12  Fwd: CHAPPIE NOTES
> From: mwiczyk@mrcstudios.com To: pascal, amy
> **MODI WICZYK:**
> "hi!so i asked si to share all the notes hes wanted to do, in detail, for weeks but hasnt been able to do.it lines up w what everyones saying.  great detail and very specific.he also included rachels document and merged it.**simon is a <u>fixer</u> and a logician** and i want him to trest this like hes been brought in to doctor it on some level, and he does too.  <u>nb has been ignoring him the past few weeks after listening to him up until then</u>. dont know why, dont care. its our turn now.i told doug that we should leave the mtg telling thema. timeline for seeing new stuff b. possibly do a parallel more radical cut to play w thebig first act and religious note.c. first "basic" cut should do all cuts in the notes, deal w ending. see you at 9."

173.   A company has a responsibility to do basic due diligence, to make sure their products are what they allege: original works. Having a CEO who is secret business partners with the CEO of a talent agency subcontractor, undermines due diligence. Failing to read a screenplay before buying the rights to that screenplay is not doing due diligence. Hiring a "fixer" to hide evidence of misappropriation is not doing due diligence. Rather, these are the methods of corrupt, mob-like conspirators.

174.   Further, during discovery in Briggs v Blomkamp et al, the Plaintiff asked the Defendants for all documentation of their due diligence to make sure Elysium was not an infringement. The Defendants failed to produced any such documentation.

**Defendant Blomkamp Gets Caught Lying To The World About**

**His "Aliens" Script (Which Also Did Not Exist) , in 2017:**

175.    Just as Def Blomkamp (with Def Wiczyk's help) sold Elysium to Sony and MRC without a screenplay, Blomkamp recently tried to sell his idea for a fifth "Aliens" film without a script—but this time he did it openly, online, for the world to see. Unfortunately, in the process he ensnared several other Hollywood notables in his' strange world of lies.

176.    On January 2nd, 2015, Def Blomkamp shared some "Aliens" concept art on his Twitter account, expressing hope of one day shooting the film. Soon dozens of Blomkamp fans began spreading the word that Def Blomkamp was out to make the fifth Aliens film, including in an article on Nerdist.com. (Said article from Nerdist.com is attached as "**Exhibit HH**" and is incorporated by reference as if fully set out herein.)

177.    By July **2016,** websites like ScreenRant.com were reporting Def Blomkamp had recruited actress Sigourney Weaver and director James Cameron to tell the world how great Blomkamp's script was. (Said ScreenRant article is attached as "**Exhibit II**" and is incorporated by reference as if fully set out herein.)  In ScreenRant Sigourney Weaver said:

> **"There is an incredible script by Neill. I didn't want to do a fifth one. I thought going to earth wouldn't be fun. I got this script that was amazing and gives fans everything they're looking for..."**

178.    And James Cameron also praised the script in the ScreenRant article:

> **Director James Cameron (*Avatar*) then went on to throw in his two cents, saying that Blomkamp's is "*a very strong script*" and "*works gangbusters.*"**

179.  "Gangbusters."

180.    Then, in April 2017, ScreenCrush.com reported that director Ridley Scott, owner of the Aliens franchise, had announced there would be no *Aliens 5* movie.  Mr. Scott explained Defendant Blomkamp **never even had a script**. (Said Screen Crush article is attached as "**Exhibit JJ**" and incorporated by reference as if fully set out herein.)   Ridley Scott stated:

> **"I don't think it will ever see the light of day. There was never a script. Just an idea that evolved from a dozen or so pages."**

181.    This all caused the article writer to wonder who was lying: "We seem to find

COMPLAINT

41

1   ourselves in a bit of a '*he said, she and he said*' situation here," Monagle wrote.

2   182.  Remember, in 2000 Def Wiczyk helped sell his brother's script to Summit without

3   so much as a script name, and Sony Pictures was right there, negotiating for the rights to

4   that unwritten, nameless script—eager to please any good friend of Ari Emanuel's.      By

5   2016, with *Aliens 5*, the Defendants had grown so brazen that they let Def Blomkamp go out

6   and lie to the world for himself, believing they could throw a script together after the

7   contract was signed. Rubbing their hands in anticipation of all that money —none of them

8   expected Ridley Scott to do due diligence and insist on seeing a script, ruining their scheme.

9

10    **IN BRIGGS V BLOMKAMP THE DEFS  HIRED A CONMAN, JEFF ROVIN**

11      **(WHO COMMITTED FRAUD UPON THE COURT & WENT ON FOX NEWS**

12       **TO ADMIT HE WAS A"FIXER" FOR BILL CLINTON) AS THEIR "EXPERT"**

13   183.  Not only does this case reveal how effortlessly seemingly everyone in Hollywood

14  lies, it reveals that when they get caught lying and stealing other people's work, they call on

15  world-class liars.

16   184.  In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of

17  thousands of California intellectual property attorneys as an expert witness, the Defs hired

18  Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the

19  same Jeff Rovin who confessed (two years <u>after</u> Briggs v Blomkamp went to MFSJ) to the

20  *National ENQUIRER (*October 19th, 2016), and confessed on **Fox News'** live telecast of

21  ***The  Sean  Hannity  Show*** (Oct 24, 2016), that he was a professional "fixer" who

21  orchestrated  false  "smear"  reports  on  people  who  disparaged  President  Bill  and  Hillary

22  Clinton—while  Bill  Clinton  was  President.  Rovin  claimed  he  then  published  these  smear

23  articles  in  tabloid  newspapers.  Rovin's  interview  with  Hannity  can  be  seen  at

24  <u>https://www.youtube.com/watch?v=L3mzoKuFN5o</u>. The story carried in countless other

25  publications, including The Daily Beast. (Said Daily Beast article is attached as "**Exhibit**

26  **KK**" and is incorporated by reference as if fully set out herein.) (Said National ENQUIRER

27  article is attached as as **"Exhibit LL"** and is incorporated by reference as if fully set out

28  herein.)

185.   **Rovin made these self-incriminating admissions on camera, in his own words.** Rovin admitted that he also bribed the victims of his smears to stay quiet. Shockingly, Rovin says the bribes were so effective that they <u>rarely</u> <u>needed</u> <u>to</u> <u>resort</u> <u>to</u> **other** **measures**. In Rovin's words, "**Most of the time** it was just money, it never had to be any threats." Witlessly, Rovin admitted threats, violence—or worse—might ensue if the money wasn't accepted.

186.   Sean Hannity summarized Rovin's work, saying, "Smearing happened. Money was paid. Orders were given. You were to go out and damage the reputation of people like Monica Lewinski."

187.   Rovin modestly agreed with Hannity's assessment, stating, "It was a team effort."

188.   Rovin went on to explain he had worked as a "fixer" many times in the past.

189.   In Brigg v Blomkamp, the Defendants paid Jeff Rovin $50,000 as a "fixer", to use his literary talents to lie, falsify and commit fraud.

190.   In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff moved the the court to exclude Rovin's "expert" report, as Rovin had falsified dozens of citations and fabricated evidence to substantiate his own claims, including a lengthy "quote" in which he fraudulently omitted 42 words—that wholly countered what Rovin reported. (Said Motion to Exclude is attached as "**Exhibit MM**" and is incorporated by reference as if fully set out herein.)   Oddly, the court took no interest in the fraud contained in Rovin's report—which became the base of the district court's summary judgment opinion—and denied the motion.

191.   How the Defendants knew such a devious man's "expert" report would meet no skepticism by the court is a mystery. How the Defendants knew such a sinister man existed—at all—is stunning.   Rovin explained that he worked for President Clinton when Bill Clinton was in office (1991-2001). When asked how he came to be involved with the Clintons, Rovin explained that the Clintons became aware of Rovin because, in Rovin's words, he was **"fixing something for an actor who was in their** (the Clinton's) **inner circle."** Rovin does not identify who this cabinet member is, but during the time Rovin was involved with the Clintons (1991-1998), **Rahm Emanuel** worked as the senior adviser to President Clinton (1993-1998). Rahm Emanuel is Defendant Ari Emanuel's brother.

## SUMMARY OF THE DEFENDANTS'
## UNLAWFUL ACTIONS
### Act 1

192.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, created a social network website called Trigger Street, or TriggerStreet ("TS" herein), located at triggerstreet.com from 2002 until 2011, and at labs.triggerstreet.com from 2011 until 2014.

193.   Kevin Spacey and Dana Brunetti, acting alone or in conspiracy with other Defendants, published and rendered the TS "Terms of Use" contract page, which stated:

> Unless otherwise specified, the materials on the Site and in the Services are presented **solely for** the purpose of promoting the entertainment, information, and community resources and services available in, and other uses in, **the United States of America.** We control and operate the Site and the Services from within the United States. We make no representation that materials on the Site or the Services are appropriate or available for use in locations outside the United States, and accessing them from territories where their contents are illegal is prohibited. Those who choose to access the Site from other locations do so on their own initiative and are responsible for compliance with local laws.

194.   The previous statement from the TS "Terms of Use" page was deliberately false and/or misleading, and intended to inform members (or suggest, imply or insinuate) that TS was intended for use by and for users in the USA. This was Fraud, Intentional Misrepresentation, False Statements, and Deceit. These false statements were made to falsely assure informed, savvy writers that the website was safe from foreign "bad actors', as there are many nations that do not, or cannot enforce the Universal Copyright Convention, and often American copyright holders never learn that their works were misappropriated by foreign infringers, because the stolen works are only displayed in the infringers' nation. (TS also may have stated it was intended for UAS use to avoid paying taxes on the international earnings from its Budweiser endorsement deal.)

195.  In truth, unbeknownst to American users who had been deceived by the Defendants, from the outset TS was intended for international use.

196.   The Defendants' action were also a violation of Cal Civ 1572, 3294, and 1709.

| | |
|---|---|
| 1 | **Act 2** |
| 2 | 197.   Defendant Kevin Spacey made numerous trips abroad, to London, Spain, etc., to |
| 3 | give speeches and interviews, and throw parties, intent to recruit new TS members. While in |
| 4 | Spain, in 2009, Spacey stated,  "I started the website about six years ago, and we now have |
| 5 | close to 400,000 <u>members around the world</u>." |
| 6 | 198.   This was **BREACH OF CONTRACT**, as the Plaintiff—like most  members in the |
| 7 | USA (perhaps all US members)—believed the website was solely for use in the USA. |
| 8 | **Act 3** |
| 9 | 199.    TS and the Defendants provided content and programming from TS to Bud.TV |
| 10 | from 2007 to 2009.  Bud.TV also ran an international advertising campaign about TS. This |
| 11 | international ad campaign advertised TS (as well as Bud.TV) all around the world. In both, |
| 12 | advertising TS in Bud.TV promotions, AND advertising TS on Bud.TV itself, the |
| 13 | Defendants **breached** the terms of TS's *Terms Of Use* contract page. |
| 14 | **Act 4** |
| 15 | 200.   The Defendant(s) made the TS website with effectively no security features, as |
| 16 | ALL members were allowed to ANONYMOUSLY read ALL screenplays. This, while TS |
| 17 | claimed to be industry standard, encapsulating all of the desires and needs of its users, and |
| 18 | touted its state of the art security. This was a violation of state and federal conspiracy, |
| 19 | negligence, gross negligence, fraud, deceit, misrepresentations, and false statements laws. |
| 20 | **Act 5** |
| 21 | 201.   Unlike a truly "industry standard" site like Writers Script Network.com, all TS |
| 21 | members/users were encouraged and deceived into using and navigating the website with |
| 22 | false identities (even for writing reviews). The Defendants' intent was to protect the |
| 23 | identities of their misappropriating conspirators, the Privacy page was written and designed |
| 24 | to scare user/members into using false identities. The TS Privacy page stated: |
| 25 | User Names and User Disclosure |
| 26 | The user name you select or are provided with upon registration with the Site is deemed non-personally identifiable information. Your user name |
| 27 | may be published on the Site and may be disclosed to others, including, |
| 28 | without limitation, to the public, and to any third parties with whom we |

elect to share such information. In addition, **if you include your name or any other personally identifying information** in any material transmitted or posted on public areas of the Site or the Services (including, without limitation, message boards, **reviews** and chat rooms), **such information will become public information and will be published on the Site and will be disclosed to other users of the Site and to other third parties who may have access to or otherwise see a display of such information**.

202.   These statements were made to encourage users to take risks they ordinarily would not take and should not take, as part of the Defendants efforts to persuade users/members to make their wares accessible to the Defendants. This was CONSPIRACY and DECEIT.

**Act 6**

203.   The TS Privacy page suggested that the website had a method to reveal the true identity of all "accessors", if necessary.

Information Disclosure
We reserve the right to disclose information submitted by or concerning any user as we feel is necessary to protect our systems or business. Specifically, but without limitation, we reserve the right to disclose such information when a visitor or member is in violation of our Terms of Use or any other agreement with us, or engages (or is suspected of engaging) in any harmful, infringing or illegal activity....

204.   However, there is no evidence to support that TS ever, truly, had any method of retrieving any access records, or the accessor's true identity, etc. Nor is there any reason to believe such a system ever existed on TS. Thus, the Defendants' action were in violation of California Civ. Code § 1572, which makes it unlawful to make materially false, fictitious, deceitful, or fraudulent statement or representation.

**Act 7**

205.   The Defendant(s) made extraordinary and fraudulent claims about website security; doing so to lure in the best undiscovered writers, and eliminate any doubts or suspicions users might otherwise reasonably have. TS made such false and exceptional claims as:

a.   The TS "About Us" page stated:

"Our team has been extensively researching and designing TriggerStreet.com to ensure that it **encapsulates every aspect of the user's desires and needs**."

COMPLAINT
46

206.    This was Fraud. All reasonable screenwriter members would expect (from a website assuring that the website "**encapsulates <u>every</u> aspect of the user's <u>desires and</u> <u>needs</u>"**) that records be preserved of all access of writers' work, identifying which members accessed which works, AND recorded by the accessor's true name —AND NOT erase all access history if the member removes his/her work because he/she worried his work may be unsafe on the website. Members would reasonably expect and *desire* this from a site claiming to be industry standard, because websites like InkTip.com were already doing this. Further, all reasonable members would **desire** and **need** a website to use accurate language, and behave in accordance with the implicit language of the website's *Terms Of Use*. And if these "Terms of Use" stated, suggested, implied that the website was solely for use in the USA, members should expect that site operators would act in accordance with that agreement, and not advertise or recruit abroad. This false claim was made to fraudulently lure writers to an unsafe website.

207.    This was deceit. The Defendants' actions were also in violation of <u>California</u> <u>Civ.</u> <u>Code § 1572</u> <u>-</u> <u>Statements</u> <u>or</u> <u>entries</u> <u>generally</u>, which makes it unlawful to make any materially false, fictitious, or fraudulent statement or representation. On the TS "*Privacy*" page, the "Security" message stated:

> "Security
> When you <u>submit</u> <u>information</u> via the Site, your information is protected using secure data networks protected by **industry** **standard** **firewall** **and** **password** **protection** **systems**. Our security practices and policies are <u>periodically</u> <u>reviewed</u> <u>and</u> <u>updated</u> as necessary, and only authorized individuals have access to the information provided by our users."

208.    This was also Fraud. There was nothing "industry standard" about the TS screenwriter website. The standard was set by Writers Script Network.com (InkTip.com). InkTip kept all records of all access, even after members left. On Inktip.com, there was no feature erasing all access records upon script removal. By implying all information was protected and secure and industry standard, reasonable members would assume all members' access activity would be recorded, stored, and protected —not erased.

209.   The Defendant(s) and TS used Def Spacey's stardom to lure in writers. Then

1  writers were **promised** "industry access and exposure"—using Spacey's fame and

2  Academy Award winning laurels to leverage this false promise. TS's statement from its

3  "About Us" page promised that:

4  "Based on the principles of creative excellence, it (the TS website) provides

5  **industry access and exposure** to help build the careers of notable new
   filmmakers and screenwriters."

6

7  210.  This false promise, bolstered by the other fraudulent statements on the "Terms of

8  Use", "About Us", and "Privacy" pages, expanded a pattern of fraud, false statements,

9  false promises, concealment, intentional misrepresentations, and deceit.

10  **Act 8**

11  211.  The Defendants added a new anti-security feature, whereby if a member removed

12  his/her screenplays from the TS website because he/she worried that his/her work might be

13  unsafe or the target of infringers or pirates, the moment that writer removed his script from

14  the site ALL access records would be erased. The Plaintiff believes the Defs added this

15  feature in 2007 to access and steal the Plaintiff's work. Whether this extra hidden layer of

16  counter-security was added when the website was made, in 2002, or if it was added in 2007,

17  the Defendant(s) and TS did not inform members about this feature, and it was never

18  mentioned on the TS website. The Defendants' failure to inform members of this

19  anti-security feature, and the risks it posed, was a deliberate omission of imperative

20  information. The Defendants actions were in violation of California Civ. Code § 1572, fraud

21  by omission, and constitute DECEIT in violation of California Civ. Code § 1709.

21  **Act 9**

22  212.  Corporations are expected to do due diligence in all substantial purchases,

23  transactions and deals (such as investing $120 million in a film). Due diligence means doing

24  **"a complete and appropriate review of documentation and facts by a potential buyer**

25  **or its agents before purchasing an asset or engaging in business with a prospect"** (from

26  the Law Offices of Stimmel, Stimmel & Smith) This definition goes on to require a

27  "...complete review using lawyers and CPAs to assist so that when one is done, one knows

28  all that one needs to know before engaging in business with or buying a company or other

1   asset or piece of property." The Defendants did not do due diligence —failing to even read

2   the screenplay before buying its rights. Thus, the Defendants engaged in **gross negligence.**

3                                                **Act 10**

4      213.   The Defendants engaged in conflicts of interests that violated **CALIFORNIA**

5   **LABOR CODE SECTION 1700.39**, which states, "No talent agency shall divide fees with

6   an employer, an agent or other employee of an employer." Defendant Ari Emanuel was the

7   central talent agent in making the film Elysium, representing Elysium's star Def Matt

8   Damon and its writer/director Def Neill Blomkamp. Defendant Ari Emanuel is also an

9   owner of MRC (the employer of Def Neill Blomkamp for the making of Elysium, and the

10  buyer of Elysium's film rights). Thus, Def Ari Emanuel divided fees as a talent agent and

11  employer. The Plaintiff was injured by this violation of California law.

12                                               **Act 11**

13     214.   The Defendants engaged in **Violations Of California Business & Professions**

14  **Code § 17200, Et Seq., Unfair Business Practices Act.** Sony Pictures' (a publicly traded

15  company), and its CEO Michael Lynton, violated California Business & Professions Code

16  § 17200, ET SEQ., by engaging in improper and unethical business relationship, whereby

17  Michael Lynton, acting as an officer of Sony Pictures, hired a subcontractor (Screenbid) to

18  sell numerous items of substantial value for Sony Pictures. Thus, Def Lynton profited as

19  Sony Pictures' CEO, and he and Defs Ari Emanuel and Bill Block profited as the owners of

20  Screenbid, the subcontracted auction service. This was a conflict of interest.

21     215.   This improper relationship caused CEO Michael Lynton to encourage his

21  subordinates and peers NOT to scrutinize projects, clients or business entities associated

22  with his secret business partner Def Ari Emanuel. Thus, Sony Pictures agreed to distribute

23  Elysium without doing due diligence to read a screenplay to see to it that it was reasonably

24  executed. Had Sony Pictures employed a reasonable standard of due diligence, Elysium

25  would not have been made; thus, no injury would have come to the Plaintiff.

26                                               **Act 12**

27     216.   The Defendants engaged in Spoliation Of Evidence by closing and destroying the

28  TS website  6 days after the Plaintiff filed his Notice of Appeal to the Ninth Circuit Court of

1   Appeals. The Defendants did this to destroy unfavorable evidence, because the district court

2   based its MFSJ ruling on reversed law (cited by the Defendants), rather than the prevailing

3   law (cited by Plaintiff). Thus, Briggs v Blomkamp, et al, is/was apt to be returned to the

4   lower court, where the Plaintiff will/would subpoena all website access records, to confirm

5   the Defendants used TS to access the Plaintiff's work, and/or confirm that TS

6   misrepresented its security and ID protection features, and had no such records or oversight.

7   **Act 13**

8   217.   By conspiring to hire "fixer" Jeff Rovin (who spent years of his life writing false

9   "smear" stories for tabloid news) to submit a falsified "expert" report to the court, the

10  Defendants engaged in civil conspiracy, as well as fraud and deceit in violation of California

11  Civ. Code §§ 1572 and 1709. In these actions may also constitute Subornation Of Perjury

12  **Act 14**

13  218.   By stating, in their answers to the Plaintiff's interrogatories, that Simon Kinberg

14  only provided a "polish" to the Defendants script *Elysium* (when, in fact, Kinberg did

15  exhaustive work to salvage the screenplay) the Defendants engaged a conspiracy to commit

16  fraud and deceit, violating California Civ. Code §§ 1572 and 1709. Beyond these civil

17  infractions, the Defendants may have committed **Perjury,** violating 18 U.S. Code § 1001.

18  **Act 15**

19  219.   In the Briggs v Blomkamp Complaint, the Plaintiff stated that the *Elysium* film

20  editor(s) would confirm that Film editing resumed in June, 2013 (after initially wrapping up

21  in February 2013) —after the Defendants learned of the Plaintiff's impending lawsuit. The

21  Plaintiff predicted the editor(s) would confirm that this final editing was done to remove the

22  hero's headaches. But during discovery, the Defs gave Plaintiff only a statement from Julian

23  Clarke, refusing to provide a statement from final editor, Lee Clarke. Thus, the Defendants

24  **violated RULE 37** —a violation that may have changed the outcome of the case**. The**

25  **Defendants' actions violated Cal Civ 1572 and 1709** —and perhaps 18 U.S. Code § 1001.

26  **Act 16**

27  220.   Using the TS website, Defendants Spacey and Brunetti marketed the Plaintiff's

28  original screenplay in foreign markets all around the world, without informing the Plaintiff.

The TS social network website made representations that the website was solely for use in the USA. The plaintiff relied on these claims. Unbeknownst to the Plaintiff, the Defendants repeatedly travelled to foreign markets to invite foreign citizens to join TS, where they could freely access the Plaintiff's screenplay ("Butterfly Driver", posted on TS in 2007). In engaging in these actions, **the Defendant committed INFRINGING EXPORTATION of the Plaintiff's copyright protected property,** under 17 USC § 602(a)(2), which makes it unlawful to export copyrighted property from the USA, without the authority of the owner of copyright, as this would infringe of the copyright owner's exclusive right to distribute, under 17 USC § 106; actionable under sections 17 USC § 501.

221.    The Plaintiff was unaware of  Defendants Spacey's and Brunetti's infringing exportation of his work until February of  2016, when the Plaintiff discovered a BBC article, written in 2009, about Kevin Spacey travelling to Barcelona, Spain to tout TS's "400,000 members around the world." (See Exhibit T). **Immediately, upon discovering the article, the Plaintiff notified the 9th Circuit Court of Appeals, via a court filing on February 29th, 2016.** Shortly after discovering the article, the Plaintiff discovered other articles about Spacey travelling abroad to market TS, dating back to 2002. (See **Exhibit P and Q.**) American users were never informed that TS was being marketed around the world.

222.    The 3 year statute of limitations to take legal action on this infringement started to run in February 2016, when the Plaintiff learned of the Defendants' infringement.

### Act 17

223.    Defendants Spacey's and Brunetti's actions (detailed in the 3 preceding paragraphs under the heading "Act 16") infringed on the Plaintiff's exclusive copyrights of his screenplay *Butterfly Driver*, posted on the TS website in 2007, as the Defendants' actions violated the Plaintiff's exclusive right to distribute his work, under section 17 USC § 106.


### STATEMENT OF INJURY

224.  Among the injuries caused by the Defendants' actions were (1) the misappropriation of Plaintiff's work; (2) the infringement of the Plaintiff's copyright —by a foreign actor (Blomkamp); (3) a judgement against the Plaintiff in his effort to protect his copyright.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
#### CIVIL CONSPIRACY
**(Against All Defendants)**

225.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 224, as if fully set out herein.

226.   Judicial Council of California Civil Jury Instructions states that "A conspiracy is an agreement by two or more persons to commit a wrongful act. **Such an agreement may be made orally or in writing <u>or</u> <u>may</u> <u>be</u> <u>implied</u> <u>by</u> <u>the</u> <u>conduct</u> <u>of</u> <u>the</u> <u>parties</u>**." Keeping with standard, the Defendants engaged in three (3) conspiracies. While engaged in these conspiracies, the Defendants committed many clear, overt acts.

### First Conspiracy

227.   To unlawfully enrich themselves, the Defendants conspired to create a social network for screenwriters and filmmakers, with little or no security features. The Defendants would then mislead screenwriters that the website was safe, then the Defendants could access and misappropriate the screenwriters' work. In the execution of this conspiracy the Defendants took the following overt actions:

1. The Defendants conspired to create a social network website (TS) for screenwriters and filmmakers, a website with effectively no security features.

2. The Defendants conspired to commit fraud and mislead TS member/users that the website had reasonable security features, when it had none.

3. The Defendants conspired to add a anti-security feature that erased all access information if members removed their screenplays.

4. The Defendants conspired to add the anti-security feature in 2007, to erase evidence of their access of the Plaintiff's script.

5. The Defendants conspired to make the film Elysium, careful not to leak any information about the project .

6. The Defendants conspired to create a *Terms of Use* page that stated the website was intended solely for use in America, but the Defendants repeatedly sent Def Spacey around the globe to recruit members, in violation of the *Terms of Use* agreement.

7.  Also in violation of the Terms of Use agreement the Defendants secretly advertised TS on international websites like Bud.TV, and other international media outlets.

8.  While producing *Elysium*, the Defendants conspired to keep the  script an absolute secret, not even allowing Hollywood giants like Jody Foster to take the script home.

9.  The Defendants (particularly Ari Emanuel, who profited the most from these acts and arrangements) had actors Def Damon and Affleck start a screenwriter/filmmaker website, similar to TS, called Project Greenlight. Not coincidentally, these two websites were created only a month apart; both websites used celebrity endorsers; both websites have been accused of being the *access* point in major film and TV copyright infringement suits; both of these "stolen" projects were eventually sold to companies with deep connections to Def Emanuel (MRC and Universal Pictures).

**Second Conspiracy**

228.   Once the Plaintiff realized the Defendants misappropriated his work, he sued.

229.    In response, the Defendants devised a second conspiracy to prevent the Plaintiff from prevailing in his copyright lawsuit. Their plan involved cheating the Plaintiff and  the US federal justice systems. In the execution of this second conspiracy the Defendants took the following actions:

1.  Rather than hiring an intellectual property attorneys as their expert witness in Briggs v Blomkamp, the Defendants opted to hire a con man named Jeff Rovin; who, two years later, admitted on Fox News' "The Sean Hannity Show" that he was a "fixer" who worked for President Bill Clinton, where he used his literary skill to create "smear" stories, to attack Clinton critics in tabloid newspapers. Rovin said he came to work for Bill and Hillary Clinton because he was working for another "actor" in the Clinton White House. This *actor* wss surely Rahm Emanuel, the Senior Advisor to the President (Clinton), who is also Defendant Ari Emanuel's brother;

2.  During discovery in Briggs v Blomkamp, the Defendants conspired to prevent editor Lee Smith from answering the Plaintiff's interrogatories;

3.  The Defendants made false statements in their interrogatory answers, as Simon Kinberg stated that he merely "polished" Def Blomkamp's script;

4.   The Defendants conspired to shut-down and destroy the TS social network 6 days after the Plaintiff filed his Notice Of Appeal;

**Third Conspiracy**

230.   To greatly increase their rate of personal enrichment, the Defendants conspired to break California business, labor and ethics codes. Breaking these codes caused an erosion in the Defendants' business practices, causing them to act recklessly and negligently. In the execution of this second conspiracy the Defendants took the following negligent actions:

1.   The Defendants conspired to commit to invest over $100,000,000 to make the film Elysium, without reading a script.

2.   The Defendants conspired to create an arrangement where Universal Pictures, or its parent or its subsidiaries, would finance and/or distribute any project Def Ari Emanuel brought to Universal Pictures—even unlawfully acquired projects.

3.   The Defendants conspired to engage in inappropriate business relationships, such as Def Emanuel and Sony Pictures CEO Michael Lynton co-owning Screenbid, and Defendant Emanuel co-owning MRC (violating  Cal Labor Code 1700.39).

231.   In these actions the Defendants willfully, with disregard for the Plaintiff's rights, and with disregard for the law, engaged in one or more conspiracies.

232.   The Plaintiff was injured as a direct, foreseeable and proximate consequence of the Defendants' actions, in an amount to be determined at trial.

**SECOND CLAIM FOR RELIEF**
SPOLIATION OF EVIDENCE
**(Against All Defendants)**

233.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 232, as if fully set out herein.

234.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression or destruction of evidence unlawful, stating: **"You may consider whether one party intentionally concealed or destroyed evidence. If you decide that a party did so, you may decide that the evidence would have been unfavorable to that party."** Similarly, 18 U.S. Code § 1519 makes it unlawful to destroy evidence —even in **anticipation or contemplation** of a legal action.

235.   The Defendants engaged in spoliation of evidence by closing and destroying their

1  social network, TS (TriggerStreet.com). Although the Defendants knew the website was the

2  central access point of an ongoing legal case, they closed the site 6 days after the Plaintiff

3  filed his Notice Of Appeal.

4    236.   The Defendants willfully, maliciously, with wrongful intent to harm the Plaintiff,

5  and with disregard for the law, acted to violate the law and conceal and destroy evidence.

6    237.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial, in accordance with prevailing compensatory and/or

8  punitive damages guideline.

9                    **THIRD CLAIM FOR RELIEF**
                    BREACH OF CONTRACT
10                Violating California Code, Civil Code § 3294
11         **(Against Defendants Kevin Spacey and  Dana Brunetti)**

12   238.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

13  237, as if fully set out herein.

14   239.   In joining the TS (TriggerStreet) social network, the plaintiff entered into a contract

15  with Defendant Spacey and Brunetti. By repeatedly travelling abroad to places like London

16  and Barcelona to market TS, the Defendants breached the TS "Terms of Use" contract,

17  which stated the site was made **solely for use in the USA**. The Defendants furthered

18  breached this contract by secretly advertising the TS social network on various media

19  outlets, like Bud.TV.   In these actions the Defendants committed numerous contractual

20  breaches, in violation of California Civil Code § 3294.

21    240.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

21  amount to be determined at trial.

22                  **FOURTH CLAIM FOR RELIEF**
                 FRAUD / INTENTIONAL MISREPRESENTATIONS
23                Violating California Civ. Code § 1572
24  **(Against Defs Satchu, Wiczyk, MRC II Dist Co LP, Blomkamp, Spacey, Brunetti)**

25   241.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

26  240, as if fully set out herein.

27   242.   The Defendants produced contracts in which the Defendants made claims that they

28  purported as true. The Defendants knew these claims were false. The Defendants intended

1  for the Plaintiff, and others, to rely on their representations. The Plaintiff relied on the

2  Defendants' claims. The Plaintiff was harmed by the Defendants' false representations. The

3  Plaintiff's reliance on the Defendants' false representation was a substantial factor in the

4  Plaintiff's harm. In these actions, the Defendants committed fraud, intentional

5  misrepresentation, and fraudulent omission, in violation of Cal Civ. § 1572.

6      243.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial.

8                      **FIFTH CLAIM FOR RELIEF**
                           DECEIT

9             Violating California Civ. Code §§ 1709 & 1710

10 **(Against Defs MRC II Dist Co LP, Blomkamp, Spacey, Brunetti, Wiczyk, and Satchu)**

11     244.   The Plaintiff hereby realleges and incorporates by reference paragraphs 1 through

12 243, as if fully set out herein.

13     245.   In their numerous acts of Deceit, detailed herein, the Defendants (1) suggested as

14 fact things that were not true and that they did not believe to be true; (2) asserted as fact,

15 that which was not true, which they had no reasonable ground for believing to be true; (3)

16 suppressed facts which they were bound to disclose it, and gave information of other facts

17 which were likely to mislead. In these actions the Defendants engaged in Deceit, in

18 violation of California Civ. Code §§ 1709 and 1710.

19     246.   The Plaintiff was injured as a consequence of the Defendants' actions, in an

20 amount to be determined at trial.

21                   **SIXTH CLAIM FOR RELIEF**
21                     CONCEALMENT

              Violating California Civ. Code § 1709

22 **(Against Defendants MRC II Distribution Company LP, Blomkamp, Spacey, Brunetti)**

23     247.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

24 246, as if fully set out herein.

25     248.   The Defendants engaged in numerous acts of Concealment (e.g. during discovery in

26 Briggs v Blomkamp, witnesses and agents for the Defendants intentionally failed to disclose

27 certain facts that were known only to them, which the Plaintiff could not have discovered),

28 in violation of California Civ. Code § 1709.

249.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

250.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 249, as if fully set out herein.

251.   The Defendants engaged in a variety of negligent business practices, in violation of Cal. Civ. Code § 1714(a). The Plaintiff was harmed by the Defendants' negligence. The Defendants' negligence was a substantial factor in causing the Plaintiff's harm.

252.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
GROSS NEGLIGENCE
Violating Cal. Civ. Code § 1714(a)
**(Against All Defendants)**

253.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 252, as if fully set out herein.

254.   Through their actions as engaging in prohibited business relationships, and failing to read the screenplay before buying its rights, the Defendants engaged in grossly negligent business practices. The Plaintiff was harmed by the Defendants' gross negligence. The Defendants' gross negligence was a substantial factor in causing the Plaintiff's harm. The Defendants actions were in violation of Cal. Civ. Code § 1714(a).

255.    The Plaintiff was injured as a consequence of the Defendants' actions, in an amount to be determined at trial.

### NINTH CLAIM FOR RELIEF
VIOLATING CALIFORNIA LABOR CODE § 1700.39
(Against Emanuel, Block, MRC II Dist Co lp, Universal City Stu llc, Sony Pictures Ent Inc)

256.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through 255, as if fully set out herein.

257.   The Defendants violated **CALIFORNIA LABOR CODE SECTION 1700.39**,

1  which states, "No talent agency shall divide fees with an employer, an agent or other
2  employee of an employer." Defendant Ari Emanuel represented *Elysium*'s star Def Matt
3  Damon, and represented writer/director Def Neill Blomkamp. Defendant Ari Emanuel is
4  also an owner of MRC (the employer of Defs Blomkamp and Damon for the making of
5  *Elysium*). Thus, Emanuel divided fees as an agent and employer. In so doing the
6  Defendants violated California Labor Code 1700.39.

7     258.   The Plaintiff was injured as a consequence of the Defendants' actions, in an
8  amount to be determined at trial.

9                          **TENTH CLAIM FOR RELIEF**
                      <u>VIOLATION OF UNFAIR BUSINESS PRACTICES ACT</u>
10                         [CAL BUS & PROF CODE§ 17200, ET SEQ.]

11    **(Against Defendants Emanuel, Block, MRC II Dist Co LP, Sony Pictures Ent Inc)**

12    259.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
13  258, as if fully set out herein.

14    260.   Def Emanuel and Def Block, while acting as the CEOs of WME and Miramax,
15  respectively, secretly entered into  a private business partnership with Sony Pictures
16  Entertainment's CEO Michael Lynton, as co-owners of Screenbid, a business that said
17  Defendants then used as a subcontractor for WME, Miramax, and Sony Picture Ent. In
18  these actions the Defendants violated the California's Unfair Business Practices Act [Cal
19  Bus & Prof Code§ 17200, Et Seq.]. Further, these arrangements contributed to the negligent
20  culture that lead to the Defendants' misappropriation of the Plaintiff's work.

21    261.   The Plaintiff was injured as a consequence of the Defendants' actions, in an
21  amount to be determined at trial.

22                        **ELEVENTH CLAIM FOR RELIEF**
                              <u>WITNESS TAMPERING</u>
23    **(Against Defs Emanuel, Block, Blomkamp, MRC II Dist Co lp,, Sony Pictures Ent Inc)**

24    262.   The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through
25  261, as if fully set out herein.

26    263.   California Civil Jury Instructions (CACI) (2017) 204 makes willful suppression of
27  of evidence unlawful; stating: **"You may consider whether one party intentionally <u>concealed</u> or**
28  **destroyed evidence. If you decide that a party did so, you may decide that the evidence would have**

1  **been unfavorable to that party."**  In such actions as (1) hiring a professional "fixer" to provide

2  a falsified expert witness report, and (2) proffering a discovery statement from writer

3  Simon Kinberg stating that he merely "polished" Def Blomkamp's screenplay—when the

4  online film communication records show Kinberg performed a massive reworking of the

5  screenplay— the Defendants willfully engaged in witness tampering.

6  264.  The Plaintiff was injured as a consequence of the Defendants' actions, in an

7  amount to be determined at trial.

8           **TWELFTH CLAIM FOR RELIEF**

             <u>INFRINGING EXPORTATION</u>

9             Violating  17 USC § 602(a)(2)

10      **(Against Defendants Spacey and Brunetti)**

11  265.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

12  264, as if fully set out herein.

13  266.  By marketing and making the Plaintiff's work available around the world on the TS

14  social network website, without the Plaintiff's consent, Defendants Spacey and Brunetti

15  committed Infringing Exportation of the Plaintiff's copyrighted work, under 17 USC §

16  602(a)(2); thereby violating the Plaintiff's exclusive right to distribute his copyrighted work

17  under 17 USC 106(3), enforceable under 17 USC § 501(a): Copyright Infringement.

18  267.  The Plaintiff was injured as a consequence of the Defendants' actions, in an

19  amount to be determined at trial.

20        **THIRTEENTH CLAIM FOR RELIEF**

         <u>COPYRIGHT INFRINGEMENT</u>

21             Under 17 USC § 501(a)

21      **(Against Defendants Spacey and Brunetti)**

22  268.  The Plaintiff hereby realleges, and incorporates by reference, paragraphs 1 through

23  267, as if fully set out herein.

24  269.  By marketing and making the Plaintiff's work available around the world on the TS

25  social network website, without the Plaintiff's consent, Defs Spacey and Brunetti infringed

26  on the Plaintiff's exclusive right to distribute his work, violating 17 USC § 501(a).

27  270. The Plaintiff was injured as a consequence of the Defendants' actions, in an amount

28  to be determined at trial.

1

2    **<u>PRAYER FOR RELIEF</u>:**

3

4        WHEREFORE, Plaintiff prays for a judgment against the Defendants as follows:

5        1.   For general damages in an amount according to proof at the time of trial;

6        2.   For exemplary damages;

7        3.   For special damages in an amount according to proof at trial;

8        4.   For   restitution   and   disgorgement   of   all   profits   (estimated   at

9             $850,000,000—which represents all projected profits the Defendants will

10            realize from the misappropriation of the Plaintiff's work; see p19, para 2)

11            for the Plaintiff, consistent with US copyright remedies;

12       5.   For Plaintiff's cost of this lawsuit and reasonable attorney's fees;

13       6.   For such injunctions and additional relief the Court may deem proper.

14

15   DATED: January 2st, 2018

16

17   Respectfully Submitted,

18                          By: __/s/ Steve Wilson Briggs_____

19                               Steve Wilson Briggs

20                               Plaintiff In Propria Persona

21

21

22

23

24

25

26

27

28