| | |
|---|---|
| 1 | **Steve Wilson Briggs** |
| 2 | 681 Edna Way |
| 3 | San  Mateo, CA 94402 |
| 4 | 510 200 3763 |
| 5 | snc.steve@gmail.com |
| 6 | PLAINTIFF In Propria Persona |
| 7 | |

<div align="center">

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

</div>

| | | |
|---|---|---|
| 10 | | ) Civ No: CV 17 6552 VC |
| 11 | STEVE WILSON BRIGGS | ) **PLAINTIFF'S OPPOSITION TO** |
| 12 | Plaintiff, | ) **DEFENDANTS' MOTION TO DISMISS** |
| 13 | vs | ) **FIRST AMENDED COMPLAINT** |
| 14 | UNIVERSAL PICTURES, et al., | ) **PURSUANT TO FED. R. CIV. P. 12(B)(6)** |
| 15 | Defendants. | ) **AND/OR 12(B)(1)** |
| 16 | | ) Judge:    The Honorable Vince Chhabria |
| 17 | _____ | ) Date:    February 22th, 2018 |

) Time:    10:00 a.m.
) Courtroom:  4

18    <u>**PLAINTIFF'S OPPOSITION TO DEFENDANT NBCU'S MOTION TO DISMISS**</u>

<div align="center">

19                                   INTRODUCTION:

</div>

20          Plaintiff, Steve Wilson Briggs, hereby submits this **Opposition** to the Defendants'

21    "Motion To Dismiss First Amended Complaint Pursuant To Fed. R. Civ. P. 12(B)(6) And/Or

21    12(B)(1); Memorandum Of Points And Authorities In Support Thereof".

22          On December 28, 2017, the Defendants (Defs) submitted a flawed and misleading

23    Motion to Dismiss, which the Plaintiff successfully opposed.

24          January 2nd, 2018, Plaintiff submitted his First Amended Complaint (**FAC**): 60 pages

25    of irrefutable facts, with 39 exhibits (contracts, interrogatories, and news articles about the

26    Defs, **in their own words**). Left with no plausible denials to file a traditional Answer, the

27    Defs were forced to file a Motion To Dismiss.  Knowing any such Motion would have no

28    merit, the Defs chose a rash strategy: **file 2 simultaneous motions to dismiss** (hoping to

<div align="center">

OPPOSITION TO DEFS EMANUEL, MRC, ET AL'S MOTION TO DISMISS

</div>

1    overwhelm the Plaintiff, or frustrate the Court into granting one of these dishonest Motions).

2         The Defs' Motion(s) advance every imaginable defense and harangue that the FAC is

3    Somehow deficient, as if acrimony were an alternative to law. But the FAC is quite sound.

4         Further, contrary to the Defense Counsel's misrepresentations in their since defeated

5    previous Motion to Dismiss (misrepresentations that are argued, currently, in their associate

6    Counsel's simultaneous Motion to Dismiss) **California recognizes conspiracy** as "...a legal

7    doctrine that imposes liability..." And CA Civ Jury Instructions (CACI) 3600 explains:

8         **A conspiracy may be inferred from circumstances, including the nature of the**
         **acts done, the relationships between the parties, and the interests of the**
9         **alleged coconspirators.** [Name of plaintiff] **is not required to prove that** [name
         of defendant] **personally committed a wrongful act or that [he/she] knew all**
10        **the details of the agreement or the identities of all the other participants.**

11

12        Thus, the Plaintiff does NOT need to prove any Defendant committed any wrongful act,

13   AND a jury may INFER a conspiracy from factors such as circumstances, the nature of the

14   acts done, the relationships between the parties, and the interests of the co-conspirators

15        In concert with CACI 3600, the FAC includes details establishing circumstances,

16   Defendant relationships, nature of the acts done, and shared interests of the Defendants.

17        ALSO contrary to the misinformation in the Defense Counsel's previous Motion to

18   Dismiss that *spoliation* is not Causes of Action in California (propounded again in their

19   associate Counsel's current and simultaneous Motion to Dismiss), in fact:

20   1.  California allows spoliation claims (per *Cedars-Sinai Med. Ctr. v Superior Court*

21       (1988) 18 C4th 1, 17, 74 CR2d 248) when:

21       a.  the spoliator is not a party to the lawsuit, but a third party with a duty to

22           preserve the evidence **(as in this case)**; OR

23       b.  when the spoliation victim does not learn of the spoliation until after trial or a

24           decision on the merits **(as in this case).**

25        Two of the more interesting aspects of the Defs' dual Motions to Dismiss are:

26   1.  neither Motion mentions *Breach of Contract*;

27   2.  neither Motion denies Defs Spacey and/or Brunetti destroyed TriggerStreet.

28                                          ii

# **TABLE OF CONTENTS**

**INTRODUCTION**....................................................................................... **i**

**TABLE OF CONTENTS**........................................................................... **iii**

**TABLE OF AUTHORITIES**…………………………………………....…….. **vi**

**MEMORANDUM OF POINTS AND AUTHORITIES**................................ **1**

      **a.  LEGAL STANDARD**.................................................... **1**

           **1.  Dismissal**.................................... **1**

           **2.  Stating The Claims**.................................... **1**

**STATEMENT OF FACTS**........................................................................... **2**

          **a.  Briggs v Blomkamp (Prior Action) Facts**.................... **2**

          **b.  Briggs v Universal Pictures, et al, (Current Action) Facts**............ **2**

**ARGUMENT**................................................................................................ **7**

**I.**     **THE DEFENDANTS  FALSELY CLAIM THE FAC IS BARRED BY**
       **THE "COLLATERAL ATTACK" DOCTRINE**.................................... **4**

**II.**    **THE DEFENDANTS FALSELY OR MISTAKENLY ASSERT THAT**
       **THE  FAC IS BARRED BY THE DOCTRINE OF RES JUDICATA**............... **5**

**III.**   **THE DEFENDANTS FALSELY AND DECEIVINGLY ASSERT A RULE**
      **12(B)(6) DEFENSE THAT THE FAC SHOULD FURTHER BE DISMISSED**
      **ON THE BASIS THAT IT  FAILS TO STATE A CLAIM FOR RELIEF**
      **AGAINST DEFENDANTS**.................................................................... **7**

      **ISSUE: Defendants' Motion To Dismiss' False Statements And Deceit**........... **20**

**CONCLUSION**.......................................................................................... **22**

iii

| | |
|---|---|
| 1 | <div align="center">**TABLE OF AUTHORITIES**</div> |
| 2 | |
| 3 | **CASES** |

4 | *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)........................................................................ 1, 7, 8

5 | *Baker*, 74 F.3d 906, 910 (9th Cir.1996)..................................................................... 6

6 | *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)................................................ 1, 7, 8

7 | *Briggs v Blomkamp* (2014).....................................................................2, 6, 9, 10, 11

8 | *Briggs v Universal Pictures, et al*......................................................................... 2

9 | *Cedars-Sinai Med. Ctr. v Superior Court* (1988) 18 C4th 1, 17, 74 CR2d 248…….…..……ii

10 | *Celotex Corp. v. Edwards*.................................................................................. 4

11 | 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)...................................... 4

12 | *Conley v. Gibson*, 355 U.S. 41 (1957)................................................................1, 7

13 | *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th Cir. 1990).......... 1

14 | *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005).......................................... 1

15 | *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008)............. 1

16 | *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir.2001);

17 | *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 902 (9th Cir. 2001)...................................... 4, 6

18 | *Siegel v. Federal Home Loan Mortgage Corp.*, 143 F.3d 525, 528-29 (9th Cir.1998).......... 6

| | |
|---|---|
| 19 | |
| 20 | |
| 21 | **RULES** |

21 | Fed. R. Civ. P. 12(B)(6) i, 1, 6

22 | Fed. R. Civ. P. 12(B)(1) i

23 | Fed. R. Civ. P Rule 37................................................................................. 11

| | |
|---|---|
| 24 | |
| 25 | |
| 26 | **OTHER AUTHORITIES** |

27 | CA Civ Jury Instructions (CACI) 3600............................................................... ii

| | |
|---|---|
| 28 | <div align="center">iv</div> |

<div align="center">OPPOSITION TO DEFS EMANUEL, MRC, ET AL'S MOTION TO DISMISS</div>

| 1 | **OTHER PUBLICATIONS AND PERIODICALS** |

2 Cornell Law School's Wex Legal Dictionary................................................................ 5

3 Merriam-Webster Dictionary................................................................ 8

4 Legal Ease (legaleasesoluntions.com)................................................................ 8

5 New York Times................................................................ 12, 17

6 Slate Magazine................................................................ 13

7 The Guardian................................................................ 15

8 The Hollywood Reporter................................................................ 18

9 Deep Focus Review (deepfocusreview.com)................................................................ 19

10 Elysium: The Art of the Film................................................................ 19

11 Variety................................................................ 17

12

13

14

15

16

17

18

19

20

21

21

22

23

24

25

26

27

28

v

OPPOSITION TO DEFS EMANUEL, MRC, ET AL'S MOTION TO DISMISS

| | |
|---|---|
| 1 | **MEMORANDUM OF POINTS AND AUTHORITIES** |
| 2 | **LEGAL STANDARD** |
| 3 | DISMISSAL |

- The FRCP 12(b)(6) instructs the court must "accept factual allegations in the complaint as true and construe the pleadings **in the light most favorable to the nonmoving party**." *Manzarek v. St. Paul Fire & Marine Ins. Co*., 519 F.3d 1025, 1031 (9th Cir. 2008).

- The court must: "read the complaint generously and draw all reasonable inferences in favor of the plaintiff." *Knievel v. ESPN*, 393 F.3d 1068, 1080 (9th Cir. 2005).

- If motion to dismiss is granted, a court should grant leave to amend unless it determines the pleading could not possibly be cured by allegations of other facts. *Cook, Perkiss & Liehe v. N. Cal. Collection Serv.,* 911 F.2d 242, 247 (9th Cir. 1990).

STATING THE CLAIMS

- *Ashcroft v. Iqbal*, <u>556</u> <u>U.S.</u> 662 (2009)(citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)) stated: "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.

- Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007), made a nuanced change to Conley v. Gibson, as Twombly specified that a complaint need not contain detailed factual allegations, but only allege **"enough facts to state a claim to relief that is plausible on its face."**

- In 1957, *Conley v. Gibson*, 355 U.S. 41 established the current standard stating: **"a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"**

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

| | |
|---|---|
| 1 | <div align="center">**STATEMENT OF FACTS**</div> |
| 2 | |
| 3 | This matter has some unquantified relationship to the Prior Action *Briggs v Blomkamp*, |
| 4 | et al, CV134679-PJH. |
| 5 | |
| 6 | <div align="center">**Prior Action *Briggs v Blomkamp*:**</div> |
| 7 | ● The Complaint explained that in May of 2013, the Plaintiff walked into a movie |
| 8 | theater and saw a trailer of a soon-to-be-released film that looked almost identical to |
| 9 | the Plaintiff's screenplay. |
| 10 | ● Plaintiff sued for one (1) Cause of Action: Copyright Infringement. |
| 11 | ● The Plaintiff lost on summary judgment. |
| 12 | ● The matter is now in the Ninth Circuit Court of Appeals. |
| 13 | |
| 14 | <div align="center">**Current Action, *Briggs v Universal Pictures, et al*:**</div> |
| 15 | ● In 2016, 15 months **after** the Prior Action went to appeals, the Plaintiff learned that |
| 16 | Defs Spacey and Brunetti went to Spain and London to promote the content of their |
| 17 | **social network** TriggerStreet.com (**TS**), which was in violation of TS contract |
| 18 | Terms of Use, which stated TS was intended solely for use in the USA. (This was a |
| 19 | clear Breach of Contract, and Fraud and Copyright Infringement; thus it forms the |
| 20 | basis for this suit's Breach, Fraud and Infringement causes.) |
| 21 | ● As the Plaintiff continued to review the various contract pages he found other |
| 21 | instances of fraud and deceit; furthering the Fraud cause, and establishing other |
| 22 | causes, such as Deceit. |
| 23 | ● Approximately simultaneous to these discoveries, the Plaintiff learned that the Defs |
| 24 | closed the TS website 6 days after the Prior Action went to appeals. This was a clear |
| 25 | effort to destroy evidence. This informs both the *spoliation* and *conspiracy* claims. |
| 26 | ● Eventually the Plaintiff learned that Jeff Rovin, the man the Defendants hired as |
| 27 | their "expert" witness in Brigg v Blomkamp, went on national TV (FOX News' |
| 28 | Sean Hannity Show) to tell the world that he (Rovin) worked for years for President |

<div align="center">OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS</div>

<div align="center">**2**</div>

1   Bill Clinton's administration as a "fixer" (someone paid to write false "smear"
2   stories for tabloid news outlets about Clinton critics, and thereby make problems go
3   away).
4   ● Def Emanuel's brother, Rahm Emanuel, was Senior Advisor to  President Bill
5   Clinton.
6   ● The Plaintiff then realized Rovin "fixed" his *expert* report, to help the Defendants
7   sabotage Plaintiff's lawsuit.
8   ● With all of these facts (and MANY more). the Plaintiff took action and sued the
9   Defendants on November 13, 2017.
10  ● Rather than responding to the Complaint with a traditional Answer, the Defs
11  responded with a tenuous Motion to Dismiss.
12  ● The Defs' Motion was riddled with obvious falsehoods, errors, and oversights.
13  ● Shortly after suing the Plaintiff realized that Spacey and Brunetti's efforts to make
14  TS available in foreign markets and recruit new members around the world, made
15  the Plaintiff's work available all around the world—without the Plaintiff's consent.
16  This was a new violation of the Plaintiff's exclusive copyright to distribute his work.
17  ● The 3 year time limit to take action on copyright claims begins to count when the
18  copyright owner learns of the infringement.
19  ● The Plaintiff learned of the infringement around February of 2016. Thus, the
20  deadline to take action expires February, 2019.
21  ● In light of these new facts, the Plaintiff filed an FAC, citing Infringing Exportation
21  and Copyright Infringement among its 13 Causes of Action against the Defendants.
22  ● Filing the FAC defeated the Defendant's Motion to Dismiss.
23  ● The Plaintiff filed a Motion for Sanctions against the Defense Counsel for filing
24  such a flawed Motion to Dismiss.
25  ● The Defense Counsel opposed the Plaintiff's Motion For Sanctions.
26  ● In response to the Plaintiff's FAC, the Defs filed **2** separate, coordinated and
27  deficient Motions to Dismiss.
28  ● This forced the Plaintiff to respond with 2 opposition briefs.

1                                                   **<u>ARGUMENT</u>**:

2

3    **I.     THE DEFENDANTS  FALSELY CLAIM THE FAC IS BARRED BY THE**

4                            **"COLLATERAL ATTACK" DOCTRINE**

5        In the first of their three (3) arguments for dismissal, the Defense Counsel argues that

6    The Plaintiff's FAC is barred by the  *"Collateral Attack"* doctrine.

7        The Plaintiff's FAC is certainly not a collateral attack, as its causes of action were not

8    addressed in the Prior Action's judgment (among other failures with this defense).

9        Cornell Law's Wex Legal Dictionary defines *Collateral Attack* as an "attack on a prior

10   judgment in a new case (i.e., not by direct appeal)."

11        Such a collateral attack requires: (1) the same parties to be named in the new case;

12   (2) the same causes of action in the new action; (3) **the claims <u>must</u> <u>have</u> <u>been</u> <u>addressed</u>**

13   **<u>in a prior order or judgment.</u>**

14        None of these conditions are met between the Prior Action and the current action, as

15   this action involves new parties, new Causes, and 13 claims that were not addressed by the

16   prior judgment.  *Rein v. Providian Fin. Corp.,* 270 F.3d 895, 902 (9th Cir. 2001), explains:

> 17     **"The collateral attack doctrine precludes litigants from collaterally**
> 18     **attacking the judgments of other courts**.  See *Celotex Corp. v. Edwards*,
>         514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995) ("We have
> 19     made clear that [i]t is for the court of first instance to determine the question
>         of the validity of the law, and until its decision is reversed for error by
> 20     orderly review, either by itself or by a higher court, its orders based on its
>         decisions are to be respected.") (internal quotation marks omitted)
> 21     (alteration in original).  **Here, the collateral attack doctrine does not**
> 21     **apply to Frenette because his claims were never addressed by a prior**
> 22     **order or judgment."**

23        To support their false claim that the Plaintiff's FAC is an improper collateral attack on

24   the dismissal of the Plaintiff's prior lawsuit, the Defense Counsel made brief and superficial

25   citations of several lower court and outer court decisions. The only citation that the Defense

26   Counsel made that is relevant is the  *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 902 (9th

27   Cir. 2001) (above). However the Defense Counsel truncated their citation, quoting only the

28   first sentence of the paragraph, to mislead the Court.

## II.  THE DEFENDANTS FALSELY OR MISTAKENLY ASSERT

## THAT THE  FAC IS BARRED BY THE DOCTRINE OF RES JUDICATA

The Defense Counsel's second argument for dismissal of the FAC claims "The FAC Is Barred By The Doctrine Of Res Judicata."

This defense suggests that the Defense counsel hasn't fully read the Res Judicata doctrine, they don't fully comprehend it, or they have chosen to omit details of the doctrine in order to mislead the Court.

The conditions for raising a Res Judicata defense are clear and DO NOT apply in this case. To assist the Court, the Plaintiff provides the following definition **and examples** of Res Judicata from Cornell Law School's Wex Legal Dictionary:

Generally, *res judicata* is the principle that a <u>cause</u> <u>of</u> <u>action</u> may not be relitigated once it has been judged on the merits. "Finality" is the term which refers to when a court renders a final judgment on the merits.

*Res judicata* is also frequently referred to as "claim preclusion," and the two are used interchangeably throughout this article.

Breaking Down the Concept

Claim preclusion can be best understood by breaking it down into two sub-categories:

1.     **Bar** - a losing <u>plaintiff</u> cannot re-sue a winning <u>defendant</u> on the same cause of action

1. example: **Plaintiff P sues Defendant D on Cause of Action C**, but loses. **P may not try for better luck by initiating a new lawsuit against D on C**.

2.     **Merger** - a winning plaintiff cannot re-sue a losing defendant on the same cause of action

1.  example: **Plaintiff P successfully sues Defendant D on Cause of Action C. P may not again sue D on C to try to recover more Damages.**

The conditions for a Res Judicata defense are not present or satisfied in this matter, as the facts of this matter are entirely new, unique and separate, and give rise to new and unrelated claims for relief and Causes of Action, and involve 10 new Defendants.

1    *Rein v. Providian Fin. Corp.*, 270 F.3d 895, 902 (9th Cir. 2001), clarified:

2    Res judicata, or claim preclusion, provides that a final judgment on the
3    meritsof an action precludes the parties from relitigating all issues connected
     with the action that were or could have been raised in that action.    See In re
4    *Baker*, 74 F.3d 906, 910 (9th Cir.1996).    Claim preclusion is appropriate
5    where: (1) **the parties are identical or in privity**; (2) the judgment in the
     prior action was rendered by a court of competent jurisdiction; (3) there was a
6    final judgment on the merits;  and (4) **the same claim or cause of action was**
7    **involved in both suits.**   *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d
     708, 713 (9th Cir.2001); *Siegel v. Federal Home Loan Mortgage Corp.*, 143
8    F.3d 525, 528-29 (9th Cir.1998).

9    Once again, the conditions necessary to make a Res Judicata defense are not satisfied:

10   1.  the parties are not identical (there are 10 parties NOT named in Prior Action);

11   2.  the claims are not the same (there are 12 new claims in this matter, and the copyright
12      infringement claim is unrelated and made against different Defendants).

13    The facts and causes of actions of the two matters are not related.

14      Again, **In the Prior Action** (*Briggs v Blomkamp*) the Plaintiff walked into a movie

15   theater and saw a trailer of a movie that looked identical to his screenplay, then sued for

16   Copyright Infringement.

17      Again, **In this matter**, the Plaintiff learned—15 months after the Prior Action went to

18   appeals—that Defendants Spacey and Brunetti went to Spain and London to promote the

19   content of TriggerStreet.com (TS), in violation of TS contract Terms of Use, which stated

20   TS was intended solely for use in the USA. These events are the basis for this suit's Cause

21   of Action *Breach of Contract* and *Fraud*.

21      As the Plaintiff reviewed the various contract pages he found other instances of fraud

22   and deceit; reinforcing such Causes as Fraud and Deceit.

23      Around this same time, the Plaintiff learned that the Defendants closed the

24   TriggerStreet social network—only six (6) days after the Prior Action went to appeals;

25   hence, the spoliation claim.

26      Shortly thereafter, the Plaintiff learned that the Defs' expert witness in Briggs v

27   Blomkamp admitted on national TV (2016) that he was a "fixer"—hired to produce false

28   stories and smear people. All of this informs the conspiracy claim.

### III.   THE DEFENDANTS FALSELY AND DECEIVINGLY ASSERT
### A RULE 12(B)(6) DEFENSE THAT THE FAC SHOULD FURTHER
### BE DISMISSED ON THE BASIS THAT IT  FAILS TO
### STATE A CLAIM FOR RELIEF AGAINST DEFENDANTS

The Plaintiff's FAC stated clear Causes for Action and claims upon which relief can be granted. However, the Defense Counsel has shameless re-worded the Rule hoping to deceive the Court.

Rule 12(b)(6) reads:

**Rule 12.** Defenses and Objections: When and How Presented; Motion for Judgment on the Pleadings; Consolidating Motions; Waiving Defenses; Pretrial Hearing

**(b)** How to Present Defenses. Every defense to a claim for relief in any pleading must be asserted in the responsive pleading if one is required. But a party may assert the following defenses by motion:

**(6)  failure to state a claim <u>upon which</u> relief can be granted**;

With the law not in their favor, the Defendants have chosen to deceive the Court.

Where Rule 12(b)(6) reads: "failure to state a claim **upon which** relief can be granted", the Defense Counsel manipulates truth to argue: "fails to state a claim **for** relief," which is a standard that does not exist.

The Defense Counsel then shamelessly goes on to argue that the FAC is deficient because it does not clarify what sort of relief the Plaintiff is seeking, which is false, AND  is a dismissal standard that has NEVER EXISTED. Making this deception worse, the Defense Counsel improperly makes many out of context, abstract citations of *Ashcroft v. Iqba*l 556 U.S. 662 (2009) (often citing *Twombly* 550 U.S. 544 (2007)) to make their false defense.

To assist the Court, the Plaintiff offers the following information regarding the federal standard for stating a claim upon which relief can be granted.

For 50 years, under *Conley v. Gibson*, <u>355</u> U.S. 41 (1957), from 1957 to 2007, plaintiff's were only required to meet the **"conceivable"** standard.

1   In 2007, after *Bell Atlantic Corp. v. Twombly* 550 U.S. 544 (2007), plaintiff's are now

2   required to show sufficient facts to meet the **"plausible"** standard.

3   Merriam-Webster Dictionary definition of "Plausible":

4   **1.  superficially fair, reasonable, or valuable but often specious.**

5

6   In 2009, *Ashcroft v. Iqbal* 556 U.S. 662 refined the Iqbal standard to establish a

7   plausible case. The heart of Ashcroft v. Iqbal 556 U.S. 662 (2009) reads:

8   "Two working principles underlie our decision in Twombly. First, the tenet

9   that a court must accept as true all of the allegations contained in a

10   complaint is inapplicable to legal conclusions. ... Second, only a complaint

11   that states a plausible claim for relief survives a motion to dismiss.

12   **Determining whether a complaint states a plausible claim for relief will,**

13   **as the Court of Appeals observed, be a context-specific task that**

14   **requires the reviewing court to draw on its judicial experience and**

15   **common sense**. ... In keeping with these principles a court considering a

16   motion to dismiss can choose to begin by identifying pleadings that, because

17   they are no more than conclusions, are not entitled to the assumption of

18   truth. **While legal conclusions can provide the framework of a**

19   **complaint, they must be supported by factual allegations. When there**

20   **are well-pleaded factual allegations, a court should assume their**

21   **veracity and then determine whether they plausibly give rise to an**

21   **entitlement to relie**f. Our decision in Twombly illustrates the two-pronged

22   approach."

23   This explanation seems fairly straight forward. Legal Ease (legaleasesolutions.com), a

24   legal website for and by attorneys, summed up Twombly and Iqbal as follows:

25   "Conclusion

26   To sum up, **to win a motion to dismiss, the defendant must now show**

27   **that the plaintiff did not plead "enough facts to state a claim to relief**

28   **that is plausible" on its face**.  Though there are still differences of opinion

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

**8**

1    about construing *Iqbal*, as such, *Iqbal* brings clarity for addressing both

2    pleading standards and the standards for a motion to dismiss for failure to

3    state a claim in all civil cases in federal court."

4

5    Given the great number of detailed facts in the FAC, with 39 exhibits (included

6    contracts, emails between the Plaintiff and TriggerStreet.com, interrogatories, and news

7    articles) the Defense Counsel's defense that the FAC failed to state a claim **upon which**

8    relief can be granted, is wholly false.

9          **The FAC Made Many First-Hand Factual Allegations, Which Support**

10              **Plaintiff's Valid Claims Upon Which Relief Can Be Granted**

11    These are just SOME of the FIRST HAND facts the Plaintiff's FAC alleged:

12    1.   The Plaintiff was a member of TriggerStreet from 2006-2014.

13    2.   Six (6) days after Plaintiff filed Notice of Appeal (in Briggs v Blomkamp,

14         C134679), the Defs closed their social network TriggerStreet.com (TS) to

15         destroy evidence and records, as this was their access point in Briggs v

16         Blomkamp; Plaintiff would subpoena these records if the 9th Circuit remands

17         the matter for trial. This was **Spoliation.**

18    3.   Breach: TS's Terms Of Use stated the site was solely for use in the USA, yet

19         secretly the site operated around the world, and without consent from US

20         members, Spacey and Brunetti went to London (2002) and Spain (2009) to

21         recruit new members, touting TS's "400,000 members around the world ."

21         This was **Breach of Contract.**

22    4.   By making Plaintiff's work available in foreign markets, without Plaintiff's

23         consent, the Defs committed Infringing Exportation, infringing on the

24         Plaintiff's copyright.   This was **Copyright Infringement & Infringing**

25         **Exportation.**

26    5.   Defs boasted TS had "**industry standard**" **security**, when, in fact, they

27         removed all security features to allow themselves constant anonymous access

28         to writer's works.  This was **Fraud and Deceit.**

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

**9**

6. in 2007, the Defs added a new anti -security feature to TS, without informing members, whereby if a member—concerned about security—deleted his script from TS, the deletion would trigger the erasure of all access records. This was done to conceal the Defs accessing the Plaintiff's work (only posted in 2007). This was **Concealment**

7. Confirming this "erasure" feature, in May 2016, in an Amazon Studios forum (https://studios.amazon.com/discussions/Tx26JKEN8CYMP95 ) a former TS member recalled that this "memory dump" feature was added in 2007. (Said forum is attached to the FAC as " Exhibit D ") This was **Spoliation, Deceit, Fraud.**

8. In 2014, as Briggs v Blomkamp proceeded through discovery, the Plaintiff contacted TS to ask for their records of all the members who accessed his work. (Said email is attached to the FAC as " Exhibit E ").

9. TS replied that when his work was removed, all access records were erased. (Said email is attached to the FAC as " Exhibit F "). This expands a pattern of **Spoliation, Fraud, Deceit**, and **Concealment**.

10. Defs made wild false promises to entice new writers to TS, such as: **"Our team has been extensively researching and designing TriggerStreet.com to ensure that it encapsulates every aspect of the user's desires and needs"**. **THIS WAS FRAUD**

11. **[[** In a surreal, mobster-like twist, in Briggs v Blomkamp, rather than hiring one of thousands of California intellectual property attorneys as an expert witness, the Defs hired Jeff Rovin, a high school-educated New York "fixer" (Rovin's self description). This is the same Jeff Rovin who confessed (two years after Briggs v Blomkamp went to MFSJ) to the National ENQUIRER (October 19th, 2016), and confessed on Fox News' live telecast of The Sean Hannity Show (Oct 24, 2016), that he was a professional "fixer" who orchestrated false "smear" reports on people who disparaged President Bill and Hillary Clinton—while Bill Clinton was President. Rovin claimed he then

1   published these smear articles in tabloid newspapers. Rovin's interview with
2   Hannity can be seen at https://www.youtube.com/watch?v=L3mzoKuFN5o .
3   The story carried in countless other publications, including The Daily Beast.
4   (Said Daily Beast article is attached to the FAC as " Exhibit KK ".) (Said
5   National ENQUIRER article is attached to the FAC as "Exhibit LL".) Rovin
6   admitted that he also bribed the victims of his smears to stay quiet.
7   Shockingly, Rovin says the bribes were so effective that they rarely needed to
8   resort to other measures . In Rovin's words, " Most of the time it was just
9   money, it never had to be any threats." Witlessly, Rovin admitted threats,
10   violence—or worse—might ensue if the money wasn't accepted. Rovin went
11   on to explain he had worked as a "fixer" many times in the past. **]]**
12   **The FAC reveals:** In Brigg v Blomkamp, the Defendants paid Jeff Rovin
13   $50,000 **as a "fixer",** to use his literary talents to lie, falsify and commit
14   fraud. In Brigg v Blomkamp, Rovin's fraud was so extensive that the Plaintiff
15   moved the the court to exclude Rovin's "expert" report, as Rovin had falsified
16   dozens of citations and fabricated evidence to substantiate his own claims,
17   including a lengthy "quote" in which he fraudulently omitted 42 words—that
18   wholly countered what Rovin reported. (Said Motion to Exclude is attached to
19   the FAC as " Exhibit MM ") This was **Witness Tampering**.
20   12. The FAC uses interrogatories from Briggs v Blomkamp to make factual
21   allegations that during Briggs v Blomkamp the Defendants made Rule 37
21   violations, and prevented the Plaintiff from getting a statement from one of
22   the two *Elysium* film editors, to confirm the editor was called back in to try to
23   remove the infringement-confirming "headaches" from the film. The Plaintiff
24   asked for statements from both editors.
25
26   The FAC makes MANY more such first hand factual allegations, to support all claims
27   upon which relief can be granted.
28

**The FAC Also Uses Media Reports To Make Factual Allegations That**

**Support Claims Upon Which Relief Can Be Granted**

The Plaintiff's FAC uses news reports to to show the Defendants' violations of their TS contractual obligations to the Plaintiff, and demonstrate that a culture of reckless negligence existed/exists between and among the Defendants.

The FAC revealed the following facts to show that many Hollywood film professionals were wary about working with the Defs Satchu, Miczyk and Emanuel, and to show that many people were concerned that they were in violation of California labor codes:

**38.** In 2007, The New York Times published an article called "Tilting The Balance of Power Toward Talent Agency Clients" (by Mike Cieply), which looked at the questionable relationship Def Ari Emanuel has with MRC, among other matters. (Said article "Tilting The Balance of Power Toward Talent Agency Clients" is attached to the FAC as " Exhibit H ") The article states:

> ….representatives of several such companies said last week that they knew of no firm that has pushed its alliance with an agency as far as Media Rights. Films backed by the financier have included substantial talent from other agencies — Brad Pitt and Cate Blanchett, stars of "Babel," are represented by Creative Artists. But virtually all of the company's projects have been built around an Endeavor-backed participant, like the actor Jude Law in "Sleuth," or Hugh Jackman, in "The Tourist."According to Mr. Wiczyk and Mr. Satchu, the agency owns a minority, nonvoting stake in their company, which they declined to specify.

**39.** Reporter Cieply also interviewed other established Hollywood financiers who are wary of working with Defs Emanuel and MRC because of these questionable arrangements.

> ...some agents last week questioned whether Media Rights could be trusted not to put their proprietary information in the service of Endeavor. Others wondered if the Endeavor's ownership stake ran afoul of regulatory provisions in California law or contracts with guilds. "For us, financing opportunities are always exciting and interesting,"said Jeremy Zimmer, a partner at United Talent. Mr. Zimmer said that his agency has not done business with Media Rights,

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

1　but might do so if it was satisfied that the company's ownership and
2　influences were clear. "What becomes critical is who is the
　　management?" he asked. "What level of transparency are we going to
3　have?" Robert Jones, California's acting labor commissioner, whose
4　office regulates talent agents, said the state's labor code has a
　　provision banning conflicts of interest by agencies. The law, from a
5　time when models were sometimes sent for hair and makeup work by
6　operators with a close connection to their agencies, says that no agent
　　may refer a client for services to any entity in which the agency has a
7　direct or indirect financial interest.

8　　　The FAC reveals the following facts regarding the Defendants corrupt business

9　engagements, to show the Defendants contemplating breaking State law, and to show why

10　Universal Pictures would work with Defs Emanuel, MRC, Wiczyk and Satchu (because, as

11　Wiczyk predicted, they—Universal Pictures—were in last place):

12　　　**48.**　In 2007, Slate remembered "the memo" in an article called "How An

13　　　Agent Turned His Pie-In-The-Sky Memo into A Reality". (Said "Slate"

14　　　article is attached to the FAC as "Exhibit I"). Writer Kim Masters wrote:

15　　　...The memo predicted the decline of the studios, with filmmaking
16　　　talent as the beneficiary. He also predicted that a management
　　　　company with a lot of big stars would start to produce and own
17　　　films. "The most immediate and pressing challenge would be to get
18　　　the studios to carry the product," he said. The likelihood of a studio
　　　　boycott was remote, he said, because "whichever studio was
19　　　suffering at the time would probably break ranks in the name of
20　　　short-term self-preservation."
　　　　Hmm.
21　　　Michael Ovitz eventually tried to launch such a management
21　　　company and failed. But Wiczyk's memo said the agencies could
　　　　also carry out the change. "A similar structure could be created
22　　　which complies with the conflict-of-interest laws," Wiczyk wrote. "If
23　　　[a] fund was created as a stand-alone entity and the agency had an
　　　　arms-length service contract, they could avoid conflict-of-interest
24　　　violations… Admittedly this is a delicate issue and a tough deal to
25　　　pull off, but it's certain someone would try it ." Why? The potential
　　　　for enhancing agency commission was "too rich to ignore." In fact,
26　　　he said, an agency could double its annual revenues.

27　　　**55.**　Bronfman Jr. was in trouble in 1998, and most of Hollywood knew it.

28　　　Bronfman Jr. came to power in 1995 with Universal in 4th place among the

1     big six studios (20 Century Fox, Disney, Paramount, Warner Bros., Sony

2     Pictures, Universal Pictures). But only one year later, in 1996, Universal

3     was in last place. And last again in 1997. And in 1998, even worse: last

4     place, and Universal had one of its worst years ever, with only a 5.9%

5     market share. Stockholders were restless. (See Exhibit J .)

6

7     The FAC reveals the following events to show that Defs Ben Affleck and Matt Damon's

8 screenwriter websites was acting in coordination with the TriggerStreet social network:

9     **88.**    Thus, September 2000, only one month after the birth of Project

10    Greenlight , TriggerStreet.com (TS) was born. (Internet Archives screenshot

11    of projectgreenlight.com, showing the origin time of Project Greenlight is

12    attached to the FAC as "Exhibit O") The probability that both of the world's

13    only screenwriter/filmmaker social websites (both of which also happened

14    to be prominently celebrity-endorsed) coincidentally starting only a month

15    apart is infinitesimal.

16    **89.**    But TS would remain a closed and inactive site for 2 years, not having

17    its official "launch" party until 2002. This helped avert suspicion, kept

18    TriggerSteet from competing with Project Greenlight, and allowed TS to

19    learn from Project Greenlight's mistakes.

20    **118.**    November 6th, 2014, 6 days after the Plaintiff filed his Notice Of

21    Motion of appeal, Defs Spacey and Brunetti closed and destroyed the TS

21    social network.

22    **119.**    In 2015, almost immediately after TS closed, **Project Greenlight**

23    (which had been dead for 10 years , came back to life, with a new HBO TV

24    show, airing fall of 2015).

25    **120.**    July 2016, HBO announced the **Project Greenlight** TV show was

26    cancelled.

27    **121.**    In 2016, with the cancellation of the TV show **Project Greenlight**,

28    and with the closing of TS—with no way to gain access to original

1   screenplays to misappropriate— ProjectGreenlight .com went active, again.

2   After 10 years of online inactivity, Def Matt Damon, Ben Affleck and

3   ProjectGreenlight.com began seeking new screenplays again.

4

5   The FAC reveals facts that show Def Spacey reaped huge benefits from Universal

6   Pictures immediately after he started the TriggerStreet social network.

7   **90.**   In November 2000, as agreed, Spacey began filming KPAX. When the

8   film was released it would be the first smoking gun in this conspiracy:

9   **91.**   KPAX was released Oct 2001. It would be the first time Universal

10   Pictures EVER cast Kevin Spacey in a leading role (in fact, Universal had

11   only ever cast Spacey in one [1] film, a supporting role, ten years prior, in

12   1990, in "Henry & June"). (*Spacey was most commonly cast in Warner

13   Bros films and independent films.) Casting Spacey to star in K-PAX, a $68

14   million film, at such a low point in Spacey's career, was almost

15   inconceivable . Def Spacey wouldn't star in a film with a budget over $40

16   million for 5 more years (Superman Returns). Spacey would only appear in

17   one other Universal Pictures film, 2 years later, The Life of David Gale—

18   originally a Warner Bros (Spacey's stable) property that Universal Pictures

19   optioned. Spacey just came with the deal.

20   **93.**   After giving Project Greenlight two years to gain traction, November

21   2002, the Defendants prepared to launch TS. To attract the best

21   undiscovered writers, the Defendants planned to generate "buzz" by

22   throwing 3 huge TS "launch parties": one in New York, one in Los Angeles,

23   and one in London . (A photo of Kevin Spacey at the TS London Launch

24   party is attached to the FAC as " Exhibit P ") While in Britain, Def Spacey

25   did many interviews about TS. The Guardian featured a piece called "Cyber

26   Spacey", in which writer Sean Clarke mocked Defs Spacey's and Brunetti's

27   well-rehearsed lines. (Said Guardian article in which Def Spacey went to

28   London to discuss TS is attached to the FAC as " Exhibit Q")

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

1    **100.**    Within just a few months of TS's official launch (Nov 2002), Def
2    Spacey would receive 3 huge payments from Defs Ari Emanuel and
3    Universal Pictures (although Spacey would receive many other "benefits"
4    during the 12 year lifespan of TS):

5        **1.**   Universal Pictures would distribute "The Life of David Gale";

6        **2.**   Spacey's production company would receive distribution money for
7              "United States of Leland";

8        **3.**    after 3 long years, Spacey's production company would receive
9              $25,000,000 to produce "Beyond the Sea".

10   **101.**    In February2003 , 3 months after TS launched, Universal Pictures
11   distributed Spacey's film " The Life of David Gale" (again, originally a
12   property of Spacey's home studio, Warner Bros). This would be the last time
13   Universal Pictures would be involved in a Spacey film (to the date of the
14   filing of this Complaint). Thus, the only two Universal Pictures films
15   featuring Spacey as a lead are K-PAX , and The Life of David Gale .

16   **102**.    That same month, February of 2003 , Spacey's production company
17   would magically get money to release and distribute its first movie in 3
18   years: "United States of Leland". The film would only be released in 14
19   theaters, losing millions, and bringing in only $344,000. Likely, Universal
20   Pictures wouldn't put their name on the film, because after two bad years,
21   Universal was back in 5th place (second to last place), and they didn't want
21   United States of Leland to move them into last place.

22   **103.**    That same month, again, February2003 , it was announced that
23   production of Spacey's Dream film, "Beyond the Sea," was being
24   fast-tracked—directed by and starring Spacey and produced by Spacey's
25   production company, with a $25,000,000 budget. 104. Suddenly, in the nadir
26   of Spacey's career, inexplicably Hollywood was showing him tremendous
27   support—when 4 of Spacey's previous 5 films were major money losers.

28

1    The FAC reveals facts showing entangling relationships among the Defendants, and
2    their suspicious circumstances, actions and reactions; such as the following:

3    **114**.    On April 27th, 2009, Def Ari Emanuel and Endeavor Talent Agency
4    (ETA) merged with the William Morris Agency (WMA), creating William
5    Morris Endeavor. 17 days later , May 14th 2009, after about 20 years with
6    the William Morris Agency , Def Spacey signed with CAA (Creative Artist
7    Agency). Def Spacey did so to keep TS members (and any observing
8    regulatory authorities) from becoming suspicious of his link to Def Ari
9    Emanuel through TS. (A New York Times article about the April 2009
10   merger of WMA and Endeavor is attached to the FAC as "Exhibit U") (A
11   May 2009 Variety article about Def Spacey leaving WME is attached to the
12   FAC as " Exhibit V ")

13

14   The FAC includes text contacts between the Defendants. These texts reveal facts that
15   further illustrate the Defendants were engaged in unlawful business relationships,
16   expanding a pattern of **grossly negligent** business practices.

17   **125**.    A few of the celebrities captured on Sony Pictures email/text leak, at
18   times, behaved poorly, but no one behaved worse than, Def Emanuel.
19   Brazen and thuggish, we see Def Ari Emanuel berate Sony Pictures'
20   Chairman Amy Pascal, with impunity. And when the other Sony execs
21   learned of this, they only called Def Emanuel a bully —behind his back. No
21   one dared to confront Def Emanuel. But more surprisingly, through a tiny
22   sliver of Def Ari Emanuel's emails (just those going into, or out of, Sony
23   Pictures) we learn:

24   1. Def Ari Emanuel is a major film producer —in conflict with his role
25      as a talent agent, and in violating California labor law which forbids
26      employers (a producer) from charging employees (his actors) fees to
27      be hired—perhaps an even more significant conflict of interest than
28      Def Emanuel's partnership in MRC II LP.

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

1       **2.**  Defs Emanuel, Bill Block and Michael Lynton (then Sony Pictures

2            CEO and Chairman) are secretly business partners: co-owners in the

3            company Screenbid.

4       **3.**  Ari Emanuel is also a film financier, or executive producer (a person

5            who provides or finds money to make films).

6

7     The FAC reveals the following facts that illustrate the Defendants did not follow

8 standard best-practices or do due diligence, and bought the Elysium screenplay (the

9 contested film central to Briggs v Blomkamp) **without ever reading a scrip**t (further

10 evidence of **gross negligence**):

11     **167**.    Similarly, MRC (co-owned by Def Emanuel) and Sony Pictures

12            bought the film and distribution rights to Elysium from Def Blomkamp,

13            without ever reading a screenplay. Sony Pictures bought the rights to

14            Elysium in a hasty meeting in 2008. In this well documented meeting MRC

15            and Def Blomkamp displayed 50-60 concept art paintings of scenes from

16            Blomkamp's proposed film. The art was so persuasive that Sony Pictures

17            agreed to buy the rights, immediately, never bothering to read the script.

18            HollywoodReporter.com reported the details of the stunningly hasty

19            meeting between Blomkamp, MRC and Sony Pictures — on the very day it

20            occurred, January 19, 2011. MRC scheduled meetings with several other

21            distributors that same day, but Sony Pictures was so rushed and eager to

21            buy the film that MRC canceled all other distribution meetings scheduled

22            that day. The Hollywood Reporter article carefully reports the "art designs"

23            that secured this deal, but never mentions a "screenplay" or a "script".

24            (Said Hollywood Reporter article about Blomkamp, MRC closing the deal

25            with Sony Pictures is attached to the FAC as " Exhibit EE ".) This same

26            meeting and concept art were also recounted in the book "Elysium: The Art

27            of the Film" —a book primarily made up of interviews with Def

28            Blomkamp, himself . On August 6th, 2013, Deep Focus Review

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

1   (deepfocusreview.com) reviewed the book "Elysium: The Art of the Film",

2   reflecting on this meeting. (Said Deep Focus Review article is attached to

3   the FAC as " Exhibit FF ") Upon interviewing Blomkamp, the Deep Focus

4   Review article revealed that Defs Blomkamp and MRC staged 50-60

5   concept art paintings "and set them against the screenplay", explaining:

6   "On the strength of these images—not to mention the strength of his first

7   film, District 9 —he garnered himself a $100 million budget and signed

8   stars Matt Damon and Jodie Foster."

9   **168.**    The Defendants used the amazing artwork to strategically distract

10   attention from the flawed screenplay. Sony Pictures took the bait. Within an

11   hour or so, a deal for about $115 million was made, and no executive from

12   Sony Pictures ever read a script. MRC didn't do due diligence because

13   Defendant Ari Emanuel was a co-owner of MRC and Def Blomkamp's

14   personal agent; thus, they stood to make millions from the deal. Sony

15   Pictures failed to do due diligence because CEO Michael Lynton had an

16   improper, secret business partnership with Def Emanuel (Screenbid.com),

17   and wanted to maintain good relations with Defs Emanuel and MRC—and

18   make millions without regard for whose work they pirated.

19

20   The FAC alleges many more facts supporting claims upon which relief can be granted.

21   Near the end of the FAC, the "Summary" section also reviews the 17 major **episodes**

21   (Acts) that the Defendants engaged in. The aggregate factual allegations that comprise each

22   of these Acts support all claims upon which relief can be granted.

23   In the FAC's final CLAIMS FOR RELIEF section, all the facts of the preceding 50+

24   pages are then realleged into each Claim For Relief. Therefore, the Defendants' defense that

25   the Plaintiff failed to state a claim upon which relief can be granted, is entirely false.

26   **All of this affirms that the FAC successfully makes sufficient plausible factual**

27   **claims upon which relief can be granted.**

28

**ISSUE:**

**Defendants' Motion To Dismiss**

**False Statements And Deceit**

The Defendants' Motion to Dismiss makes many false assertions. The Plaintiff will only trouble the Court to address a two of these willfully false statements.

1. On page 6 of the Memorandum of their Motion to Dismiss, the Defendants state that the Plaintiff seeks the same relief in this matter as he sought in the Prior Action:

> "Indeed, the FAC's prayer for relief seeks "restitution and disgorgement of all profits [from Elysium] (estimated at **$850,000,000**— which represents all projected profits the Defendants will realize from the misappropriation of the Plaintiff's work)." FAC p. 60. These are the same damages for copyright infringement that Plaintiff sought in the Prior Action."

**BUT IN FACT,** In *Briggs v Blomkamp* the Plaintiff made no specific request for financial relief. AND the Plaintiff only reported that the Defendants earned $161,000,000 in profit from the film *Elysium*.

2. On page 13 of the Memorandum of their Motion to Dismiss, the Defendants make the following false statements, which suggest that the Plaintiff conceded that Defs Spacey and Brunetti created TriggerStreet.com alone:

   a. "**Many of Plaintiff's allegations concede that Spacey and Brunetti alone were the creators and operators of triggerstreet.com.**"
      (page 13, para 2 of their motion to dismiss)

   b. "**Similarly, several of Plaintiff's causes of action tacitly concede Spacey and Brunetti were alone responsible for triggerstreet.com.**" (page 13, para 3 of their motion to dismiss)

**BUT IN FACT**, the Plaintiff never made any such concession, but for rhetoric. In the following passages from the FAC the Plaintiff vociferously and repeatedly states his belief that other Defendants/conspirators designed and created the TriggerStreet:

| | |
|---|---|
| 1 | (FAC page 2, para 1, item 2) |
| 2 | 2.  Defs Spacey and Brunetti (likely acting at Def Emanuel's behest) created |
| 3 | the social network, TS, to secretly and unlawfully access, appropriate and alter |
| 4 | the original works of undiscovered writers. The Defs financially profited from |
| 5 | these activities, or received film acting roles, or film production or distribution |
| 6 | benefits. |
| 7 | |
| 8 | (FAC page 5, para 20) |
| 9 | 20.   The Defendants conspired to create and operate (for 12 years) a social |
| 10 | network for screenwriters and filmmakers, known as TriggerStreet (referred to |
| 11 | as TS in this Complaint)... |
| 12 | |
| 13 | (FAC page 8-9, para 33 and 34) |
| 14 | KEVIN SPACEY (Defendant) |
| 15 | 33.   Defendant Kevin Spacey is an Academy Award winning actor. His career |
| 16 | was floundering and at its nadir in 2000 when the conspiracy(s) detailed |
| 17 | herein began, and when, purportedly, he and Def Brunetti conceived of TS. |
| 18 | Def Spacey, who dropped out of Juilliard School in his sophomore year, has |
| 19 | no known web-design skills. Seemingly, Spacey's only value to the TS social |
| 20 | network was as a high-profile, semi-likeable celebrity whose promise of |
| 21 | "industry access and exposure" would lure the best undiscovered writers to |
| 21 | the website, to unwittingly surrendering their wares to the Defendants. |
| 22 | DANE BRUNETTI (Defendant) |
| 23 | 34.   Defendant Brunetti has no known college education. He joined the US |
| 24 | coast guard in 1992, at 18 or 19. Brunetti met Spacey around 1998, while |
| 25 | Brunetti was selling cell phones in New York. Brunetti soon became Spacey's |
| 26 | partner and personal assistant. It is purported around the internet (including on |
| 27 | Wikipedia) that Brunetti was responsible for designing TriggerStreet.com. That |
| 28 | is possible. However, there is no evidence that Brunetti possessed any of the |

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS

skills required to design a social network. **The Plaintiff suspects Def Asif Satchu (who founded the internet-based marketplace SupplierMarket.com) may be the website's true designer and talent coordinator.**

(FAC page 17-18, para 77)

77.     It's possible that during these tough times, Spacey and Brunetti looked around online for affordable scripts for Spacey's production company to film. And maybe then they stumbled upon Writers Script Network.com , which inspired them to create TS... Then, this unlikely pair—a college dropout actor whose career was on life support, and a cellphone salesman—teamed up to create a massive social network for screenwriters and filmmakers. And soon Ari Emanuel learned about the site and asked Spacey to make some modifications: relaxing security, and making access private and untraceable. That could be how TS was created. It makes little difference to the conspiracy that followed.

78.     However, the Plaintiff believes TS was formed in a conspiracy conceived by Def Ari Emanuel, to enrich himself and his conspirators…

## CONCLUSION:

For the foregoing reasons, the Plaintiff respectfully asks the Court to deny the Defendants' Motion To Dismiss and Memorandum Of Points And Authorities.

Dated:  January 30, 2018

    Respectfully Submitted,

                                By:  /s/ Steve Wilson Briggs      ___

                                Steve Wilson Briggs

                                Plaintiff, In Propria Persona

OPPOSITION TO DEFS EMANUEL, MRC, ET AL, MOTION TO DISMISS